Appeal No. 2017-1333

# United States Court of Appeals
*for the*
# Federal Circuit

OREXO AB, OREXO US INC.,

*Plaintiffs-Appellants,*

– v. –

ACTAVIS ELIZABETH LLC,

*Defendant-Appellee.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF DELAWARE IN CASE NO. 1:14-CV-00829-SLR-SRF
SUE L. ROBINSON, UNITED STATES DISTRICT JUDGE

## NON-CONFIDENTIAL BRIEF FOR PLAINTIFFS-APPELLANTS

ERROL B. TAYLOR
FREDRICK M. ZULLOW
ANNA BROOK
JORDAN P. MARKHAM
MILBANK, TWEED, HADLEY
& MCCLOY LLP
28 Liberty Street
New York, New York 10005
(212) 530-5000

*Attorneys for Plaintiffs-Appellants*

Originally filed: February 6, 2017
Corrected: February 7, 2017

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Orexo AB **v.** Actavis Elizabeth LLC

Case No. 17-1333

## CERTIFICATE OF INTEREST

Counsel for the:
☐ (petitioner) ☒ (appellant) ☐ (respondent) ☐ (appellee) ☐ (amicus) ☐ (name of party)

Orexo AB and Orexo US, Inc.

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10 % or more of stock in the party |
|---|---|---|
| Orexo AB | Orexo AB | none |
| Orexo US, Inc. | none | Orexo AB |
| | | |
| | | |
| | | |
| | | |
| | | |

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (**and who have not or will not enter an appearance in this case**) are:

Milbank, Tweed, Hadley & McCloy LLP: Ryan Hagglund, Nangah Tabah, Jenny Shum, Kyanna Lewis
Morris, Nichols, Arsht & Tunnel LLP: Jack Blumenfeld, Derek Fahnestock, Jeremy Tigan
Fitzpatrick, Cella, Harper & Scinto: Bruce Haas, Henry Renk, Michael McGraw, James Tyminski

Dec 23, 2016
Date

/s/ Errol B. Taylor
Signature of counsel

Please Note: All questions must be answered

Errol B. Taylor
Printed name of counsel

cc: Counsel for Actavis Elizabeth LLC

Reset Fields

Case: 17-1333 Document: 21 Page: 2 Filed: 12/23/2016


# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on December 23, 2016
by:

- ☐ U.S. Mail
- ☐ Fax
- ☐ Hand
- ☒ Electronic Means (by E-mail or CM/ECF)

| Errol B. Taylor | /s/ Errol B. Taylor |
|---|---|
| Name of Counsel | Signature of Counsel |

| | |
|---|---|
| Law Firm | Milbank, Tweed, Hadley & McCloy, LLP |
| Address | 28 Liberty St. |
| City, State, Zip | New York, NY 10005 |
| Telephone Number | 212-530-5545 |
| Fax Number | 212-822-5545 |
| E-Mail Address | etaylor@milbank.com |

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

Reset Fields

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES…………………………………………………iv

STATEMENT OF RELATED CASES……………………………………..vii

JURISDICTIONAL STATEMENT………………………………………...viii

PRELIMINARY STATEMENT ....................................................................1

STATEMENT OF ISSUES ............................................................................7

STATEMENT OF THE CASE.......................................................................7

STATEMENT OF FACTS .............................................................................8

I. The ’330 patent. ...........................................................................8

A. The ’330 patent covers Orexo’s Zubsolv® sublingual tablet for the treatment of opioid addiction. ........................................8

B. The ’330 patent claims a sublingual tablet with a unique structural arrangement of ingredients. .................................................9

C. The ’330 patent’s claimed structural arrangement provides increased bioavailability while maintaining the optimal 4:1 buprenorphine:naloxone ratio. ........................................11

II. The prior art addressed by the district court. ..............................................13

A. Suboxone® tablets.....................................................................13

B. Orexo’s ’443 publication. ................................................................15

C. The ’832 patent (Suboxone® film). ...................................................16

III. The patent examiner’s reasons for allowance emphasized that the prior art now at issue did not teach the ’330 patent’s claimed structural arrangement or how to achieve improved bioavailability in a sublingual tablet. ..........................................................20

IV. The district court’s rulings. .......................................................................21

SUMMARY OF THE ARGUMENT ....................................................................23

ARGUMENT ..............................................................................................26

I. Standard of review. .................................................................................26

II. Issue 1: The district court committed reversible legal and factual errors in ruling that buprenorphine particles in contact with, adhered to, and separate from citric acid carrier particles are obvious. ...............................................................................27

A. No prior art disclosed incorporation of citric acid as claimed or provided a reason to do so. ..........................................27

B. The district court erred by relying solely on *ipse dixit* expert testimony to show elements missing from the prior art inherently appear. .........................................................30

1. Dr. Dyar's *ipse dixit* testimony is legally insufficient evidence for a finding of obviousness by clear and convincing evidence. ...........................................32

2. Dr. Dyar's unsupported assertion that citric acid is "the right size" is devoid of support and clearly contradicted by the evidence. ..........................................36

3. Even accepting Dr. Dyar's unsubstantiated and inaccurate statement regarding citric acid particle size, Actavis did not prove inherency. ..................................38

C. The district court's findings that skilled artisans knew *how* to formulate (and that prior art does not teach away from) *interactive mixtures* fails to address the claimed *structural arrangement* missing from the art. ....................................45

III. Issue 2: The district court committed reversible legal error by holding that '832 patent disclosures relating to naloxone absorption and the 4:1 ratio were "irrelevant" and ignoring other evidence against combining references. ..............................................49

A. The '832 patent's teaching that citric acid negatively impacts naloxone absorption and maintaining the 4:1 ratio is legally relevant to no motivation to combine. .........................49

B. The district court inconsistently relied on the impact of citric acid on buprenorphine absorption while disregarding its impact on naloxone absorption. ................................52

C. The negative impact of citric acid on maintaining the 4:1 buprenorphine:naloxone ratio is also legally relevant to objective indicia. ........................................................................53

D. The district court compounded its errors by ignoring other evidence that a skilled artisan would not use citric acid in the claimed structural arrangement. ........................................54

CONCLUSION..........................................................................................60

CONFIDENTIAL MATERIAL STATEMENT:

The material redacted on page 56 of this brief is subject to a protective order and was designated as confidential by Actavis Elizabeth LLC.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) .....33

*Allergan, Inc. v. Sandoz Inc.*,
726 F.3d 1286 (Fed. Cir. 2013) .....44

*Arendi S.A.R.L. v. Apple Inc.*,
832 F.3d 1355 (Fed. Cir. 2016) .....33, 34, 35

*Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*,
119 F.3d 953 (Fed. Cir. 1997) .....57

*Ashland Oil, Inc. v. Delta Resins & Refractories, Inc*.,
776 F.2d 281 (Fed. Cir. 1985) .....33, 38

*In re Berg*,
320 F.3d 1310 (Fed. Cir. 2003) .....58

*Cephalon, Inc. v. Watson Pharm., Inc.*,
707 F.3d 1330 (Fed. Cir. 2013) .....*passim*

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*,
676 F.3d 1063 (Fed. Cir. 2012) .....35, 49

*Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*,
471 F.3d 1369 (Fed. Cir. 2006) .....53

*Genetics Inst., LLC v. Novartis Vaccines & Diagnostic, Inc.*,
655 F.3d 1291 (Fed. Cir. 2011) .....52

*In re Gordon*,
733 F.2d 900 (Fed. Cir. 1984) .....48

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016) .....6, 25, 50, 51

*InTouch Techs., Inc. v. VGo Commc'ns, Inc.*,
751 F.3d 1327 (Fed. Cir. 2014) ....................25, 26, 47

*K/S Himpp v. Hear-Wear Techs., LLC*,
751 F.3d 1362 (Fed. Cir. 2014), *cert. denied*, 135 S. Ct. 1439, 191 L. Ed. 2d 368 (2015) .................... 32-33, 34, 35

*KSR Int'l. Co. v. Teleflex, Inc.*,
550 U.S. 398 (2007) .................... 47-48

*McGinley v. Franklin Sports, Inc.*,
262 F.3d 1339 (Fed. Cir. 2001) ....................50

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
520 F.3d 1358 (Fed. Cir. 2008) ....................53

*Panduit Corp. v. Dennison Mfg. Co.*,
810 F.2d 1561 (Fed. Cir. 1987) ....................6, 25, 52, 55

*PAR Pharm., Inc. v. TWI Pharm., Inc.*,
773 F.3d 1186 (Fed. Cir. 2014) ....................*passim*

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
522 F.3d 1299 (Fed. Cir. 2008) ....................58

*Pozen Inc. v. Par Pharm., Inc.*,
696 F.3d 1151 (Fed. Cir. 2012) ....................26

*Preemption Devices, Inc. v. Minn. Mining & Mfg. Co.*,
732 F.2d 903 (Fed. Cir. 1984) ....................53

*In re Rijckaert*,
9 F.3d 1531 (Fed. Cir. 1993) ....................*passim*

*In re Roberts*,
470 F.2d 1399 (CCPA 1973) ....................48

*Sanofi-Aventis Deutschland GmbH v. Glenmark Pharm. Inc., USA*,
748 F.3d 1354 (Fed. Cir. 2014) ....................56

*In re Sullivan*,
498 F.3d 1345 (Fed. Cir. 2007) ....................53

*In re Swanson*,
540 F.3d 1368 (Fed. Cir. 2008) ....................................................................33

*Takeda Chem. Indus., Ltd. v. Alphapharm Pty.,Ltd.*,
492 F.3d 1350 (Fed. Cir. 2007) ....................................................................51

*Upjohn Co. v. Mova Pharm. Corp.*,
225 F.3d 1306 (Fed. Cir. 2000) ....................................................................36

*In re Wesslau*,
353 F.2d 238 (C.C.P.A. 1965)......................................................................55

*In re Zurko*,
258 F.3d 1379 (Fed. Cir. 2001) ....................................................................33

**Statutes**

35 U.S.C. §100 et seq..................................................................................7

35 U.S.C. § 316(e) ........................................................................................33

Hatch-Waxman Act, 21 U.S.C. §355(j)..........................................................7

**Other Authorities**

U.S. Patent No. 8,454,996..............................................................7, 8, 21, 29

U.S. Patent No. 8,475,832...................................................................*passim*

U.S. Patent No. 8,940,330...................................................................*passim*

## STATEMENT OF RELATED CASES

No other appeal in or from this civil action was previously before this or any other appellate court.

U.S. Patent No. 8,940,330 (the "'330 patent") is asserted by Orexo against Actavis in litigation in the U.S. District Court for the District of Delaware, C.A. Nos. 15-996-GMS-SRF and 16-062-GMS-SRF. The outcome of this Court's decision regarding the '330 patent will affect these cases.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over this patent infringement action under 28 U.S.C. §§ 1331, 1338(a) and 1400(b). The district court entered a final judgment on November 15, 2016 (Appx11769), entered an amended final judgment on December 9, 2016 (Appx1-2), Orexo timely appealed the final judgment on December 7, 2016 (Appx11770), and Orexo timely appealed the amended final judgment on December 9, 2016 (Appx11778-11780). This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## PRELIMINARY STATEMENT

Orexo appeals the district court's judgment that claims 1, 3-6 and 8-10 of the '330 patent are invalid as obvious. The '330 patent describes and claims Zubsolv® sublingual tablets, a new formulation for treating opioid addiction.

Zubsolv® tablets contain a combination of the opioid analgesic buprenorphine, and the opioid antagonist naloxone. Unlike the prior art, the '330 patent claims require a novel structural arrangement that provides simultaneous and proportional enhancement in the bioavailability of both active ingredients. As a result, the claimed tablets maintain the therapeutically optimal 4:1 buprenorphine: naloxone ratio, which in turn: (1) ensures that the tablet includes enough naloxone to antagonize (or block) the effects of the opioid buprenorphine when it is abused/injected; but (2) does not contain too much naloxone such that it inhibits buprenorphine's ability to treat addiction when taken appropriately (sublingually). The enhanced bioavailability of the '330 patent compositions permits formulations containing significantly lower amounts of potentially harmful opioids compared to prior art formulations, and reduces opioid exposure for patients and society.

The '330 patent claims a formulation that requires citric acid carrier particles with buprenorphine adhered to their surfaces by interactive forces (dependent claim 6) and separate particles of buprenorphine and citric acid in contact with

each other (all asserted claims). No prior art reference touches upon the use of citric acid particles as carrier particles (claim 6). And no prior art discloses or suggests the importance of a structure with separate particles of buprenorphine in contact with citric acid (all claims). Nevertheless, the district court held these features were obvious.

The district court's judgment should be reversed for at least two reasons. ***First***, the district court committed legal error by not requiring clear and convincing evidence to hold the '330 patent claims obvious. Lacking a teaching of the '330 patent's claimed structural arrangement, the district court legally and factually erred by relying on a theory (supported only by Actavis's expert's *ipse dixit* testimony) that these features would necessarily be formed if Suboxone® tablet prior art were combined with interactive mixture prior art.

The structural arrangement required by '330 claim 6 (citric acid carrier particles to which buprenorphine microparticles are adhered by interactive forces) and claim 1 (separate particles of citric acid and buprenorphine in contact with each other) ***is entirely absent from the art***. Suboxone® tablets—prior art commercial buprenorphine/ naloxone sublingual tablets—included citric acid ***but not in separate particulate form*** (in Suboxone® tablets, the buprenorphine and citric acid are dissolved together, and are therefore not in separate particles; the citric acid certainly does not act as carrier particles to which buprenorphine

microparticles are adhered by interactive forces. Another prior art reference, Orexo's Application No. US 2010/0129443 (the "'443 publication"), taught a buprenorphine/naloxone sublingual tablet with carrier particles that are made from naloxone and (optionally) materials other than citric acid, but ***does not mention citric acid at all <u>or in any form</u>***.

Left with these deficiencies in the art, the district court followed Actavis's expert in simply assuming that combining Suboxone® tablet art with the '443 publication (reformulating Suboxone® tablets as an interactive mixture) would necessarily yield the claimed invention despite no mention or suggestion in these references (or any prior art reference) of the claimed structural arrangement or reason to use it. ***Filling missing limitations in this manner amounts to a finding of inherency in the obviousness context, requiring a high standard of proof that Actavis did not come close to meeting***: "The mere fact that a certain thing ***may*** result from a given set of circumstances is not sufficient [to establish inherency]." *In re Rijckaert*, 9 F.3d 1531, 1534 (Fed. Cir. 1993) (emphasis in original) (quotation and citation omitted); *see also PAR Pharm., Inc. v. TWI Pharm., Inc.*, 773 F.3d 1186, 1195 (Fed. Cir. 2014).

Actavis and the district court relied entirely on *ipse dixit* expert testimony consisting of ***two statements, nine lines, and no support from any documentary evidence***. Such *ipse dixit* testimony "cannot be enough to constitute clear and

convincing evidence" and the district court committed reversible legal error by relying on it as such. *Cephalon, Inc. v. Watson Pharm., Inc.*, 707 F.3d 1330, 1338-39 (Fed. Cir. 2013).

Besides being entirely unsupported, the *ipse dixit* testimony was clearly wrong as a factual matter, incomplete, and wholly inadequate to prove inherency in the obviousness context. Actavis's expert testified that if Suboxone® tablets were reformulated as an interactive mixture according to the '443 publication, citric acid would act as carrier particles because the citric acid in Suboxone® tablets is "the right size" to act as carrier particles. But there is absolutely ***no evidence*** (other than Actavis's expert's *ipse dixit* testimony) regarding the size of citric acid particles in the prior art. In fact, documentary evidence relied on by Orexo's expert and the '330 patent examiner shows unequivocally that the ***citric acid in Suboxone® tablets does not exist as particles separate from buprenorphine at all***, much less as particles of "the right size" to act as carrier particles.

In addition, even if the above were not the case, Actavis's expert did not address other conditions that would be necessary for citric acid to act as a carrier particle. All experts testified (with support from the prior art) that the active ingredient must be mixed ***with the carrier particle ingredient (e.g., citric acid) under the right conditions*** to form an interactive mixture. This is critical, since

Actavis's expert did not provide any motivation or reason to use citric acid as the carrier particle in his proposed interactive mixture.

Thus, even accepting the proposed combination, there is a complete failure of proof that citric acid would act as carrier particles with buprenorphine adhered by interactive forces as required by claim 6. Importantly, the district court was silent with regard to—and there is no record evidence separately addressing—the obviousness of claim 1's requirement for separate particles of buprenorphine in contact with citric acid. Therefore, Actavis's failure of proof for claim 6 is also a failure of proof for claim 1.

The district court committed reversible legal and clear factual error by relying on Actavis's expert's *ipse dixit*, inaccurate, and incomplete testimony as clear and convincing evidence that the claimed structural arrangement was inherent or obvious in the prior art combination(s) at issue.

***Second***, the district court legally erred by expressly disregarding prior art teaching away from the '330 patent's claimed structural arrangement. U.S. Patent No. 8,475,832 (the "'832 patent") teaches it is not possible to increase buprenorphine absorption without simultaneously increasing naloxone absorption to unacceptable levels, resulting in the loss of an important product feature, the 4:1 buprenorphine:naloxone ratio. But, the district court held that the '832 patent's teaching away regarding unacceptably increased naloxone absorption is

"irrelevant" because it relates to an unclaimed feature. That holding was reversible legal error: Unclaimed features may be "central to no motivation to combine." *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1368 (Fed. Cir. 2016).

And, the district court's selective reliance on the '832 patent's teaching regarding buprenorphine absorption (that it is changed by citric acid) while ignoring the corresponding teaching regarding naloxone absorption (that it is negatively impacted by citric acid) violated the requirement that prior art be considered "as a whole." *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1568 (Fed. Cir. 1987). The district court also legally erred by failing to consider the '330 patent invention's unexpected maintenance of the 4:1 ratio as an objective indicium of nonobviousness.

Finally, the district court compounded these reversible errors by remaining silent on other teachings in the prior art. For example, citric acid promotes salivation, which conflicts with the use of interactive mixtures and disintegrants as required by claims 1 and 6. And, citric acid causes extremely high buprenorphine degradation levels in a binary dry mix. And, the district court clearly erred by not addressing why the examiner's reasons for allowance (expressly addressing the same art asserted by Actavis) were wrong.

## STATEMENT OF ISSUES

1. Whether the district court committed reversible legal and clear factual error in ruling that Actavis proved by clear and convincing evidence that the asserted ’330 patent claims were obvious based on *ipse dixit* expert testimony to allege missing patent claim limitations would inherently be present if prior art references are combined.

2. Whether the district committed reversible legal error by expressly disregarding the negative impact of a prior art disclosure because that disclosure related to an unclaimed feature and ignoring other evidence that provided reasons not to combine.

## STATEMENT OF THE CASE

This was a patent infringement action brought pursuant to the Hatch-Waxman Act, 21 U.S.C. § 355(j) and 35 U.S.C. § 100 et seq. On June 26, 2014, Orexo filed suit against generic drug manufacturer Actavis over its ANDA No. 206258 seeking FDA approval to sell a generic version of Orexo’s Zubsolv® products prior to expiration of U.S. Patent No. 8,454,996 (the “’996 patent”). The ’330 patent issued on January 27, 2015. On May 1, 2015, Orexo amended the complaint to add the ’330 patent. On August 31, 2015, the district court held a claim construction hearing. On October 6, 2015, the district court issued a claim construction order. Appx4835-4839.

Following a bench trial in June 2016, the district court adjudged the ’996 patent valid and infringed but held the ’330 patent invalid for obviousness. Appx1-71; Appx11769. Orexo appeals the district court’s judgment that the asserted ’330 patent claims are invalid.

## STATEMENT OF FACTS

### I. The ’330 patent.

#### A. The ’330 patent covers Orexo’s Zubsolv® sublingual tablet for the treatment of opioid addiction.

Opioid addiction is a major and growing issue in the United States. The ’330 patent discloses and claims Zubsolv®, a sublingual tablet used to treat opioid addiction. Appx6530 at 53:7-14. The ’330 patent’s claimed structural arrangement allows Zubsolv® to achieve improved bioavailability (and have a reduced dose) compared to prior art products while maintaining the therapeutically optimal 4:1 buprenorphine:naloxone ratio. Appx51-71 at 12:29-55, 14:61–15:12, 17:35–19:63, 23:13-28, Figs. 1 & 3; Appx6532 at 58:16-21; Appx6533 at 62:20–63:17.

Zubsolv®’s two active ingredients have different roles. Buprenorphine is an opioid agonist and analgesic used to treat dependence on other opioids, like heroin and prescription pain treatment medication. Appx60 at 1:54-64. However, buprenorphine itself is a potential target for abuse. Appx60 at 2:17-36, 1:41-53. Patients may solubilize buprenorphine products and inject them. *Id*. Therefore,

naloxone is included in Zubsolv® to address potential abuse. Naloxone is an opioid antagonist that reverses the effects of opioid analgesics. Appx60 at 1:65–2:4. Naloxone has poor bioavailability when administered transmucosally (e.g., under the tongue), but is rendered fully bioavailable when administered by injection. *Id*. If a buprenorphine/naloxone combination product is taken as intended (sublingually), the small amount of naloxone that is absorbed does not interfere with buprenorphine's intended effect. Appx60 at 2:13-16. If the product is dissolved and injected by an abuser, the increased availability of naloxone reverses the effects of buprenorphine and causes opioid withdrawal symptoms. Appx60 at 2:17-22. A 4:1 buprenorphine:naloxone ratio (the ratio in Zubsolv®) is recognized to provide the therapeutically optimal balance for sublingual treatment and abuse deterrence. Appx64-65 at 10:27-30, 12:43-55; Appx71 at 23:17, 23:25; Appx6532 at 58:16-21.

### B. The '330 patent claims a sublingual tablet with a unique structural arrangement of ingredients.

The '330 patent claims a sublingual tablet formulation with a novel, nonobvious structure, form, and placement of citric acid in relation to buprenorphine that exhibits unexpected benefits. In addition to buprenorphine and citric acid, the claims also require naloxone and a superdisintegrant. It was undisputed that the claimed ingredients, while known, were never combined in a

single formulation and were certainly not combined with the ’330 patent’s claimed structural arrangement.

’330 patent claim 1 requires tablets for sublingual administration comprising (1) “microparticles of a pharmacologically-effective amount of buprenorphine … presented upon the surface of carrier particles,” where (2) “microparticles of buprenorphine … are in contact with particles comprising citric acid, wherein the buprenorphine … and the citric acid are not in the same particle,” (3) naloxone, and (4) at least one of three identified superdisintegrants. Appx71 at 24:17-31. Thus, with regard to citric acid, claim 1 requires separate particles of buprenorphine and citric acid in contact with each other. The other asserted claims (claims 3-6 and 8-10) depend from claim 1 and therefore also require this structural arrangement.

Claim 6 depends from claim 1 and further limits the carrier particles to citric acid: “the particles of citric acid are presented and act as carrier particles.” Appx71 at 24:42-44. While the district court broadly construed “carrier particles” to mean “particles comprising one or more pharmaceutically acceptable substances” (Appx4835), other claim limitations require a specific structural relationship between the citric acid carrier particles of claim 6 and buprenorphine. For example, claim 1 requires microparticles of buprenorphine be “presented upon the surface of carrier particles,” which the district court construed to mean that

buprenorphine microparticles be "positioned at the outside part or layer of the carrier particles by interactive forces strong enough to keep the adherent particles at the carrier surface." Appx4836. Thus, as construed by the district court, claim 6 requires that microparticles of buprenorphine are adhered to the surfaces of citric acid carrier particles by interactive forces.

### C. The '330 patent's claimed structural arrangement provides increased bioavailability while maintaining the optimal 4:1 buprenorphine:naloxone ratio.

Based on a clinical study, Orexo's Zubsolv® prototype ('330 patent Example 2) exhibits 66% improved buprenorphine bioavailability compared with prior art Suboxone® tablets. Appx68-69 at 17:35–19:63; Appx51-52 at Figs. 1 & 3. Significantly, this clinical study showed that the patented formulation was able to increase bioavailability of buprenorphine and naloxone to the same degree and therefore maintain the therapeutically optimal 4:1 buprenorphine:naloxone ratio at the same time as increasing bioavailability. Appx6532 at 58:16-21; Appx6733-6734 at 625:17–627:2. It is the structural arrangement required by the '330 patent claims that surprisingly provides roughly equivalent absorption enhancement for both the buprenorphine and naloxone. *Id.*; Appx65 at 12:43-55. Zubsolv®, another preferred embodiment described in '330 patent examples 7 and 8, also contains a 4:1 buprenorphine: naloxone ratio but uses 29% less of these active ingredients

than therapeutically equivalent Suboxone® tablets. Appx6533 at 62:20–63:17; Appx10811; Appx71 at 23:13-28.

It was undisputed that the benefits of Zubsolv® are the result of the claimed structural arrangement between particles in the product, including citric acid carrier particles (claim 6) and separate particles of buprenorphine and citric acid in contact with each other (claim 1). Appx6537-6542 at 80:18–81:22, 89:22–90:10, 93:11-14, 94:24–95:15, 99:16-19; Appx6770-6777 at 644:2-8, 655:20–656:3, 670:10-19; Appx65-66 at 12:43-55, 14:59–15:12. The inventor of the ’330 patent explained, Orexo’s expert Dr. Sinko agreed, and Actavis’s expert Dr. Dyar did not dispute, that the claimed structural arrangement results in a novel and surprising “pH timing effect.” *Id*.

The pH timing effect (illustrated in ’330 patent figures 5, 6, 8, and 9) explains how the ’330 patent’s claimed structural arrangement provides a dynamic pH profile, enhanced dissolution and absorption, that ultimately gives improved bioavailability. Appx55-59 at Figs. 5, 6, 8, 9; Appx65 at 12:43-55; Appx70-71at 21:38–22:36, 23:30–24:14; Appx6539-6541 at 88:25–95:15; Appx6773-6777 at 655:20–660:15, 670:13–671:11; Appx6800 at 761:14–763:8; *see also* Appx7067-07068; Appx7076. It was undisputed that ***the claimed structural arrangement*** was what provided improved bioavailability compared to (1) the prior art products,

Suboxone® tablets and Suboxone® film, and (2) a comparative example made according to the invention but without citric acid. *Id*.

The lower buprenorphine dose in Zubsolv® is important because it translates into a reduced opioid load on patients and society. Appx60 at 2:51-60; Appx65 at 12:29-41; Appx6533 at 64:11-20; Appx6802 at 770:22–771:19. At the same time, the maintenance of the 4:1 ratio is important because it permits enough naloxone to antagonize the effects of buprenorphine if Zubsolv® were to be abused and injected, but when taken appropriately (sublingually), does not counteract the effects of buprenorphine. Appx60-65 at 2:13-22, 10:27-30, 12:43-55; Appx6733 at 626:15-23; Appx6532 at 58:22–59:7.

## II. The prior art addressed by the district court.

### A. Suboxone® tablets.

Suboxone® tablets are prior art buprenorphine/naloxone combination sublingual tablets with inferior bioavailability compared to the ’330 patent’s claimed tablets. Appx51-69 at 17:35–19:63, Figs. 1 & 3; Appx6532-6533at 61:19–62:3. While Suboxone® tablets include citric acid, it is uncontested that they do not have citric acid carrier particles (’330 patent claim 6) or separate

particles of buprenorphine and citric acid in contact with each other ('330 patent claim 1).[1]

Indeed, the citric acid in Suboxone® tablets is not in the form of separate particles at all. The manufacturing process for Suboxone® tablets is provided by WO2008/152347 ("Cairns").[2] Appx8795; Appx6769 at 640:19-22. According to Cairns: "lactose, starch, mannitol and povidone were thoroughly mixed together, wetted and granulated with a ***solution of*** buprenorphine hydrochloride, citric acid and sodium citrate ***previously dissolved*** in a mixture of the purified water and ethanol by stirring." Appx8795 (emphasis added); Appx6769-6770 at 640:13–644:1. The prior art showed, Dr. Sinko testified, and Dr. Dyar did not dispute that this process of dissolving buprenorphine and citric acid together would not result in citric acid carrier particles (claim 6) or separate particles of buprenorphine and citric acid (claim 1). Appx6734 at 628:21–629:9; Appx6770 at 642:19–643:5.

At trial, Actavis's expert, Dr. Dyar, introduced and relied on only the Suboxone Monograph in the Physician's Desk Reference ("Suboxone

---

[1] Actavis did not assert anticipation in this case.

[2] Cairns provides the manufacturing process for Subutex® tablets, a product with essentially the same formulation as Suboxone® tablets, but without naloxone. Appx10692 ("[T]he Suboxone® formulation is closely based on the formulation of buprenorphine alone sublingual tablets but with naloxone added ...."); Appx6547-6548 at 121:23–122:5.

Monograph"), which Dr. Dyar admitted is "just a list of ingredients" and provides no information about manufacture or particle sizes. Appx6706 at 518:19-25. And there can be no question that the ingredients list provides no information regarding the structural arrangements of the ingredients. Appx8922.

### B. Orexo's '443 publication.

The '443 publication is an Orexo patent application that discloses combination opioid analgesic/opioid antagonist sublingual tablets where the opioid is carried on the surface of larger carrier particles that comprise the opioid antagonist. Appx8780 at ABSTRACT, [0017]-[0018]. Buprenorphine is among the opioid analgesics and naloxone is among the opioid antagonists disclosed in the '443 publication. Appx8781 at [0022]-[0023]. But, while the '443 publication discloses a buprenorphine/naloxone sublingual tablet, it is uncontested that it does not disclose the use of citric acid anywhere in the disclosure, much less citric acid carrier particles ('330 patent claim 6) or separate particles of buprenorphine and citric acid in contact with each other ('330 patent claim 1). Appx6708 at 524:20–525:4; Appx6771 at 645:22–646:4.

Indeed, the opioid antagonist (e.g., naloxone) containing carrier particles are a central requirement of the '443 publication disclosure. Appx8780 at ABSTRACT, [0017]-[0018]. And although the '443 publication includes a fulsome disclosure of materials that may additionally be included in the carrier

particles (e.g., mannitol), it was undisputed that it does not teach or suggest that citric acid may be among those materials. Appx8783-8786 at [0045], [0087]-[0088], [0096], [0100]; Appx6708 at 524:20–525:4. The ’443 publication examples describe mixing naloxone/mannitol carrier particles and the active ingredient to be adhered by interactive forces (without other ingredients) for 72 hours before additional ingredients are added to this pre-mix and mixed for an additional half hour.[3] Appx8779-08786 at [0090]-[0092], [0097], [0101].

### C. The ’832 patent (Suboxone® film).

The ’832 patent describes Suboxone® film. Appx6687 at 439:15-18; Appx67078 at 523:25–524:2. Suboxone® film is a prior art buprenorphine/naloxone combination film product that is bioequivalent to Suboxone® tablets (i.e., with the same doses and no significant improvement in bioavailability). Appx6708 at 524:3-5; Appx6731 at 618:8-19; Appx8767 at 4:55-

[3] The district court also relies on EP0324725A1 (the “EP ’725 application”) for its teachings regarding carrier particles. The EP ’725 application does not relate to opioids or sublingual tablets. Appx6722 at 580:5-12; Appx13. Like the ’443 publication, the EP ’725 application includes a fulsome disclosure of materials that may be used as carrier particles (again, e.g., mannitol) but neither Actavis nor the district court asserts that this list encompasses or suggests citric acid carrier particles. Appx8803-8804 at 2:54–3:3. Also like the ’443 publication, the EP ’725 application examples describe mixing only the ingredients intended to be adhering in the interactive mixture (mannitol, active ingredient, and sometimes disintegrant) for a long mixing time (50 hours). Appx8805 at 5:45-55, 6:50-59.

58. Because sublingual film is an entirely different type of formulation from a sublingual tablet, a point emphasized by the patent examiner (Appx8195), neither Actavis nor the district court suggested that the ’832 patent disclosed citric acid carrier particles (’330 patent claim 6) or separate particles of buprenorphine and citric acid in contact with each other (’330 patent claim 1). *See, e.g.*, Appx8773 at 15:32-39 (describing a “wet composition” with a “polymeric carrier matrix”); Appx6780-6781 at 684:24–685:13.

The ’832 patent discloses that although citric acid can, in some instances, affect buprenorphine absorption, critically, in those instances, naloxone absorption is increased to unacceptable levels such that the optimal 4:1 ratio of buprenorphine to naloxone cannot be maintained. Appx6776 at 666:4–668:13. Because the ’832 patent teaches that citric acid affects the bioavailability of the two actives indiscriminately, this teaches away from using citric acid to try to improve bioavailability because a critical product feature, the 4:1 ratio will be lost. *Id.*

The ’832 patent reports bioequivalence data for three examples comparing Suboxone® tablets and films, each film with a different pH (different amounts of citric acid). Appx8763-8778 at Exs. 6-8 and 19:1–23:11. At trial, Dr. Sinko presented a table summarizing the comparative bioavailability results for the three examples:

| '832 patent | Buprenorphine Film/Ref. | Naloxone Film/Ref. | 4:1 Ratio | Buprenorphine Bioavailability Increase |
|---|---|---|---|---|
| **pH = 6.5** (Ex. 6) (Formulation 1) | **113%** | **302%** | ✗ | ✗ |
| **pH = 5-5.5** (Ex. 7) (Formulation 3) | **130%** | **155%** | ✗ | ✓ |
| **pH = 3-3.5** (Ex. 8) (Formulation 2) | **106%** | **114%** | ✓ | ✗ |

Appx6776 at 665:20–668:13.

The '832 patent examples show that it is not possible to improve bioavailability of buprenorphine at the same time as maintaining the optimal 4:1 buprenorphine:naloxone ratio. Example 6, with film at local pH 6.5, shows absorption of buprenorphine within bioequivalent range (113%) compared to Suboxone® tablets, but shows unacceptably high levels of naloxone (302%). Appx8775 at 19:55-67, *especially id*. at 19:60-61 ("the absorption was also maximized for the naloxone, ***which was undesirable***") (emphasis added). Example 7, with film at local pH 5-5.5, shows improved absorption of buprenorphine (130%) compared to Suboxone® tablets but, again, unacceptably high levels of naloxone (155%). Appx8776 at 21:17-26, *especially id*. at 21:21-23 ("the naloxone values ***did not provide a bioequivalent result*** as the one dose tablet.") (emphasis added). Example 8, with film at local pH 3-3.5, shows bioequivalent absorption of both buprenorphine (106%) and naloxone (114%)

compared to Suboxone® tablets, but no significant improvement in bioavailability. Appx8777 at 23:1-11.

The ’832 patent describes the local pH of 3.5 as “most preferred” based on example 8 because this local pH allows for absorption of naloxone to be minimized and the therapeutically optimal 4:1 buprenorphine:naloxone ratio to be maintained. Appx8771 at 12:33-36 (“Most preferably the local pH of the film composition is about 3.5. At this local pH level, absorption of the buprenorphine is optimized ***while the absorption of the naloxone is inhibited***.”) (emphasis added); *id*. at 12:57-58 (“Most desirably, the film composition contains about 4:1 agonist to antagonist per dosage.”); Appx8772 at 13:39-44 (“By keeping the antagonist ionized and the local pH at the optimum pH, ***the antagonist has limited if any absorption, but is still present should the product be abused or taken via a different route of administration***. However, when taken as administered, ***the antagonist has little to no effect in blocking the agonist***.”) (emphasis added). Thus, the ’832 patent teaches that it is only possible to maintain the 4:1 ratio when buprenorphine absorption is ***not increased*** compared to Suboxone® tablets. Appx6776 at 667:23–668:13.

## III. The patent examiner's reasons for allowance emphasized that the prior art now at issue did not teach the '330 patent's claimed structural arrangement or how to achieve improved bioavailability in a sublingual tablet.

Actavis and the district court relied primarily on three references: the Suboxone Monograph, the '443 publication, and the '832 patent. It was undisputed that equivalents of these three references were directly addressed by the examiner in her reasons for allowance. Appx6732 at 620:22–622:1; Appx6769 at 640:19-22.

The examiner explained her reasons and provided support for granting the '330 patent over Actavis's and the district court's references—***the structural arrangement and placement of ingredients*** in the claimed tablets result in unexpectedly improved bioavailability:

> The examiner considers the closest prior art to be Cairns (WO 2008/152347) [Suboxone® tablets] who discloses a sublingual tablet comprising buprenorphine, citric acid, and a disintegrant prepared by granulation wherein particles are sieved through a 20 mesh screen after granulation and prior to tableting (page 8). This approach to formulation results in a sublingual tablet comprising particles no larger than 800 microns, and containing ***buprenorphine and citric acid within the same particle. Applicant has demonstrated the unexpected result that when similar components are formulated according to the instant invention*** such that microparticles of buprenorphine, or a pharmaceutically-acceptable salt thereof are presented upon the surface of carrier particles, and are in contact with particles comprising citric acid, and wherein the buprenorphine or pharmaceutically acceptable salt thereof and the citric

> acid are not in the same particle, and wherein the tablet further comprises one of the disintegrants specified in the claims, ***the tablet exhibits superior buprenorphine bioavailability compared to tablets formulated according to the prior art cited above [Cairns/Suboxone® tablets]***.
>
> While tablet compositions for sublingual delivery that contain carrier particles were generally known in the prior art (e.g. Pettersson (WO 2008/068471) ['443 publication]; and while adding citric acid to reach a target pH for improved buprenorphine bioavailability from a sublingual film strip was known in the prior art (e.g. Myers US PG Pub No. 2011/0033542; filing date 7 August 2009, available under 35 USC 102(e)) ['832 patent], ***there was no clear guidance in the prior art on how to accomplish a comparable improvement in buprenorphine bioavailability in a sublingual tablet.*** This is particularly evident in view of Applicant's demonstration that ***the mere presence of citric acid in the sublingual tablets formulated according to the prior art (e.g. Cairns [Suboxone® tablets]) is insufficient to achieve the superior pharmacokinetic profile exhibited by the instant invention. Applicant has persuasively demonstrated that the instant tablet exhibits unexpectedly superior sublingual buprenorphine bioavailability due to the ingredients as well as the structural characteristics recited in the instant claims***.

Appx8194-08195 (underlining in original; bold italics and clarifying text in brackets added); Appx6732 at 621:7–622:1; Appx6770 at 643:20–644:1; Appx6800 at 763:19–764:15.

## IV. The district court's rulings.

The district court found that Actavis infringed Orexo's '996 patent and held that the '996 patent was not invalid for obviousness. Appx3-46 at 8-19, 35-43.

The district court also made findings requiring a judgment that Actavis's ANDA products infringe the '330 patent if the '330 obviousness judgment is overturned. *Id*. at 35-43. However, the district court held that the asserted '330 patent claims were obvious because a skilled artisan would be motivated to reformulate Suboxone® tablets as an interactive mixture to improve bioavailability based on the teaching of interactive mixtures in the '443 publication and EP '725 application. *Id*. at 22-23.

To reach this holding, the district court accepted the conclusory, unsubstantiated, and clearly erroneous testimony of Actavis's expert, Dr. Dyar, that if a skilled artisan reformulated Suboxone® tablets to make an interactive mixture, citric acid would act as a carrier particle because it is "of appropriate size." *Id*. at 23. The district court never addressed why a skilled artisan would use citric acid as a carrier particle with buprenorphine adhered by interactive forces (claim 6) or why a skilled artisan would make sure that the citric acid was in particulate form and in contact with separate particles of buprenorphine (claim 1).[4]

---

[4] The district court's opinion does not address the obviousness of claim 1's requirements relating to citric acid (that there be separate particles of citric acid and buprenorphine in contact with each other) at all and appears to assume that if the claim 6 requirements are met, these claim 1 requirements would be met as well.

The district court found that a skilled artisan would not remove citric acid from the reformulated tablets because the ’832 patent teaches that citric acid improves buprenorphine bioavailability. *Id.* at 24-26. However, the district court held that as a matter of law the ’832 patent’s teaching away—that buprenorphine bioavailability cannot be improved using citric acid without the loss of the therapeutically optimal 4:1 buprenorphine:naloxone ratio—is “irrelevant” to obviousness because it relates to an unclaimed product feature. *Id.* at 26 n.23.

## SUMMARY OF THE ARGUMENT

**I.** This is a case where core patent claim limitations are completely missing from the prior art. No prior art reference discloses citric acid carrier particles with buprenorphine adhered by interactive forces (claim 6) and no prior art discloses separate particles of buprenorphine and citric acid in contact with each other (claim 1 and all asserted claims).

Lacking a teaching of the ’330 patent’s claimed structural arrangement, the district court legally and factually erred by relying on a theory (supported only by Actavis’s expert’s *ipse dixit* testimony) that these features would inherently be formed if Suboxone® tablet prior art were combined with interactive mixture prior art. First, an expert’s *ipse dixit* testimony is legally insufficient to constitute clear and convincing evidence of invalidity. *Cephalon.*, 707 F.3d at 1338-39. Second, Actavis’s expert’s testimony was clearly inaccurate in asserting that citric acid in

Suboxone® tablets is "the right size" to act as carrier particles. The prior art of record unquestionably shows that citric acid does not exist as separate particles in Suboxone® tablets at all due to a dissolution step in the manufacture. There is not even any record evidence regarding the particle size for the citric acid used as a ***starting material*** in Suboxone® tablets, let alone what its size is in the final tablets. Third, even accepting Actavis's expert's *ipse dixit* statement that citric acid is the right size, the testimony still falls short of the high standard for inherency in the obviousness context. Neither the *ipse dixit* testimony nor any other evidence addressed ***mixing conditions*** necessary to form an interactive mixture where ***citric acid*** acts as a carrier particle with separate buprenorphine microparticles adhered to its surfaces. Much more is required to show by clear and convincing evidence that two prior art references, neither of which disclose the missing claim elements, when combined would inherently and necessarily result in the presence of those structural elements. *See In re Rijckaert*, 9 F.3d at 1534; *TWI Pharm., Inc.*, 773 F.3d at 1195-96. For these reasons, Actavis failed to prove (and the district court erred in finding) that citric acid would act as carrier particles or that buprenorphine would be adhered to the carrier particles if a person of ordinary skill reformulated Suboxone® tablets as an interactive mixture.

The district court's finding that skilled artisans knew how to formulate an interactive mixture does not cure the deficiency in the art. Evidence that skilled

artisans ***could*** do something is not sufficient to prove they ***would*** do so in the specific manner required to achieve the claimed structural arrangement. *InTouch Techs., Inc. v. VGo Commc'ns, Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014). Similarly, the district court's finding that the prior art does not teach away from interactive mixtures does not cure the failure of the prior art to disclose the '330 patent's claimed structural arrangement. Nor does it relieve Actavis of its burden of showing by more than *ipse dixit* testimony that the prior art combination inherently results in buprenorphine particles that are separate from, in contact with, and adhered by interactive forces to, citric acid carrier particles.

**II.** The district court also legally erred by holding that the '832 prior art patent's teaching away was "irrelevant" because it addressed an unclaimed feature. Unclaimed features are legally relevant and may be "central to no motivation to combine." *Intelligent Bio-Sys.*, 821 F.3d at 1368. The district court compounded that error by considering unclaimed features as a motivation to combine that very same prior art. By selectively relying on the '832 patent's teaching regarding buprenorphine absorption while ignoring the corresponding teaching regarding naloxone absorption, the district court violated the law requiring that prior art be considered "as a whole." *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1578 (Fed. Cir. 1987). And, the district court also legally erred by failing to

consider the unexpected maintenance of the 4:1 ratio while increasing bioavailability as an objective indicium of nonobviousness.

The district court further compounded these errors by not addressing additional evidence that the references would ***not*** be combined, including the reasons and proof provided in the patent examiner's reasons for allowing the '330 patent over the very same art.

## ARGUMENT

### I. Standard of review.

Obviousness is a question of law that this Court reviews *de novo*. *Pozen Inc. v. Par Pharm., Inc.*, 696 F.3d 1151, 1160 (Fed. Cir. 2012). The Court reviews underlying factual determinations for clear error following a bench trial. *Id.* "A party seeking to invalidate a patent on obviousness grounds must demonstrate by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *InTouch Techs., Inc.*, 751 F.3d at 1352 (internal quotations omitted).

## II. Issue 1: The district court committed reversible legal and factual errors in ruling that buprenorphine particles in contact with, adhered to, and separate from citric acid carrier particles are obvious.

### A. No prior art disclosed incorporation of citric acid as claimed or provided a reason to do so.

The ’330 patent claims include several limitations entirely missing from all prior art references. Claim 6 requires citric acid carrier particles with microparticles of buprenorphine held at their surfaces by interactive forces. SOF§I.B; Appx71 at 24:42-44. Claim 1 (and all asserted claims[5]) require separate particles of buprenorphine in contact with citric acid particles. Appx71 at 24:42-44. No prior art discloses these limitations.

Suboxone® tablets do not contain buprenorphine particles adhered by interactive forces to citric acid carrier particles (claim 6) or particles of citric acid separate from and in contact with buprenorphine particles (claim 1). Appx8795; Appx6769-6977 at 640:13–644:1; SOF§II.A. It is undisputed, and was emphasized by the ’330 patent examiner, that unlike the asserted claims, Suboxone® tablets are made by wet granulation processes where citric acid and

[5] Asserted claims 3-6 and 8-10 depend on and require the presence of the limitations in claim 1.

buprenorphine are dissolved together and are "within the same particle."[6] Appx8194; Appx8795; SOF§III. Orexo's expert Dr. Sinko also emphasized this point, *see* Appx6769-6770 at 640:13–644:1; and Actavis's expert Dr. Dyar accepted and never disputed it, *see* Appx6707 at 519:15–520:5.

The '443 publication, which the district court relies on for motivation to use carrier particles, does not mention or refer to citric acid in its entire disclosure. Appx6708 at 524:20–525:4; Appx6771 at 645:22–646:4; SOF§II.B. Citric acid is accordingly absent from the '443 publication examples and importantly from its list of materials suitable for use as carrier particles. Appx8779-8786 at ABSTRACT, [0045], [0087]-[0088], [0096], [0100]. Instead, a key aspect of the '443 disclosure is the use of an entirely different type of carrier—opioid antagonist (e.g., naloxone) containing carrier particles. Appx8779-8786 at ABSTRACT,

[6] The district court also identifies Suboxone® film and Temgesic® as buprenorphine products that include citric acid, but neither the district court nor Actavis asserts or presents evidence that these products incorporate citric acid in the '330 patent's claimed structural arrangement; and no such record evidence exists. *See, e.g.*, Appx8773 at 15:32-39 (Suboxone® film is a "wet composition," incorporating citric acid into a "polymeric carrier matrix"); Appx6704 at 509:9-18 (Dr. Dyar admitting that the Temgesic® reference he relied on provides "just the list of ingredients" and "[i]t doesn't give you any information about the manufacture").

[0017]-[0018]. All three exemplary formulations use carrier particles made of naloxone and mannitol.[7] Appx8779-8786 at [0087]-[0088], [0096], [0100].

It is the ***claimed structural arrangement*** that distinguishes the '330 patent claims from the prior art. Appx60-66 at 2:5-8, 3:10-14, 13:9-23. The patent examiner explained that: "the mere presence of citric acid in the sublingual tablets formulated according to the prior art (e.g. Cairns [Suboxone® tablets]) is insufficient to achieve the superior pharmacokinetic profile exhibited by the instant invention"; and "Applicant has persuasively demonstrated that the instant tablet exhibits unexpectedly superior sublingual buprenorphine bioavailability due to the ingredients as well as ***the structural characteristics*** recited in the instant claims." Appx8195 (underline in original; bold italics and brackets added).

Thus, even if Suboxone® tablets provided a motivation to use citric acid in a sublingual buprenorphine/naloxone tablet, and the '443 publication provided a motivation to use interactive mixtures with carrier particles, neither the district court nor Actavis identified any teaching in the prior art that taught the use of ***citric***

[7] The district court also relied on the EP '725 application for motivation to use carrier particles (even though it does not relate to opioids or sublingual tablets—a point that the Court expressly decided when addressing the '996 patent, Appx13). Appx6722 at 580:7-12. Like the '443 publication, the EP '725 application provides no disclosure of citric acid at all. Appx8802-8811 at 2:54-58, 5:45-50, 6:50-53, 7:30-33.

***acid*** as a carrier particle, let alone one with buprenorphine microparticles adhered by interactive forces (claim 6) or to have separate particles of citric acid and buprenorphine in contact with each other (claim 1).

### B. The district court erred by relying solely on *ipse dixit* expert testimony to show elements missing from the prior art inherently appear.

Lacking a prior art disclosure of the ’330 patent’s claimed structural arrangement or a teaching to combine prior art disclosures to get that claimed structural arrangement (citric acid carrier particles with buprenorphine particles adhered to them by interactive forces or citric acid and buprenorphine in separate particles and in contact with each other), the district court concluded that citric acid carrier particles would necessarily be present if Suboxone® tablets were reformulated as an interactive mixture.[8] Appx26.

To reach this conclusion, the district court depended upon unsupported and counterfactual assertions by Actavis’s expert Dr. Dyar that consisted of two and only two statements (nine lines of testimony) without any documentary support.

---

[8] The district court was silent and there is no record evidence addressing the obviousness of claim 1 (and the requirement for separate particles of buprenorphine in contact with citric acid) other than the discussion of claim 6 (and the requirement for citric acid carrier particles with buprenorphine microparticles adhered by interactive forces). Therefore, if claim 6 is not obvious, then claim 1 is not obvious.

Dr. Dyar incorrectly asserted that the citric acid ***in Suboxone® tablets*** would act as carrier particles because it is "***of appropriate size***":

> So the carrier particle is a pharmaceutically acceptable substance that's water soluble, and ***it's of appropriate size***. Citric acid fits that definition within this, ***within the Suboxone tablet***, so therefore it would act as a carrier if you made an interactive mixture.

Appx6683 at 426:7-11 (emphasis added).

> Well, citric acid is pharmaceutically acceptable, water soluble, and of ***the right size***, so therefore it would act as a carrier particle, because it is ***in the Suboxone tablet***.

Appx6685 at 433:12-15 (emphasis added).

The references relied on by the district court do not disclose or suggest citric acid carrier particles with buprenorphine adhered to them by interactive forces (claim 6) or citric acid and buprenorphine in separate particles and in contact with each other (claim 1). Therefore, the combination of references could only address the claimed structural arrangement if it inherently forms when the prior art in question is combined.

"A party must … meet a ***high standard*** in order to rely on inherency to establish the existence of a claim limitation in the prior art in an obviousness analysis—the limitation at issue ***necessarily*** must be present, or the ***natural result*** of the combination of elements explicitly disclosed by the prior art." *TWI Pharm.*,

773 F.3d at 1195-96 (emphasis added). The *TWI Pharm.* court explained that, in the obviousness context:

> Inherency … may not be established by ***probabilities*** or ***possibilities***. The mere fact that a certain thing ***may*** result from a given set of circumstances is not sufficient.

*Id*. (citing *In re Oelrich*, 666 F.2d 578, 581 (CCPA 1981); *see also In re Rijckaert*, 9 F.3d at 1533-34 ("The mere fact that a certain thing ***may*** result from a given set of circumstances is not sufficient [to establish inherency]." (emphasis in original) (internal quotation and citation omitted).

Dr. Dyar's unsupported testimony is insufficient to meet the high standard to show inherency in the obviousness context and the district court's finding to the contrary was erroneous for at least the following three reasons.

**1. Dr. Dyar's *ipse dixit* testimony is legally insufficient evidence for a finding of obviousness by clear and convincing evidence.**

First, Dr. Dyar's assertions are unsupported by any documentary evidence. They are *ipse dixit* and, therefore, are a legally insufficient linchpin for a judgment of obviousness by clear and convincing evidence. *See Cephalon*, 707 F.3d at 1338 (expert's *ipse dixit* statements "***cannot be enough to constitute clear and convincing evidence***") (emphasis added). A missing claim limitation (e.g., citric acid carrier particles) is a "***core factual finding***, and as such, ***requires more than a conclusory statement***" to prove obviousness. *See K/S Himpp v. Hear-Wear*

*Techs., LLC*, 751 F.3d 1362, 1365 (Fed. Cir. 2014), *cert. denied*, 135 S. Ct. 1439, 191 L. Ed. 2d 368 (2015)[9] (emphasis added); *see also ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327-28 (Fed. Cir. 2012) (finding conclusory and factually unsupported expert testimony insufficient to support determination of obviousness); *In re Zurko*, 258 F.3d 1379, 1385 (Fed. Cir. 2001) ("This assessment of basic knowledge and common sense was not based on any evidence in the record and, therefore, lacks substantial evidence support."); *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc*., 776 F.2d 281, 294 (Fed. Cir. 1985) ("Lack of factual support for expert opinion going to factual determinations … may render the testimony of little probative value in a validity determination.").

Dr. Dyar's statements that "[citric acid] would act as a carrier particle ***because it is in the Suboxone tablet***" (Tr. 433:12-15 (emphasis added)) fall way short of "common sense" because it is a *non sequitur*. This is especially the case when the evidence clearly showed that citric acid was ***not*** acting as a carrier

[9] *Hear-Wear* (and *Arendi*, *In re Zurko*, and *In re Rijckaert* cited below) involved appellate review of the PTO's Appeal Board, which applies a lower standard than the district court was required to apply. *In re Swanson*, 540 F.3d 1368, 1377 (Fed. Cir. 2008) ("In PTO examinations and reexaminations, the standard of proof—a preponderance of evidence—is substantially lower than in a civil case."); 35 U.S.C. § 316(e). Thus, failure of a conclusory statement to prove obviousness at the PTO, under the lower evidentiary standard, would apply with all the more force to the district court here. *See, e.g.*, *Cephalon*, 707 F.3d at 1338.

particle in Suboxone® tablets. But even if Dr. Dyar's statements did rise to the level of "common sense," the Federal Circuit "***has repeatedly warn[ed]*** that references to 'common sense'—whether to supply a motivation to combine or a missing limitation—***cannot be used as a wholesale substitute for reasoned analysis and evidentiary support, especially when dealing with a limitation missing from the prior art references specified***." *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1362 (Fed. Cir. 2016); *see also Hear-Wear*, 751 F.3d at 1365-66 ("[A]n assessment of basic knowledge and common sense ***as a replacement for documentary evidence*** for core factual findings ***lacks substantial evidence support***.") (emphasis added).

In *Cephalon*, an enablement case but with circumstances similar to those here, this Court held it was an error of law for a district court to rely on unsubstantiated expert statements to show invalidity by clear and convincing evidence: "Dr. Mumper's *ipse dixit*, statements that co-administration would be 'difficult' and 'complicated,' however, ***cannot be enough to constitute clear and convincing evidence***." 707 F.3d at 1338 (emphasis added). Similarly, in *Arendi*, the Federal Circuit reversed a judgment of obviousness where the only support for a missing limitation was an expert declaration, explaining that "the burden is [patent challengers'] to provide more than a mere scintilla of evidence of the [the missing claim limitation], where [this limitation] is not 'evidently and indisputably

within the common knowledge of those skilled in the art.'" 832 F.3d at 1364-65 (quoting *Hear-Wear*, 751 F.3d at 1364-65). Thus, the district court erred as a matter of law in relying on Dr. Dyar's *ipse dixit* statement as clear and convincing evidence to fill in a claim limitation missing in the prior art.

The district court's statement that Dr. Dyar's theory of invalidity was "more credible" than Dr. Sinko's testimony (Appx0026) does not change the result. Actavis bears the burden of proof here by clear and convincing evidence, and the burden does not ever shift to Orexo, especially when Actavis failed to meet it. *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1078-79 n.5 (Fed. Cir. 2012) (stating "the party challenging validity bears the burden of persuasion throughout the litigation") (citing *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S.Ct. 2238, 2245 & n.4 (2011)).

For example, in *Cephalon*, after recognizing that an expert's *ipse dixit* statement does not constitute clear and convincing evidence, the Federal Circuit held that, given the expert's largely unsupported testimony, the district court's credibility finding carried little weight. 707 F.3d at 1338; *see also In re Cyclobenzaprine*, 676 F.3d at 1072 ("While we would normally afford the district court deference in crediting such an opinion, we cannot do so here because Dr. Amidon failed to discuss why, in the specific context of cyclobenzaprine, a skilled artisan would expect PK values drawn from the prior art to yield a therapeutically

effective formulation."). Thus, because Dr. Dyar's theory of obviousness was not supported by documentary evidence, the district court erred in relying on it. *See Upjohn Co. v. Mova Pharm. Corp.*, 225 F.3d 1306 (Fed. Cir. 2000) ("At this critical point in the determination of obviousness, there must be factual support for an expert's conclusory opinion.")

### 2. Dr. Dyar's unsupported assertion that citric acid is "the right size" is devoid of support and clearly contradicted by the evidence.

Second, Dr. Dyar cited no support for his assertion that citric acid in the Suboxone® tablet is "the right size" and none exists.[10] The prior art is categorically silent on this essential information. In addressing Suboxone® tablets, Dr. Dyar introduced and relied on the Suboxone Monograph, which he admitted provides "just a list of ingredients" (i.e., no information about particle size). Appx6706 at 518:19-25. Orexo's expert, Dr. Sinko, agreed that the Suboxone Monograph provides no information about particle size and specifically addressed this lack of disclosure in the context of the claim 6 requirement for citric acid carrier particles,

---

[10] Dr. Dyar addressed carrier particle size because the court construed the claim language "presented on" to require "interactive forces strong enough to keep the adherent [buprenorphine] particles" "at the outside part or layer of the carrier particles" and all agreed that, for such interactive forces to form, the carrier particles must be larger than the adhering particles (Appx6684-6685 at 430:24–431:12; Appx6780 at 681:5–682:15; Appx8784 at [0065]; Appx8803 at 1:1-9, 1:16-22).

concluding that "a person of skill would not find this very useful." Appx6735 at 632:5-25.

In contrast to Dr. Dyar's two conclusory/unsupported assertions and no documentary evidence, Dr. Sinko introduced the Cairns reference that shows that Dr. Dyar's assertion was not only unsupported, it was wrong. Appx6769-6770 at 640:4–643:5. Cairns shows that citric acid is dissolved with buprenorphine in the manufacture of Suboxone® tablets and so does not exist as separate particles within the Suboxone® tablet at all. Appx8795; Appx6770 at 641:10-18. This was emphasized by the patent examiner, who concluded that the Cairns "approach to formulation results in a sublingual tablet … containing buprenorphine and citric acid ***within the same particle***." Appx8194 (emphasis added); Appx6770 at 643:6–644:1. Thus, not only did the art not provide separate particles of citric acid, it did not provide any information regarding particle sizes (for citric acid or anything else) in Suboxone® tablets. Importantly, Dr. Dyar's statement (relied on by the district court) was *ipse dixit*, while Dr. Sinko's testimony and the examiner's statements were expressly supported by the prior art.

The district court clearly erred as a factual matter in finding that citric acid in Suboxone® tablets is "of appropriate size" or "the right size" to act as carrier particles. Appx0026. The district court's only evidence for this finding was Dr. Dyar's unsubstantiated testimony. But again, Dr. Dyar admitted that the reference

he relied on did not provide this information. Appx6706 at 518:19-25. Nor did any other reference address the citric acid particle size in Suboxone® tablets (or the starting material particle sizes for that product). And Dr. Sinko provided documentary evidence showing that citric acid did not exist as particles at all in Suboxone® tablets. Appx10696; Appx6769-6770 at 640:13–644:1. Under these circumstances, it was clear error for the district court to rely on Dr. Dyar's unsupported testimony. *See, e.g.*, *Ashland Oil*, 776 F.2d at 295-96 (reversing finding of obviousness for clear error where the district court relied on expert testimony without documentary support). And, in light of the failure of proof of particle size, Actavis clearly failed to establish that buprenorphine particles separate from, in contact with, and adhered to citric acid carrier particles "***necessarily*** must be present, or [be] the ***natural result***" of formulating Suboxone® tablets as an interactive mixture. *TWI Pharm.*, 773 F.3d at 1195-96.

### 3. Even accepting Dr. Dyar's unsubstantiated and inaccurate statement regarding citric acid particle size, Actavis did not prove inherency.

Third, even if Dr. Dyar's testimony that citric acid in Suboxone® tablets is "the right size" to act as carrier particles was supported or accurate (it is neither), Actavis still failed to prove by clear and convincing evidence that citric acid carrier particles with buprenorphine adhered by interactive forces (claim 6) would inherently ("necessarily" or "naturally") be formed. The evidence is clear that

even if Suboxone® tablets were formulated as an interactive mixture, and even if the citric acid were the right size, citric acid would still need to be incorporated into the mixture in the right way (i.e., under the proper conditions) if the goal was to form citric acid carrier particles with buprenorphine particles adhered. Citric acid's mere presence in the tablet does not prove that the citric acid would be ***part of the interactive mixture*** (i.e., that ***citric acid*** would be a carrier particle with buprenorphine adhered by interactive forces to its surfaces as claim 6 requires).

The '443 publication makes clear that even in a tablet formulated as an interactive mixture, not all of the materials are in the interactive mixture. For example, the '443 publication specifically states that disintegrant should not be in the interactive mixture and provides a list of additional ingredients that are also not part of the interactive mixture. Appx8779-8786 at [0055], [0059]-[0062].

The art and expert testimony are clear that forming an interactive mixture with citric acid in the interactive mixture (as carrier particles) would require specific conditions ***in addition to*** the particle size of the ingredients. Both parties' experts agreed that to be included in the interactive mixture the appropriate ingredients must be mixed together for an appropriate amount of time and under proper conditions. For example, Dr. Dyar testified:

> Q. Okay. Does the length of time that you blend a substance make a difference with respect to an interactive mixture?

> A. Yes, especially at a small scale. The longer you mix it, the more interactive forces that are presented. And so the more likely you are to make an interactive mixture.

Appx6644 at 381:17-22. Thus, Dr. Dyar's testimony that only certain mixing conditions make it "***more likely***" to form an interactive mixture establishes that there are conditions under which an interactive mixture will not form. Likewise, Dr. Dyar testified that the scale and geometry of the blender impacts whether an interactive mixture will be formed. Appx6643-6644 at 376:11–379:21. Similarly, Dr. Sinko, when addressing whether citric acid could be used as a carrier particle testified that it could do so only "if you make the assumption that you have all the proper mixing dynamics…." Appx6780 at 682:5-15.

The prior art is consistent with this testimony. For example, the '443 publication examples describe mixing ***only the ingredients intended to be in the interactive mixture*** (the naloxone/mannitol carrier particles and the active ingredient) separately for an extremely long mixing time (72 hours). Appx8779-8786 at [0090], [0097], [0101]. The EP '725 application examples similarly describe mixing ***only the ingredients intended to be in the interactive mixture*** (mannitol, active ingredient, and sometimes disintegrant) for a long mixing time (50 hours). Appx8805 at 5:45-55, 6:50-59.

The simple inclusion of citric acid without providing it in the right form and without applying appropriate mixing conditions does not produce the '330 patent's

claimed structural arrangement. Actavis's generic Suboxone® product (which preceded and differed from its generic Zubsolv® product) proves this. It was made by "dry blending" citric acid and buprenorphine and ***did not achieve superior bioavailability*** compared to Suboxone® tablets. Appx8542 (Formulation I or PI-2178 has citric acid and "was based on Actavis' previously approved Generic for Suboxone Sublingual Tablets"); Appx8578 ("dry blending process"); Appx8583-08584 (8 mg and 2 mg doses). This shows generic Suboxone® tablets did not have the '330 patent invention's structural arrangement because, as addressed above, it is the claimed structural arrangement that provides the unexpectedly increased bioavailability. SOF§I.C.

Thus, in order to have ***citric acid*** act as a carrier particle with active ingredient adhered to it ***in the form of an interactive mixture*** (not just present in the final tablet), a skilled artisan would need to incorporate it under the right mixing conditions. But neither Dr. Dyar nor the district court provided a reason or motivation that the skilled artisan would do so. While, in addition to asserting that citric acid in Suboxone® tablets is the right size to act as carrier particles, Dr. Dyar also asserted that it is (1) pharmaceutically acceptable and (2) water soluble (Appx6683-6685 at 426:7-11, 433:12-15), these assertions do not provide a motivation to include citric acid as a carrier particle with buprenorphine adhered to its surfaces.

All ingredients in any pharmaceutical tablet are by definition pharmaceutically acceptable. Thus, that citric acid is pharmaceutically acceptable does not provide a motivation to include it (as opposed to any other ingredient) as carrier particles with buprenorphine particles adhered in an interactive mixture. Similarly, water solubility does not provide a motivation to use citric acid. Water solubility is not a claim requirement in the ’330 patent claim 1 or 6, nor is it a requirement for carrier particles under the district court’s construction. And the ’443 publication expresses no preference for water soluble carrier particles, providing a list of ingredients suitable for use as additional carrier particle materials including water ***insoluble*** ingredients, such as crosslinked polyvinylpyrrolidone (“x-PVP”). Appx8779-8786 at [0038], [0041], [0045] (carrier particle ingredients include x-PVP, preferred biomucoadhesives include x-PVP, and biomucoadhesives “are substantially insoluble in water”).

Thus, by not addressing the undisputedly critical question of mixing conditions, Dr. Dyar’s testimony fails to establish that citric acid carrier particles “***necessarily*** must be present, or [be] the ***natural result***” of formulating Suboxone® tablets as an interactive mixture. *TWI Pharm.*, 773 F.3d at 1195-96.

*In re Rijckaert* presents analogous circumstances.[11] The patent at issue claimed a magnetic recording device with certain components arranged with a particular claimed relationship of angles and intervals. 9 F.3d at 1532. The prior art described such a recording device with the claimed components, but did not disclose the claimed arrangement of components. *Id*. at 1532-33. The PTO assumed that the claimed relationship was inherent in the prior art and the Commissioner argued that it was the "optimal" condition. *Id*. at 1533-34. The Federal Circuit reversed, however, holding that because the art did not disclose this "optimal" condition, it was not inherent: "The mere fact that a certain thing ***may*** result from a given set of circumstances is not sufficient to establish inherency." *Id*. at 1534 (emphasis in original). The Court also held: "That which ***may*** be inherent is not necessarily known. Obviousness cannot be predicated on what is unknown." *Id*. at 1534 (quoting *In re Spormann*, 363 F.2d 444, 448 (CCPA 1966)) (emphasis added).

Even accepting Dr. Dyar's testimony regarding particle size as true and supported (which it is not), that testimony at most established that citric acid ***may*** act as a carrier particle if Suboxone® tablets were reformulated as an interactive

[11] As addressed above (*see* n.9), the PTO Appeal Board applies a lower standard of review than the district court. Therefore, unacceptable evidence of inherency for the Board must be all the more unacceptable for the district court.

mixture; this is not enough to establish obviousness by inherency. *Id.*; *see also Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1294 n.1 (Fed. Cir. 2013) (finding no inherency where "it ***may*** be true the mere administration of [the claimed formulation] inherently produces the claimed result" but where the record was not conclusive) (emphasis added).

Dr. Dyar's approach to proving obviousness by inherency with unsupported, incomplete, and inaccurate statements (where Actavis bears the burden by clear and convincing evidence) is irreconcilable with his approach to this question for purposes of infringement (where Orexo's burden is the lower preponderance of the evidence). Dr. Dyar disputed Orexo's infringement proofs despite clear evidence that citric acid is dry mixed for an appropriate time with buprenorphine in Actavis's product. Appx8669-Appx8675. He testified that the only way to tell if an interactive mixture is present is to look at the intermediate blend of the manufacture.[12] Appx6645 at 383:13-18. But in connection with validity, Dr. Dyar

[12] Orexo met its infringement burden, presenting 83 exhibits relating to Raman imaging of Actavis's tablets, Raman imaging of remanufactured intermediate blend of Actavis's product, three-dimensional images of particles from the intermediate blend, scanning electron microscopy images of intermediate blend, and Raman imaging of tablets compressed from the remanufactured intermediate blend. Appx6932-6949. Within that evidence, Orexo presented Raman images of the remanufactured intermediate blend where smaller buprenorphine particles (red) were attached (adhered) to larger citric acid carrier particles by interactive forces (yellow). Appx11414-11416; Appx11417-11419.

did not look at anything for Suboxone® tablets other than the Suboxone Monograph, which provides "just a list of ingredients." Appx6706 at 518:19-25. Simply put, Dr. Dyar and Actavis flipped the burdens and demanded more proof for infringement on this subject than was presented for validity.

Thus, the district court's and Dr. Dyar's failure to address mixing dynamics and manufacturing order and conditions or to provide any reason or motivation for incorporating ***citric acid with buprenorphine adhered*** in an interactive mixture is critical. Without these proofs, there is ***no reason*** to expect, much less ***clear and convincing evidence***, that citric acid carrier particles with buprenorphine particles adhered (claim 6) would be the "necessary" or "natural" result of the combination of references under the district court's theory.

### C. The district court's findings that skilled artisans knew *how* to formulate (and that prior art does not teach away from) *interactive mixtures* fails to address the claimed *structural arrangement* missing from the art.

The district court's finding that skilled artisans knew "how to make ***interactive mixtures***" (Appx0027 (emphasis added)) does not cure the lack of a disclosure in the art of the ***claimed structural arrangement***: citric acid carrier particles with buprenorphine adhered by interactive forces (claim 6) and separate particles of citric acid and buprenorphine in contact with each other (claim 1). Similarly, the district court's finding that the prior art "does not criticize, discredit, or otherwise discourage the use of ***interactive mixtures***" (Appx0027 (emphasis

added)) does not address the lack of any teaching of or toward the ***claimed structural arrangement*** missing from the prior art.

The district court followed Actavis's lead in incorrectly characterizing one of Orexo's arguments as follows: "Orexo argues that Suboxone taught away from using an interactive mixture; i.e., it does not teach one of skill in the art ***how*** to formulate an interactive mixture." Appx27 (emphasis added). Neither Orexo nor any of its witnesses argued that skilled artisans did not know how to formulate an interactive mixture. Instead, Orexo argued:

(1) Citric acid carrier particles are a missing limitation:

> "[T]here is no teaching in any reference of citric acid carrier particles …." Appx7085-7086.

(2) Actavis did not provide a reason or motivation to supply the missing limitation:

> "Actavis provides no explanation why a POSA would be motivated to replace the essential '443 naloxone carrier particles with citric acid carrier particles." Appx7085.

(3) Actavis employs hindsight to mix and match prior art features, and even so, failed to prove that citric acid carrier particles would result from the combination:

> "Actavis employs a hindsight approach by mixing and matching between the Suboxone® tablets and the '443 publ. to cobble together the '330 claims without providing an adequate rationale. Actavis's purported approach is to keep the ingredients of Suboxone® tablets

> but to make an interactive mixture in accordance with the ’443 publ. But Actavis ignores that the ’443 publ. teaches the use of carrier particles comprising naloxone. [Appx8780 at 0017.] Thus, Actavis must apply the teachings of the ’443 publ., but with a different carrier particle. Actavis’s theory appears to depend on citric acid acting as a carrier particle, but as previously addressed ([Appx7060-7061 at Sec. III.C.1]), the evidence shows that Suboxone® tablets do not have citric acid carrier particles because buprenorphine and citric acid are in the same particle. There is certainly no evidence that Suboxone® tablets have citric acid particles of a size that means that they would be capable of acting as carrier particles, nor is there evidence that simply dry mixing citric acid particles (with anything) will inevitably result in them acting as carrier particles.” Appx7070.

The fact that skilled artisans knew how to formulate an interactive mixture simply does not address Orexo’s proofs and position. Orexo stressed that skilled artisans lacked a motivation or reason to use citric acid carrier particles, not that skilled artisans lacked knowledge about how to make interactive mixtures.

The district court’s finding that skilled artisans knew ***how to*** and therefore ***could*** formulate an interactive mixture with citric acid cannot stand in for proof that they ***would be motivated*** to use citric acid carrier particles. *See InTouch Techs., Inc.*, 751 F.3d at 1352 (reversing obviousness finding where “testimony primarily consisted of conclusory references to [the expert’s] belief that one of ordinary skill in the art ***could*** combine these references, not that they ***would*** have been motivated to do so” (emphasis in original)); *KSR Int’l. Co. v. Teleflex, Inc.*,

550 U.S. 398, 418-19 (2007) ("[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art."); *In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984) ("The mere fact that the prior art ***could*** be so modified would not have made the modification obvious unless the prior art suggested ***the desirability*** of the modification."); *In re Roberts*, 470 F.2d 1399 (CCPA 1973) (reversing obviousness by inherency where, even though the solution would be obvious once the source of the problem was recognized, conclusion of obviousness "is reachable only by reconstructing the invention from the prior art with the benefit of [patentee's] own disclosure").

Similarly, the district court's findings that the Suboxone Monograph "does not criticize, discredit, or otherwise discourage the use of interactive mixtures" (Appx0027, internal quotations omitted) and that "the prior art references do not teach away from the claimed combination" (Appx29-30 at n.24) do not address Orexo's argument that ***no prior art reference or the combination of references disclosed the claimed structural arrangement***. Where Actavis failed to identify any disclosure of the claimed structural arrangement or present evidence that the claimed structural arrangement would be inherent in a combination of the prior art (*see* §II.A-B above), it is of no moment whether the Suboxone Monograph (which merely provides a list of ingredients in any event, Appx6706 at 518:19-25) or any

prior art reference teaches away. The burden was Actavis's to prove obviousness by clear and convincing evidence. *In re Cyclobenzaprine*, 676 F.3d at 1078-79 n.5. The district court legally erred by failing to hold Actavis to this burden.

## III. Issue 2: The district court committed reversible legal error by holding that '832 patent disclosures relating to naloxone absorption and the 4:1 ratio were "irrelevant" and ignoring other evidence against combining references.

### A. The '832 patent's teaching that citric acid negatively impacts naloxone absorption and maintaining the 4:1 ratio is legally relevant to no motivation to combine.

The district court committed reversible legal error by relying on the '832 patent for its teachings regarding buprenorphine bioavailability while expressly declining to consider the '832 patent's teachings regarding naloxone bioavailability (and the 4:1 buprenorphine:naloxone ratio). Appx29 at n.23.

The '330 patent claims a sublingual tablet with two active ingredients: buprenorphine and naloxone. While not claimed, the absorption levels of both active ingredients are critical to the product. An unexpected benefit of the '330 patent's claimed structural arrangement is a proportional increase in the absorption of both active ingredients. Appx51-69 at 12:43-55, 17:35–19:63, Figs. 1 & 3; Appx6532 at 58:16-21; Appx6733-6734 at 625:17–627:2; SOF§I.C. This allows

for the maintenance of the therapeutically optimal 4:1 buprenorphine:naloxone ratio.[13] *Id*.

The ’832 patent teaches it is not possible to increase buprenorphine absorption using citric acid without simultaneously increasing naloxone absorption to unacceptable levels. Appx8763-8778 at 19:55-67, 21:17-26, 23:1-11; Appx6776 at 665:20–668:13; SOF§I.C. This teaches away from using citric acid to improve buprenorphine absorption because a critical product feature, the 4:1 buprenorphine:naloxone ratio, would be lost. Appx6776 at 668:10-13.

The district court held that the relative active ingredient absorption levels and the related 4:1 ratio was “irrelevant” to its validity analysis because it is an unclaimed feature. Appx29 at n.23. But unclaimed features may be “central to a finding of no motivation to combine.” *Intelligent Biosystems*, 821 F.3d at 1368; *see also McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1354 (Fed. Cir. 2001) (“If references taken in combination would produce a ‘seemingly inoperative device,’ we have held that such references teach away from the combination and thus cannot serve as predicates for a *prima facie* case of obviousness.”) (quoting *In*

[13] The 4:1 buprenorphine:naloxone ratio is unquestionably the “optimal,” “optimum,” and “preferred” ratio. Appx7009; Appx5; Appx64 at 10:27-30; Appx71 at 23:17, 23:25; Appx8763-8778 at 12:33-36, 12:57-58, 19:60-61, 21:21-23; Appx6532 at 58:16-21; Appx6733-6734 at 625:17–627:2.

*re Sponnoble*, 405 F.2d 578, 587 (CCPA 1969)); *Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1353, 1362 (Fed. Cir. 2007) (considering unclaimed benefit of reduced toxicity in analysis of motivation to modify).

This issue on appeal is on all fours with *Intelligent Biosystems*. *Intelligent Biosystems* held that because an unclaimed feature (quantitative deblocking) was among the criteria for successful combination of claimed features (a particular blocking group used in particular polynucleotide sequencing method), a teaching in the art that this unclaimed criteria was not met (a teaching that the claimed blocking group was not quantitatively deblocked under relevant conditions) "support[s] a conclusion … a person of ordinary skill in this field would not have been motivated to use the [particular blocking group] as the claim requires." *Id*. at 1368-69. Similarly here, because an unclaimed feature (a naloxone bioavailability that allows the maintenance of the optimal 4:1 buprenorphine:naloxone ratio) was among the criteria for a successful combination of the claimed features (citric acid in a sublingual buprenorphine/naloxone combination product), a teaching in the art that this unclaimed criteria would not be met (a teaching that the use of citric acid could improve bioavailability but would not maintain the 4:1 ratio) supports the conclusion that a "person of ordinary skill in this field would not have been motivated to use [citric acid] as the claim requires." *Id*.

Thus, the district court committed reversible legal error by disregarding as "irrelevant" teaching in the '832 patent that using citric acid in such buprenorphine/naloxone combination products (claimed features) would result in failure to maintain the 4:1 ratio (unclaimed feature) to assess obviousness and motivation to combine.

### B. The district court inconsistently relied on the impact of citric acid on buprenorphine absorption while disregarding its impact on naloxone absorption.

The district court compounded its error by relying on the '832 patent's disclosures regarding unclaimed buprenorphine absorption as a motivation to combine (Appx29) while disregarding teachings from the same '832 patent regarding unclaimed naloxone absorption that teaches away from the combination. *See Panduit*, 810 F.2d at 1578 (reversing obviousness finding where the district court failed to consider the prior art "as a whole," but rather "selected bits and pieces from prior patents that might be modified to fit its legally incorrect interpretation"); *Genetics Inst., LLC v. Novartis Vaccines & Diagnostic, Inc.*, 655 F.3d 1291, 1305 (Fed. Cir. 2011) (holding when "[v]iewed as a whole, the prior art would not have prompted one of ordinary skill to require retention of the [claimed feature]"); *Bausch & Lomb, lnc. v. Barnes-Hind/Hydrocurve,* 796 F.2d 443, 448 (Fed. Cir. 1986) (reversing obviousness finding where the district court "failed to consider the Caddell reference in its entirety and thereby ignored those portions of

the reference that argued against obviousness"). The lack of consistency when addressing unclaimed features from a single reference highlights the district court's misapplication of law.

### C. The negative impact of citric acid on maintaining the 4:1 buprenorphine:naloxone ratio is also legally relevant to objective indicia.

The district court also legally erred by ignoring the '330 patent invention's maintenance of the 4:1 ratio while improving bioavailability as an unexpected result. Appx30-31; Appx7088-7089. Objective evidence of nonobviousness need not be recited or required by the claim language in order to constitute evidence of validity. *See Preemption Devices, Inc. v. Minn. Mining & Mfg. Co.*, 732 F.2d 903, 907 (Fed. Cir. 1984) (even when unclaimed "[i]t is entirely proper, nevertheless, in evaluating nonobviousness, for a court to take into account advantages directly flowing from that invention patented"). *See also In re Sullivan*, 498 F.3d 1345, 1348, 1353 (Fed. Cir. 2007) (unclaimed unexpected property of neutralizing the lethality of rattlesnake venom while reducing the occurrence of adverse immune reaction in humans "cannot be ignored"); *Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*, 471 F.3d 1369, 1373, 1380 (Fed. Cir. 2006) (unclaimed benefit of not raising cholesterol levels buttressed conclusion of nonobviousness); *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1361, 1365 (Fed. Cir. 2008)

(considering unexpected benefit, not recited in compound claim 1, of anticonvulsive activity).

Therefore, the district court committed reversible legal error in ignoring the evidence of the ’330 patent invention’s unexpected maintenance of the critical 4:1 ratio while improving bioavailability.

### D. The district court compounded its errors by ignoring other evidence that a skilled artisan would not use citric acid in the claimed structural arrangement.

The district court compounded the legal error in holding the ’330 patent claims obvious by not addressing evidence that a skilled artisan would not use citric acid carrier particles with buprenorphine adhered by interactive forces (claim 6) or separate particles of buprenorphine and citric acid in contact with each other (claim 1).

For example, the district court did not address Orexo’s proof that citric acid promotes salivation, which conflicts with the use of interactive mixtures and disintegrants as required by claims 1 and 6. Appx7066-7067; Appx7070-7071. Dr. Dyar conceded that citric acid promotes swallowing, which is bad for bioavailability in a sublingual formulation. Appx6706 at 518:1-15. Dr. Sinko, citing references, explained “you wouldn’t combine citric acid with a fast dissolving tablet, because you would just get much higher concentrations under the tongue and more would be cleared by swallowing.” Appx6772 at 650:20-23; *see*

*also* Appx6720-6721 at 574:14–576:9, 576:10–577:8; Appx8732 at 1:34-39; Appx8727 at 2:5-13. And, the art taught that the problem with swallowing would be exacerbated by a disintegrant. *See, e.g.*, U.S. App. Pub. No. 2010/0233257 (“Herry”) (disintegrating agents cause active ingredient to be swallowed before being absorbed through the buccal mucosa). Appx11601 at [0028]-[0030]; Appx6777 at 669:2-19. It is error to combine competing elements from disparate art without providing a rationale, particularly where the art teaches away from such a combination. *Panduit Corp.*, 810 F.2d at 1578 (prior art must be considered as a whole, including teaching away).

As another example, the district court relied on a disclosure that the ’443 publication’s “invention,” i.e., compositions with opioid antagonist containing carrier particles, allow for “administration of ‘reduced’ amounts of the opioid analgesic” compared to prior art compositions. Appx29; Appx8785 at [0082]. But this disclosure teaches that improvements in bioavailability over prior art tablets are obtained when an opioid antagonist containing (and not citric acid) carrier particles is used. Appx8785 at [0082]. Thus, the district court erred by not addressing why a skilled artisan would be motivated to discard this critical feature and replace it with citric acid, which is not disclosed in the ’443 publication at all. *In re Wesslau*, 353 F.2d 238, 241 (C.C.P.A. 1965) (“It is impermissible within the framework of section 103 to pick and choose from any one reference only so much

of it as will support a given position, to the exclusion of other parts necessary to the full appreciation of what such reference fairly suggests to one of ordinary skill in the art.”).

As yet another example, the district court did not address the fact that [redacted] causes extremely high [redacted] levels in a binary dry mix. Appx7072. Actavis’s Research Manager admitted that citric acid causes much higher levels of buprenorphine degradation than every other binary mixture tested. Appx6711-06712 at 538:3–539:10; Appx8476. Before copying Orexo’s published application for the ’330 patent, Actavis was considering a formulation [redacted] at all (e.g., a skilled artisan was led away). *See, e.g.*, Appx8476 (formulation without [redacted] or [redacted]); Appx8542; Appx8546-8547 (bioavailability testing of PI-2185 without buffers compared to [redacted]); Appx6713 at 543:19–545:3; *see also* Appx6924-06928; *see Sanofi-Aventis Deutschland GmbH v. Glenmark Pharm. Inc., USA*, 748 F.3d 1354, 1360 (Fed. Cir. 2014) (“patentability may consider all of the characteristics possessed by the claimed invention, whenever those characteristics become manifest”).

Also, the district court did not address the longstanding failure to combine interactive mixture concepts with citric acid–containing buprenorphine formulations. The concept of interactive mixtures existed side–by–side with

Suboxone® tablets for nearly ten years before they were combined in the '330 patent. Interactive mixtures ***without citric acid*** were known since the 1980s. Appx6708 at 523:10-15. Suboxone® tablets (sublingual buprenorphine product with citric acid but ***no interactive mixture***) were launched in April 2003.[14] Appx10725. The priority date of the '330 patent is September 2012. Appx0048. This longstanding failure to combine interactive mixtures with citric acid–containing buprenorphine sublingual tablets until the '330 patent inventor did it weighs in favor of nonobviousness of the combination. *Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*, 119 F.3d 953, 957-58 (Fed. Cir. 1997).

And, of particular importance, the district court incorrectly characterized the examiner's reasons for allowance and did not address why the examiner was wrong to grant the '330 patent over essentially the same art being asserted by Actavis. Appx0028; Appx7058-07060. Examiners are "persons of scientific competence in the fields in which they work" and their findings are "informed by

---

[14] Temgesic®, a sublingual buprenorphine product with citric acid but ***no interactive mixture***, was known since 1990, making the total time interactive mixture concepts with citric acid–containing buprenorphine formulations have been known more than twenty years. Appx8735. In addition, the '443 publication (describing a buprenorphine sublingual tablet with an interactive mixture but ***no citric acid***) was published in May 2010, Appx8779, and the patent describing Suboxone® film (sublingual buprenorphine product with citric acid but ***no interactive mixture***) was published in February 2011, Appx8763.

their scientific knowledge, as to the meaning of prior art references to persons of ordinary skill in the art." *In re Berg,* 320 F.3d 1310, 1315 (Fed. Cir. 2003). The district court quoted but did not follow the law regarding deference to an examiner who has considered the prior art relied on by a patent challenger:

> When no prior art other than that which was considered by the PTO examiner is relied on by the attacker, he has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents.

*PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304 (Fed. Cir. 2008) (quoting *Am. Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d 1350, 1359 (Fed. Cir. 1984)). The examiner had before her all prior art and addressed virtually the same combination of references relied on by the district court and Actavis in her reasons for allowance. SOF§IV; Appx8194-8195.

The district court did not give deference to the examiner or even address why the examiner's reasons for allowance were wrong. Instead, the district court cited the examiner only once, and clearly erred when stating that Orexo's explanation of the pH timing effect persuaded the examiner to issue the '330 patent. Appx28. The reasons for allowance ***did not*** refer to the pH timing effect, nor was the pH timing effect argued during the prosecution of the '330 patent.

Instead, the examiner's reasons for allowance addressed how the ***claimed structural arrangement*** of the invention differentiated it from the prior art and provided unexpectedly improved bioavailability. SOF§IV; Appx8194-8195. The district court erred as a matter of law by failing to afford deference due to the examiner, a person of scientific competence in the field, who provided reasoning ***with citations to the art*** to explain why the missing structural limitations were nonobvious, and clearly erred as a matter of fact when characterizing the examiner's reasons.

*****

The district court made reversible errors of fact and law in adjudging the '330 patent obvious. First, there was a hole in Actavis's proofs and the district court erred legally and factually by relying on unsupported, incomplete, and clearly erroneous expert testimony that in no way meets the high standard for inherency in the obviousness context to fill that hole. Second, the district court expressly disregarded or ignored legally relevant teachings in the art that would dissuade a skilled artisan from filling the hole in the way the district court's theory requires. When considering all the facts and correctly applying the law, the evidence does not support the district court's judgment that the '330 patent is invalid as obvious.

## CONCLUSION

The district court's judgment of invalidity of the '330 patent should be reversed.

February 6, 2017

Respectfully submitted,

/s/ Errol B. Taylor

Errol B. Taylor
Fredrick M. Zullow
Anna Brook
Jordan P. Markham
MILBANK, TWEED, HADLEY & McCLOY LLP
28 Liberty Street
New York, New York 10005
Telephone: 212-530-5000
Facsimile: 212-530-5219

*Attorneys for Plaintiffs-Appellants Orexo AB and Orexo US, Inc.*

# ADDENDUM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OREXO AB and OREXO US, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 14-829 (SLR)(SRF) |
| | ) | |
| ACTAVIS ELIZABETH LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**[PROPOSED] AMENDED FINAL JUDGMENT**

Whereas the Court issued its post-trial Opinion (D.I. 228) and Order (D.I. 229) and entered Judgment In a Civil Case (D.I. 230) on November 15, 2016 stating that "IT IS ORDERED AND ADJUDGED that judgment be and is hereby entered in favor of plaintiff and against defendant as to the '996 patent, and in favor of defendant and against plaintiff as to the '330 patent," the Judgment is hereby amended in its entirety as follows:

IT IS ORDERED AND ADJUDGED on this 9th day of December, 2016, that:

1. Plaintiffs Orexo AB and Orexo US, Inc. (collectively "Orexo") asserted claims 1 and 2 of U.S. Patent No. 8,454,996 ("the '996 patent");

2. Judgment is hereby entered in favor of plaintiffs Orexo and against defendant Actavis Elizabeth LLC ("Actavis") as to the '996 patent in accordance with the Court's Opinion and Order dated November 15, 2016;

3. Pursuant to 35 U.S.C. § 271(e)(4)(A), the effective date of any approval of ANDA No. 206258 under § 505(j) of the Federal Food, Drug & Cosmetic Act (21 U.S.C. § 355(j)) for the drug products described therein ("ANDA Products") shall be a date which is not earlier than the September 24, 2019 expiration of the '996 patent.

4. In accordance with 35 U.S.C. § 271(e)(4)(B), Actavis, its officers, agents, servants, employees, and attorneys, other persons who are in active concert or participation with them, and any person or entity to whom Actavis transfers ANDA No. 206258 are enjoined from engaging in the commercial manufacture, use, offer to sell (as defined in 35 U.S.C. § 271(i)) and/or sale of the ANDA Products within the United States or importing the ANDA Products into the United States until after the September 24, 2019 expiration of the '996 patent.

5. Plaintiffs Orexo asserted claims 1, 3-6 and 8-10 of U.S. Patent No. 8,940,330 ("the '330 patent").

6. Judgment is hereby entered in favor of defendant Actavis and against plaintiffs as to the '330 patent in accordance with the Court's Opinion and Order dated November 15, 2016.

UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OREXO AB and OREXO US, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. No. 14-829-SLR |
| | ) | |
| ACTAVIS ELIZABETH LLC, | ) | |
| | ) | |
| Defendant. | ) | |

---

Jack B. Blumenfeld, Esquire and Derek J. Fahnestock, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware. Counsel for Plaintiffs. Of Counsel: Errol B. Taylor, Esquire, Fredrick M. Zullow, Esquire, Ryan Hagglund, Esquire, Anna Brook, Esquire, Nangah Tabah, Esquire, Jordan P. Markham, Esquire, Jenny Shum, Esquire, and Kyanna Lewis, Esquire of Milbank, Tweed, Hadley & McCloy LLP.

John C. Phillips, Jr., Esquire and David A. Bilson, Esquire of Phillips, Goldman, McLaughlin & Hall, P.A., Wilmington, Delaware. Counsel for Defendant. Of Counsel: George C. Lombardi, Esquire, Michael K. Nutter, Esquire, Ivan M. Poullaos, Esquire, and Tyler G. Johannes, Esquire of Winston & Strawn LLP.

---

**OPINION**

Dated: November 15 , 2016
Wilmington, Delaware

ROBINSON, District Judge

# I. INTRODUCTION

This action arises out of the filing of an Abbreviated New Drug Application ("ANDA") by defendant Actavis Elizabeth LLC ("Actavis") seeking to market a generic sublingual tablet containing buprenorphine and naloxone. Plaintiffs Orexo AB and Orexo US. Inc. (collectively "Orexo") brought this action alleging infringement of U.S. Patent Nos. 8,454,996 ("the '996 patent") and 8,940,330 ("the '330 patent"). The court held a *Markman* hearing on August 31, 2015 and issued a claim construction order on October 6, 2015 construing certain disputed limitations. (D.I. 127) The court held a final pretrial conference on May 11, 2016 and a five-day bench trial from June 6-13, 2016 on the issues of infringement and validity, and the parties have since completed post-trial briefing. The 30-month stay of FDA final approval on Actavis's ANDA expires on November 16, 2016. The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1400(b). Having considered the documentary evidence and testimony, the court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

# II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

## A. Technology at Issue

### 1. Buprenorphine

Buprenorphine is an opioid agonist used to treat patients for opioid dependence, such as heroin or other prescription pain medication. Buprenorphine may be solubilized and injected by patients seeking to abuse it. To address the abuse potential, naloxone (an opioid antagonist that reverses the effects of opioid analgesics) may be added to

some buprenorphine formulations. Naloxone has poor transmucosal bioavailability, therefore, if used in a sublingual formulation, the small amount of naloxone absorbed should not interfere with the desired effects of buprenorphine. If the formulation is dissolved and injected by an abuser, the increased availability of naloxone "serve[s] to antagonize the effects of buprenorphine, at the same time as precipitating unpleasant opioid withdrawal symptoms." Naloxone only partially blocks buprenorphine's action for a short time, thus, there is still potential for abuse of a formulation containing both naloxone and buprenorphine. ('330 patent, 1:54-2:36; D.I. 206 at 901:24-902:8)

Suboxone® ("Suboxone") is a sublingual tablet containing buprenorphine and naloxone in a 4/1 ratio, which was on the market in the United States in 2004. ('330 patent, 2:5-8; JTX 69 at 2; D.I. 206 at 901:16-23) The 4/1 ratio is the preferred dose ratio of buprenorphine and naloxone to treat opioid addiction and deter abuse. ('330 patent, 10:27-29; D.I. 202 at 58:18-59:2)

**2. Zubsolv®**

Orexo developed Zubsolv® ("Zubsolv"), a sublingual tablet formulation containing buprenorphine and naloxone in a 4/1 ratio intended for the treatment of opioid dependence. (D.I. 202 at 53:9-14; D.I. 205 at 770:22-771:3) According to Thomas Lundqvist ("Lundqvist"), co-founder of Orexo, Orexo invested approximately $60 million to research and develop a more abuse-resistant buprenorphine product from 2009-2014. (D.I. 202 at 56:19-22; D.I. 196 at 6) Andreas Fischer ("Fischer"), the inventor of the '330 patent, testified that the "goal was to develop a product with at least 25% higher bioavailability compared to Suboxone." (D.I. 202 at 83:20-84:3; D.I. 196 at 9)

Fischer's first laboratory notebook entry set forth a formulation of an "interactive mixture (tablet)" for "sublingual administration." The ingredients included buprenorphine, naloxone, citric acid, and sodium citrate.[1] (JTX 122 at 148; D.I. 202 at 88:1-6; JTX 123 at 12; D.I. 202 at 85:16-86:3; 124:15-24; 122:10-17) Anders Pettersson ("Pettersson"), first inventor on the '996 patent, testified that he suggested using a mucoadhesive component in order to reduce the risk of the active ingredient being swallowed. (D.I. 203 at 333:4-8) He stated that he knew about such agents from the literature, which described that "they had the ability to adhere to biological mucous surfaces." (D.I. 203 at 334:17-20; D.I. 211 at 48)

Lundqvist testified that the first clinical results showed that Zubsolv had a 66% improvement in bioavailability. (D.I. 202 at 58:9-15; D.I. 211 at 36) According to a bioequivalence study, Zubsolv increases the bioavailability of buprenorphine, such that patients require a 29% lower dose using Zubsolv as compared to Suboxone. (JTX 153; D.I. 202 at 63:11-17; D.I. 205 at 770:22-771:3; D.I. 196 at 12) Orexo's pharmaceutical development report stated that "[d]ue to the anticipated improved dissolution of buprenorphine the selected dose of 6 mg buprenorphine is expected to give approximately the same systemic buprenorphine exposure in humans as a Suboxone® tablet with 8 mg buprenorphine." (JTX 123 at 4; JTX 128 at 32; D.I. 203 at 352:11-22)

**2. The '996 patent**

The '996 patent, titled "Pharmaceutical Composition for the Treatment of Acute

[1] The explanation regarding the function and inclusion of citric acid and sodium citrate is redacted.

Disorders," was filed on November 26, 2011 and issued on June 4, 2013, with a priority date of September 24, 1998.[2] It claims a method of sublingually administering a tablet comprising (1) microparticles of buprenorphine, "presented at" (claim 1) or alternatively "adhered to" (claim 2) the surfaces of carrier particles, and (2) a bio/mucoadhesion promoting agent also in a mixture with carrier particles. ('996 patent, 12:18-43) The patent states that using "ordered mixtures for sublingual administration, where the volume of liquid available as a solvent is limited to a few milliliters, has not been considered as a feasible approach. It was therefore unexpected that the present form of a solid dosage form preparation and administration route gives positive and useful results." ('996 patent, 3:56-61) The patent explains that "[a] variety of polymers known in the art can be used as bio/mucoadhesion promoting agents," and provides examples thereof. ('996 patent, 5:8-51) At issue are claims 1 and 2. Claim 1 recites:

> A method comprising sublingual administration to an individual of a pharmaceutical composition in the form of a tablet sized for placement under a tongue, wherein the composition comprises
>
> (a) water-soluble carrier particles having exterior surfaces,
>
> (b) microparticles of buprenorphine or a pharmaceutically-acceptable salt thereof, wherein said microparticles are smaller than the carrier particles and are admixed with the carrier particles, and
>
> (c) particles of a bioadhesion and/or mucoadhesion promoting agent consisting essentially of a polymer that swells when brought into contact with saliva, admixed with the carrier particles,
>
> wherein the microparticles of buprenorphine or a pharmaceutically-acceptable salt thereof are presented at the exterior surfaces of the carrier particles.

[2] The inventors are Christer Nyström and Anders Pettersson. The patent is assigned to Orexo AB and is listed in the FDA's Orange Book for Zubsolv.

('996 patent, 12:18-33) Claim 2 adds additional requirements, including that the composition be "essentially water free." ('996 patent, 12:34-43)

Orexo's expert, Dr. Sinko, and Actavis' expert, Dr. Dyar, agreed that the limitation "microparticles . . . presented at the exterior surfaces of the carrier particles" describes an interactive mixture. An interactive mixture is made up particles of active ingredient adhered to the surface of carrier particles by interactive forces. (D.I. 205 at 676:4-18; D.I. 203 at 360:25-361:4, 365:13-366:9, 367:1-16; D.I. 127 at 3) The three "major elements" of the claims are a sublingual tablet; water soluble carrier particles and buprenorphine formulated as an interactive mixture; and a bioadhesive agent. (D.I. 203 at 387:2-14, 388:4-9; D.I. 205 at 734:6-22) Dr. Dyar explained that the "water free" requirement "relates to the bio-mucoadhesive, because if you have moisture in the tablet, then it could activate the mucoadhesive properties of that tablet and result in it sticking potentially to the package prior to being placed in the mouth." (D.I. 204 at 416:1-15)

**3. The '330 patent**

The '330 patent, titled "Abuse-Resistant Pharmaceutical Composition for the Treatment of Opioid Dependence," was filed on September 18, 2012 and issued on January 27, 2015.[3] Claim 1 of the '330 patent recites:

> A tablet composition suitable for sublingual administration comprising:
>
> microparticles of a pharmacologically-effective amount of buprenorphine, or a pharmaceutically-acceptable salt thereof, presented upon the surface of carrier particles, wherein microparticles of buprenorphine or a pharmaceutically acceptable salt thereof are in contact with particles

[3] The listed inventor is Andreas Fischer. The '330 patent is assigned to Orexo AB and is listed in the FDA's Orange Book for Zubsolv.

comprising citric acid, wherein the buprenorphine or pharmaceutically acceptable salt thereof and the citric acid are not in the same particle;

a pharmacologically-effective amount of naloxone, or a pharmaceutically-acceptable salt thereof; and

a disintegrant selected from the group consisting of croscarmellose sodium, sodium starch glycolate, crosslinked polyvinylpyrrolidone and mixtures thereof.

('330 patent, 24:17-32) The specification provides a pH timing diagram comparing the in vitro pH for the composition of the invention to that of Suboxone and certain other formulations in a small-volume funnel dissolution test. It also provides a graph of the release of buprenorphine and naloxone, respectively, from such formulations. ('330 patent, figures 5 and 6)

Claim 1 is directed to a sublingual tablet comprising buprenorphine, naloxone, one of three named disintegrants, and citric acid. The parties' experts, Dr. Sinko and Dr. Dyar, explained that the limitation "microparticles . . . presented upon the surface of carrier particles" represents an interactive mixture. (D.I. 205 at 676:4-18; D.I. 203 at 360:25-361:4, 365:13-366:9; 367:1-16; D.I. 127 at 3) Orexo also asserted dependent claims 3-6. ('330 patent, 24:35-44)

**B. Obviousness**

**1. Standard**

"A patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a). Obviousness is a question of law, which depends on underlying factual inquiries.

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966)).

"[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 550 U.S. at 418. Likewise, a defendant asserting obviousness in view of a combination of references has the burden to show that a person of ordinary skill in the relevant field had a reason to combine the elements in the manner claimed. *Id.* at 418-19. The Supreme Court has emphasized the need for courts to value "common sense" over "rigid preventative rules" in determining whether a motivation to combine existed. *Id.* at 419-20. "[A]ny need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.* at 420. In addition to showing that a person of ordinary skill in the art would have had reason to attempt to make the composition or device, or carry out the claimed process, a defendant must also demonstrate that "such a person would have had a reasonable expectation of success in doing so." *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1360 (Fed. Cir. 2007).

A combination of prior art elements may have been "obvious to try" where there existed "a design need or market pressure to solve a problem and there [were] a finite number of identified, predictable solutions" to it, and the pursuit of the "known options

within [a person of ordinary skill in the art's] technical grasp" leads to the anticipated success. *Id.* at 421. In this circumstance, "the fact that a combination was obvious to try might show that it was obvious under § 103." *Id.*

A fact finder is required to consider secondary considerations, or objective indicia of nonobviousness, before reaching an obviousness determination, as a "check against hindsight bias." *See In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1079 (Fed. Cir. 2012). "Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Graham*, 383 U.S. at 17-18.

"Patents are presumed to be valid, and overcoming that presumption requires clear and convincing evidence." 35 U.S.C. § 282; *Spectrum Pharm., Inc. v. Sandoz Inc.*, 802 F.3d 1326, 1333 (Fed. Cir. 2015) (citing *Microsoft Corp. v. i4i Ltd. P'ship.*, 564 U.S. 91, 95 (2011) (holding that an invalidity defense must be proved by clear and convincing evidence)). In conjunction with this burden, the Federal Circuit has explained that,

> [w]hen no prior art other than that which was considered by the PTO examiner is relied on by the attacker, he has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents.

*PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304 (Fed. Cir. 2008) (citations omitted).

**2. The '996 patent**

a. **Prior art references**

i. **Interactive mixtures**

**European Patent Application No. EP 0324725 ("the '725 application")**, titled "A Pharmaceutical Composition," was filed on January 12, 1989.[4] (JTX 54) It teaches "an ordered mixture of particles of a water-soluble, pharmaceutical carrier substance and smaller particles of at least one pharmaceutically active substance which adhere to the carrier particles." ('725 application, abstract, 2:50-53) The '725 application sought to increase the amount of pharmaceutically active substance contained in an ordered mixture without decreasing the dissolution speed. (*Id.* at 1:38-48) It explains that ordered mixtures are advantageous as they enable "the therapeutically active substances to dissolve more quickly . . . when administered and consequently act more quickly." (*Id.* at 1:32-37) It provides that a "suitable carrier particle size is from 50 to 1000 microns, and . . . preferably from 100 to 500 microns." (*Id.* at 2:43-45) "The pharmaceutically active substances present in the preparation will suitably have a maximum particle size of about 24 microns, preferably not greater than about 10 microns." (*Id.* at 4:3-7) It further explains that "the preparation is essentially free from water, since the presence of water would result in premature dissolution of the active substance." (*Id.* at 5:1-4)

> The ordered mixtures prepared in accordance with the invention can be incorporated in various kinds of pharmaceutical preparations. Such preparations are preferably intended for enteral administration, primarily orally. The preparations will then, for instance, be in the form of table[t]s, capsules, powders or granulates, or in the form of suppositories for rectal administration. It is also possible to use the ordered mixtures of the

[4] The parties agree that such reference is prior art to the '996 and '330 patents. (D.I. 164, ex. 1 at 7-8)

present invention in certain preparations . . . intended for external application, such as ointments or creams.

(*Id.* at 4:55-65) The formulation contains a pharmaceutical disintegrant, for example Ac-Di-Sol®, a modified cellulose gum, which is highly swellable in water. (*Id.* at 3:8-22)

The parties dispute whether the '725 application disclosed sublingual administration by discussing "enteral administration." The parties' experts offer a confusing and largely unhelpful explanation of the term "enteral," with Dr. Dyar concluding that sublingual administration would be understood by the disclosure of "oral" and Dr. Sinko reaching the opposite conclusion.[5] (D.I. 203 at 363:12-20, 394:18-395:2; D.I. 204 at 491-494, 608-610; D.I. 205 at 748-759) The '725 application does not use the term "sublingual" and does not describe any such administration. The court determines that the '725 application does not disclose sublingual administration.

The **Westerberg thesis**[6] aims "to evaluate the extent to which ordered mixing can be used to improve the dissolution rate of a sparingly soluble drug." (JTX 58 at 16) It explains that "the rate of dissolution is an important determinant for the evaluation of bioavailability of drugs with a low aqueous solubility."[7] (JTX 58 at 8) It states, by

[5] Orexo argues that Dr. Dyar's opinion on the meaning of "enteral system" was first presented at trial and moves to strike such testimony. (D.I. 200 at 10-11) The parties each objected to the opposing experts' testimony at trial and each argued that their expert's testimony was supported by their respective reports. (D.I. 203 at 363:22-364:11; D.I. 204 at 487:18-494:19, 609:1-21) At the post-trial stage, the court concludes that both parties' experts were permitted to offer testimony on the meaning of "enteral" as used in the '725 application – the actual issue at bar. The court will not strike such testimony.

[6] Marie Westerberg, *Studies on Ordered Mixtures for Fast Release and Dissolution of Drugs with Low Aqueous Solubility*, Doctoral Thesis at Uppsala University (1992).

[7] The parties agree that such reference is prior art to the '996 and '330 patents. (D.I. 164, ex. 1 at 7-8)

reference to an article from 1976, that "the advantage of an ordered mixture is the ready availability of the drug for dissolution and absorption in the gastrointestinal track." (JTX 58 at 15) The disclosed formulation also uses Ac-Di-Sol®. (JTX 58 at 17)

### ii. Buprenorphine

The Rote Liste 1997 publication[8] lists **Temgesic® ("Temgesic")** as an analgesic.[9] Temgesic is a sublingual tablet containing buprenorphine, indicated for the treatment of "[m]oderate to severe pain." The ingredients of the sublingual tablet are buprenorphine and the additional components are lactose, cornstarch, mannitol, polyvidone (also known as povidone), citric acid, sodium citrate, and magnesium stearate. (JTX 66; JTX 67) **U.S. Patent No. 4,935,428 ("the '428 patent")**, titled "Treating Opiate Dependence," was filed on November 25, 1998 and issued on June 19, 1990. (JTX 46) The '428 patent is related to Temgesic and discloses that the sublingual tablet compositions contain "binding agents such as povidone."[10] ('428 patent, 4:15)

### iii. Bioadhesives

**U.S. Patent No. 4,259,686 ("the '686 patent")**, titled "Pharmaceutical Preparation for Oral Cavity Administration," was filed on September 22, 1975 and

[8] A compendium of commercial pharmaceutical products.

[9] According to Orexo, the Rote Liste 1997 publication's disclosure of Temgesic is cumulative to U.S. Patent No. 4,582,835 ("the '835 patent"), titled "Analgesic Compositions," filed December 5, 1984 and issued April 15, 1986. (JTX 139) The '835 patent discloses a sublingual tablet formulation containing buprenorphine and naloxone.

[10] The parties agree that both the Rote Liste 1997 publication and the '428 patent are prior art to the '996 and '330 patents. (D.I. 164, ex. 1 at 7-8)

issued on November 22, 1977.[11] (JTX 44) The '686 patent describes the use of sodium polyacrylate ("PANA") in making a pharmaceutical preparation for oral cavity administration with superior adhesion to local sites. ('686 patent, 1:4-12) According to the '686 patent, the available sublingual tablets give "patients an impulse to crunch and swallow the tablet" and are hard to hold in the mouth for a long period of time. Incorporating an adequate amount of PANA into a preparation allows it to become "strongly adherent to [the] local site and dissolve[] gradually over a long period of time while releasing appropriate amounts of the active component." ('686 patent, 1:15-43) PANA "first absorbs water and adheres strongly to the local site, then swells and dissolves gradually at the site over a long period of time, while releasing the medicinal agent substantially uniformly." (*Id.* at 2:34-44) More specifically, the '686 patent states that the "buccal tablet and sublingual tablet are pharmaceutical preparations intended for a systemic effect" and are conducive to formulations that are susceptible to decomposition "in the digestive tract and the liver, resulting in decreased drug effect." These tablets allow the drugs to be efficiently "absorbed through the oral mucous membrane . . . directly, through the systemic circulation." (*Id.* at 1:62-2:5)

> An advantage of these tablets is in the efficient absorption of the drug, because the drug is not decomposed by the liver. However, if the disintegration and dissolution of the tablet are too rapid, the object of such a way of administration is not achieved. The tablet should be prepared so that it may gradually disintegrate or dissolve in the mouth over a period of more than one hour, but actually there is not available a satisfactory preparation.

(*Id.* at 2:5-13)

[11] The parties agree that such reference is prior art to the '996 and '330 patents. (D.I. 164, ex. 1 at 7-8)

**U.S. Patent No. 4,755,386 ("the '386 patent")**, titled "Buccal Formulation," was filed on January 22, 1986 and issued on July 5, 1988.[12] (JTX 45) The '386 patent describes a "buccal formulation" which includes a soluble, pharmaceutically acceptable adhesive of a pharmaceutically acceptable disintegrant and a soluble, directly compressible tablet excipient. ('386 patent, abstract) The specification explains that the buccal formulation must "remain in contact with the oral mucosa for a time sufficient for absorption of the medicament to be administered. If the formulation falls apart too quickly, the active ingredient is swallowed, and an insufficient amount of medicament is delivered." (*Id.* at 1:34-39) The "adhesive is used to provide tackiness to the buccal formulation so that it will be held in place upon administration." Use of less than 1% adhesive "may result in insufficient adhesive properties or the formulation falling apart too quickly while excessive amounts may result in the formulation lasting for a longer period than is desirable." (*Id.* at 2:3-12) The "adhesive forms a gel-like substance which is gradually broken up by a pharmaceutically acceptable disintegrant which swells upon administration, thus exposing more of the formulation to saliva. This causes the formulation to break up gradually." (*Id.* at 2:45-50)

The **Gandhi reference**[13] states "unlike the buccal region, the sublingual region does not appear promising for attachment of a bioadhesive system, primarily because of the physical structure and mobility of tissue in this area." The "sublingual route has

---

[12] The parties agree that such reference is prior art to the '996 and '330 patents. (D.I. 164, ex. 1 at 7-8)

[13] Rajesh B. Gandhi and Joseph R. Robinson, *Oral Cavity as a Site for Bioadhesive Drug Delivery*, 13 Advanced Drug Delivery Reviews 43, 64 (1994). (JTX 63)

been used extensively for delivery of drugs which require a rapid onset of action." (JTX 63 at 67)

**b. Motivation to combine**

Dr. Dyar identified each of the three major elements of asserted claim 1 in the prior art. He explained that "[i]f you're trying to relieve pain, you want something to work rapidly." Therefore, a person of ordinary skill would select an interactive mixture to do so. (D.I. 203 at 398:8-15) In other words, a person of ordinary skill would have started with Temgesic and understood that the bioavailability of buprenorphine needed to be enhanced. The person of ordinary skill would have tried an interactive mixture based upon the '725 application and added a mucoadhesive based upon the '686 patent to arrive at a product with enhanced bioavailability. Dr. Dyar also opined that a person of ordinary skill would have expected such combination to work based on the fact that Temgesic and interactive mixtures separately worked. (D.I. 203 at 396:10-397:10; 400:25-401:19, 408:10-22) The mucoadhesive element of the '996 patent is known from the '686 and '386 patents, as well as from Temgesic. The '996 patent only requires the presence of the bioadhesive, not any particular amount. (D.I. 203 at 406:18-25) As to claim 2, Dr. Dyar explained that the additional limitation of "being water free" was a well-known requirement of an interactive mixture as disclosed by the '725 application. (D.I. 203 at 387:15-20, 407:16-25)

According to Dr. Sinko, Dr. Dyar improperly combined references from three competing and incompatible groups to arrive at his obviousness conclusion: swallowed formulations using interactive mixtures; sublingual administration of buprenorphine without interactive mixtures; and bioadhesives. (D.I. 204 at 567:21-568:3, 578:11-24,

581:6-13, 583:11-19) There would be no motivation to combine the references as "you would not expect the interactive mixture to work sublingually; . . . would expect that the bioadhesive formulations would not allow rapid dissolution of the drug; and that the bioadhesives . . . would not be promising for sublingual administration . . . ." (D.I. 204 at 583:11-19) The '996 invention combines these three "unexpected" features. (D.I. 204 at 573:4-574:2)

The first question addressed by the experts was whether the application of an interactive mixture to a sublingual formulation would be expected to increase dissolution in the sublingual space (as compared to a sublingual formulation without an interactive mixture). The '725 application generally provides that the use of an ordered mixture increases dissolution rate. Orexo argues that a person of ordinary skill would not have expected interactive mixtures to accelerate dissolution sublingually, because the sublingual volume is much smaller than the stomach volume. Dr. Sinko pointed to the explanation in the '996 patent that the volume of liquid sublingually is not conducive to dissolution. He explained that the small volume of liquid in the sublingual environment would affect both absorption and concentration, as compared to the stomach where the volumes are much larger. The absorption and concentration in the sublingual space would be "much different" than for the stomach. In the small volume of the sublingual space, drug concentration is increased and the elevated concentration can decrease dissolution rate. The decreased dissolution rate from the high concentration "competes" with the improved dissolution rate from the ordered mixture. Saliva flow may reduce the concentration by causing swallowing, but the flow is not fast enough to dilute it out to a low concentration. (D.I. 204 at 592:13-598:14) Dr. Dyar opined that, even though the

sublingual volume is small, it is not a closed system. Instead, "the drug is actually moving in a continuous manner across the mucosal membrane and getting absorbed into the body. So once it's removed, then there's more space for drug to be absorbed." (D.I. 203 at 399:1-400:18) The parties' experts have each offered a plausible explanation for whether or not a person of ordinary skill would have expected interactive mixtures to increase dissolution sublingually.

The experts then addressed whether there would be a motivation to combine the various prior art references described above. "[W]hen the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious." *KSR*, 550 U.S. at 416. A reference teaches away from a claimed invention when a person of ordinary skill, "upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994). The "mere disclosure of alternative designs does not teach away." *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004). "[C]ourts must take an 'expansive and flexible approach' to the question of obviousness." *Dome Patent L.P. v. Lee*, 799 F.3d 1372, 1380 (Fed. Cir. 2015) (citing *KSR*, 550 U.S. at 415). "The degree of teaching away will of course depend on the particular facts." *In re Gurley*, 27 F.3d at 553. "[O]bviousness must be determined in light of all the facts, and there is no rule that a single reference that teaches away will mandate a finding of nonobviousness." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006).

Dr. Sinko characterized interactive mixtures (the '725 application) and bioadhesives (the '686 and '386 patents, as well as the Gandhi reference) as "competing technologies" because "bioadhesives were associated with kind of slow release and interactive mixtures with fast release." (D.I. 204 at 603:2-15, 604:1-13, 613:25-614:4) Bioadhesives "would be expected . . . to slow dissolution." They would increase residence time, slow the release, and "hinder rapid dissolution of the active ingredient." (D.I. 204 at 612:15-21) Dr. Sinko explained that fast release to get fast absorption is wanted for sublingual delivery. (D.I. 204 at 606:11-19) Therefore, a person of ordinary skill would not expect slowly dissolving formulations to be good for sublingual administration. (D.I. 204 at 604:14-16) He testified (contrary to Dr. Dyar's opinion) that "the art is suggesting to a person of ordinary skill that if you increase dissolution, you're going to decrease absorption." (D.I. 204 at 577:2-8) Dr. Sinko explained that many factors may affect sublingual absorption, including the permeability of the drug and the environment under the tongue. (D.I. 204 at 600:7-602:13)

Dr. Sinko referenced the '686 patent's statement – a dissolution period of more than one hour is desirable – as "not something" which would be associated with sublingual administration. He concluded that the '686 patent "in some ways . . . expressly teaches away from formulations that dissolve rapidly in the mouth." (D.I. 204 at 604:24-605:5) Dr. Sinko pointed to the '386 patent's explanation – if disintegration occurs too quickly, the active ingredient is swallowed, resulting in less absorption and insufficient amount of medicament delivered to the body – to explain that increasing dissolution rate does not always increase absorption. (D.I. 204 at 574:14-577:1) Dr. Sinko concluded that both the '686 and '386 patents "taught that speeding up

dissolution would decrease bioavailability and absorption." (D.I. 204 at 613:10-15) Dr. Sinko pointed to the Gandhi reference to argue that a person of ordinary skill in the art would understand that bioadhesives would not be promising for a fast releasing formulation. (D.I. 204 at 606:23-607:22)

According to Dr. Dyar, the '686 patent teaches a person of ordinary skill to "keep the tablet in place for the time that you need to keep it in place." (D.I. 203 at 404:22-405:1) The '386 patent teaches a person of ordinary skill that adjusting the amount of adhesive allows for different amounts of adhesion. The formulation includes sufficient adhesive for the formulation to remain in contact with the oral mucosa for a time sufficient for the absorption of the medicament. (D.I. 203 at 402:22-403:19) Dr. Dyar testified that the '725 application explained that when the active ingredient is dissolved more quickly, it can act more quickly. Dr. Dyar also relied on the Westerberg thesis to explain that the rate of dissolution "is very important for determining the evaluation of bioavailability of drugs with a low aqueous solubility." (D.I. 203 at 391:1-392:3)

A motivation to combine can be found implicitly or explicitly in the prior art, or can be demonstrated by proving "by clear and convincing evidence that a person of ordinary skill in the [drug formulation arts] at the time of the invention" would have recognized the problem identified by the inventors and found it obvious to solve such problem in the manner claimed in the invention. *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1378 (Fed. Cir. 2012). The court has determined that the '725 application does not disclose sublingual administration. The record also supports Dr. Sinko's observation that interactive mixtures and sublingual tablets were known in the art for over twenty years, but not combined before September 24, 1998, the priority date for the '996 patent. (D.I.

204 at 572:21-24; D.I. 205 at 737:21-740:10) The question is whether Actavis has proven, by clear and convincing evidence, that a person of ordinary skill would be motivated to combine all the prior art references, representing three competing and incompatible groups of formulations, to arrive at the inventive concept of the '996 patent. The court concludes that, although a person of ordinary skill upon reading the prior art[14] would not necessarily be discouraged from trying interactive mixtures in a sublingual formulation, Actavis has not carried its burden to prove that a person of ordinary skill would be motivated to use the competing prior art teachings to arrive at the '996 patent combination.[15]

**4. The '330 patent**

**a. Prior art references[16]**

**U.S. Patent Application No. 2010/0129443 ("the '443 application")**, titled "Non-Abusable Pharmaceutical Composition comprising Opioids," was filed December 3, 2007 and published May 27, 2010. (JTX 50) The '443 application discloses interactive mixture compositions, i.e., "where smaller particles (of, for example, opioid analgesic and/or bioadhesion and/or mucoadhesion promoting agent) are attached to . . . the surfaces of larger opioid antagonist-containing, or opioid antagonist-based, carrier

---

[14] The '725 application, the Westerberg thesis, Temgesic, and the '386 and '686 patents.

[15] Orexo did not present secondary considerations of nonobviousness separately from its "teaching away" arguments.

[16] In addition to the art disclosed above for the '996 patent, the parties agree that the following references are prior art to the '330 patent, which has a later priority date (September 2012) than does the '996 patent (September 1998). (D.I. 164, ex. 1 at 8)

particles." ('443 application at [20]) It discloses naloxone as an opioid antagonist and describes preparations for sublingual administration. (*Id.* at [23], [73])

The prior art commercial formulations contain citric acid. Citric acid is a common excipient, used as a buffer system. (D.I. 204 at 420:20-421:5) For example, a **Suboxone tablet** contains buprenorphine and naloxone.[17] It uses citric acid and sodium citrate as a buffer system to improve the absorption of buprenorphine. (JTX 69 at 2; D.I. 204 at 420:8-15) Temgesic, Subutex®[18] ("Subutex"), and Suboxone film each use citric acid and sodium citrate. (JTX 66, JTX 69, JTX 49 at 16:1-31)

**U.S. Patent No. 8,475,832 ("the '832 patent")**, titled "Sublingual and Buccal Film Compositions," was filed on August 7, 2009 and issued on July 2, 2013.[19] (JTX 49) The '832 patent is directed to films containing therapeutic actives, including buprenorphine (a film formulation of Suboxone). ('832 patent, 1:6-15, 5:6-13) The '832 patent provides that the combination of antagonist and agonist (such as Suboxone)

> in tablet form have the potential for abuse. In some instances, the patient who has been provided the drug may store the tablet in his mouth without swallowing the tablet, then later extract the agonist from the tablet and inject the drug into the individual's body. Although certain antagonists (such as highly water-soluble antagonists) may be used to help reduce the ability to separate the agonist, the potential for abuse still exists. It is desired to provide a dosage that cannot be easily removed from the mouth once it has been administered.

---

[17] Suboxone is described in the *Physicians' Desk Reference* ("PDR") (58th ed. 2004). The parties agree that such reference is prior art to the '330 patent. (D.I. 164, ex. 1 at 7-8)

[18] Sublingual tablet containing buprenorphine.

[19] The parties agree that such reference is prior art to the '330 patent. (D.I. 164, ex. 1 at 7-8)

(*Id.* at 1:53-64) In describing preferred embodiments, the specification provides that "it has been surprisingly discovered that the absorption of one particular agonist, buprenorphine, can provide an optimum absorption at a pH of about 2-4 as well as about 5.5-6.5. Thus, one may 'optimize' the absorption of buprenorphine by providing a pH of about 2-4 or about 5.5-6.5." (*Id.* at 3:27-32) The buffer used "to control the local pH of the film composition . . . may include sodium citrate, citric acid, and combinations thereof." (*Id.* at 12:62-13:10)

> An important consequence of nonionic diffusion is that a difference in pH between two compartments will have an important influence upon the partitioning of a weakly acidic or basic drug between those compartments. The partition is such that the un-ionized form of the drug has the same concentration in both compartments, since it is the form that is freely diffusible; the ionized form in each compartment will have the concentration that is determined by the pH in that compartment, the pK and the concentration of the un-ionized form. The governing effect of pH and pK on the partition is known as the pH partition principle [or theory].

(JTX 61 at 715-16)

> [T]he local pH of the dosage is preferably controlled to provide the desired release and/or absorption of the agonist and antagonist. Buprenorphine is known to have a pKa of about 8.42, while naloxone has a pKa of about 7.94. According to pH partition theory, one would expect that saliva (which has a pH of about 6.5) would maximize the absorption of both actives. However, it has been surprisingly discovered by the [a]pplicants that by buffering the dosage to a particular pH level, the optimum levels of absorption of the agonist and antagonist may be achieved. Desirably, the local pH of a composition including an agonist and an antagonist is between about 2 to about 4, and most desirably is from 3 to 4. At this local pH level, the optimum absorption of the agonist and the antagonist is achieved.

('832 patent, 11:44-57) "The term 'local pH' refers to the pH of the region of the carrier matrix immediately surrounding the active agent as the matrix hydrates and/or dissolves, for example, in the mouth of the user." (*Id.* at 3:35-38) The buffer is used to

provide a "local pH of the composition within a range that provides the desired level of absorption of the buprenorphine." (*Id.* at 11:65-67) In example 8,

> the in vivo data indicated that the absorption of buprenorphine was substantially bioequivalent to that of the one dose tablet when the film composition local pH was lowered to about 3-3.5. This result was surprising as it did not appear to follow the pH partition theory. Further, at a local pH of about 3-3.5, it was seen that the absorption of naloxone was substantially bioequivalent to that of the one dose tablet.

(*Id.* at 21:35-23:7)

**b. Motivation to combine**

The court starts with the observation that the scope of the prior art for the '330 patent had expanded greatly from that just discussed for the '996 patent. The most significant change was the introduction in 2004 of a commercial product, Suboxone, which was a tablet administered sublingually containing buprenorphine, naloxone, and citric acid. The art, of course, developed even further after Suboxone tablets came to the market, to include prior art references which disclosed the use of an interactive mixture to improve the absorption of buprenorphine (the '443 application).[20] The ultimate question is whether Actavis has carried its burden to prove, by clear and convincing evidence, a motivation to combine these references. *See, e.g., Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1368 (Fed. Cir. 2016) ("'If all elements of a claim are found in the prior art, as is the case here, the factfinder must further consider the factual questions of whether a person of ordinary skill in the art would be motivated to combine those references, and whether in making that

---

[20] Dr. Sinko conceded that the '443 application showed that "sublingual formulations with interactive mixtures could be used with formulations of buprenorphine and naloxone," and that the prior art taught each element of claim 1 other than the use of citric acid. (D.I. 205 at 674:3-13-675:1 and 677:1-11; *see also* D.I. 204 at 620:10-14)

combination, a person of ordinary skill would have had a reasonable expectation of success.'") (citation omitted).

The court concludes that the expert opinions offered by Dr. Dyar were more credible than those offered by Dr. Sinko in this regard. Dr. Dyar opined that claim 1 was obvious in light of the combination of Suboxone with the interactive mixture disclosures (the '443 application and '725 application). Dr. Dyar testified that a person of ordinary skill would have started with the Suboxone sublingual tablet (which contains buprenorphine, naloxone, and citric acid) and then would have used an interactive mixture in order to enhance bioavailability. The person of ordinary skill would have looked to an interactive mixture to enable the active ingredient to dissolve more rapidly (as disclosed in the '443 and '725 applications) and, consequently, to act more quickly. The use of disintegrants was disclosed in the art, for example, the '725 application discloses disintegrants, including Ac-di-sol, which swells in water. He further explained that citric acid is present in many pharmaceutical products and is used as a pH buffering system. The citric acid also fits the definition of a carrier particle – "a pharmaceutically acceptable substance that is water soluble." As citric acid is of appropriate size, "it would act as a carrier if you made an interactive mixture." According to Dr. Dyar, "mannitol was also in Suboxone and would form a[n] . . . active carrier." The combination would have been expected to work as Suboxone was a commercial product and interactive mixtures had been shown to enhance bioavailability. As to claim 6, Dr. Dyar opined that "citric acid is pharmaceutically acceptable, water soluble, and of the right size, so therefore it would act as a carrier particle, because it is in the Suboxone tablet." (D.I. 204 at 417-427, 433)

Orexo offers several different arguments in opposition, notwithstanding the undisputed fact that, as of 2012, every other sublingual buprenorphine formulation that was sold commercially contained citric acid and Dr. Sinko's admissions that, by the time of the '330 patent, the prior art taught a person of ordinary skill that "sublingual formulations with interactive mixtures could be used with formulations of buprenorphine and naloxone together." (D.I. 205 at 674:3-12) In the first instance, Orexo argues that Suboxone taught away from using an interactive mixture; i.e., it does not teach one of skill in the art how to formulate an interactive mixture. The record demonstrates, however, that the prior art was replete with instructions on how to make interactive mixtures, the appropriate particle sizes to use, and the mixing that is required to achieve adhesion to a variety of carrier particles. (*See, e.g.*, D.I. 203 at 391:4-11; D.I. 204 at 423:20-24, 426:3-11, 433:8-15; D.I. 205 at 674:8-12, 682:5-15; JTX 50 at ¶¶ 1, 20, 22, 23, 31, 33, 51; JTX 54 at 4-5, 56-57) Given the teachings of the '443 application and the fact that Suboxone's description in the PDR "does not criticize, discredit, or otherwise discourage" the use of interactive mixtures, *In re Fulton*, 391 F.3d at 1201, the evidence of record clearly weighs in favor of a finding of obviousness in this regard.

Orexo also argues that a person of ordinary skill would not have been motivated to combine the prior art references at issue because buprenorphine would have been expected to follow the pH partition theory, which stands for the proposition that the lower the pH (an ionized state), the lower the transmucosal absorption of a drug such as buprenorphine. (D.I. 205 at 650-654; JTX 61 at 716) To put the point another way, "[f]aster disintegration/dissolution would be expected to release citric acid faster, lowering the pH and putting buprenorphine in the wrong state for absorption." (D.I. 200

at 29-30) According to Orexo, the '330 patent discloses a new theory of how the transmucosal absorption of buprenorphine occurs:

> The separate particles of buprenorphine and citric acid allow the citric acid to be more freely soluble, providing a more rapid pH decrease (as seen in Fig. 5). . . . The contact between buprenorphine and citric acid creates a localized area of lower pH that shifts buprenorphine into the ionized (more soluble) form, allowing for rapid release of buprenorphine into sublingual solution (as seen in Fig. 6). . . . Then, after the citric acid has dissolved quickly as a result of being in separate particles, the buffering capacity of the saliva brings the pH back to nearly neutral values, which shifts the buprenorphine to the non-ionized (more permeable) form (as seen in Fig. 5) allowing for improved absorption. . . . Prior to the '330 inventor's discovery, nowhere was the pH timing effect disclosed or suggested in the art. . . .

(*Id.* at 33) This argument persuaded the examiner to issue the '330 patent. (JTX 4 at 945)

Orexo presented exhaustive explanations with citations to technical references in connection with its arguments that the unclaimed pH timing effect disclosed in the '330 patent is relevant to a finding that one of skill in the art would not be motivated to combine the prior art references at issue. *See Intelligent Bio-Systems*, 821 F.3d at 1368.[21] As acknowledged by Orexo, Dr. Sinko's opinions are based on "a close reading of the '832 patent disclosures relating to 'local pH' and its effect on drug behavior; an examination of the pH and bioavailability data presented in the '832 patent examples; and '330 patent Fig. 8 that showed that there is a difference between the '832 patent's definition of Suboxone® film's 'local pH' (3-3.5) and an actual sublingual pH of about 6.8, as well as Suboxone® film's relatively static and nearly neutral pH profile compared to the '330 invention's dynamic pH dip and return." (D.I. 200 at 45) In other words, Dr.

---

[21] According to the Federal Circuit, unclaimed features are irrelevant to the reasonable expectation of success requirement. *Id.* at 1367.

Sinko's opinions are based on a hindsight critique of the prior art references, as opposed to what the prior art references actually taught a person of skill in the art at the time.

Contrary to Orexo's position, the court finds that the '832 patent[22] expressly taught a person of ordinary skill that the addition of citric acid facilitated an increased level of absorption of buprenorphine despite a lower pH.[23] (JTX 49 at 11:50-53; *see also* D.I. 205 at 707-709, 712) The court concludes, therefore, that the credible evidence of record clearly demonstrates that a person of ordinary skill in the art would have been motivated to reformulate Suboxone tablets as an interactive mixture to improve bioavailability (the '443 application), that the use of citric acid with an interactive mixture would also improve bioavailability (the '832 patent), and that a person of skill would have known how to form an interactive mixture using citric acid. (D.I. 205 at 674-676, 682, 733; D.I. 202 at 106-107, 126; JTX 54 at 2:43-45) Other than Dr. Sinko's reliance on unclaimed features and subjective criticisms, there is nothing in the prior art which would have discouraged a person of ordinary skill from following the path set out in the various references.[24] The court concludes that a person of ordinary skill, in light

[22] Orexo's prior art references to the contrary were published before the '832 patent and only one, J.P. Cassidy, et al., *Controlled buccal delivery of buprenorphine*, 25 Journal of Controlled Release, 21-29 (1993) (JTX62 at 8), addressed buprenorphine, albeit without addressing the pH partition theory.

[23] According to Dr. Sinko, examples 6-8 of the '832 patent show that, as the buprenorphine bioavailability is adjusted through pH variations, the naloxone availablity is compromised - that is, the desired 4/1 ratio is lost. (D.I. 205 at 666-668) Again, the 4:1 ratio is an unclaimed feature of the '330 patent, and any problems with maintaining the ratio forecast by the '832 patent goes to the reasonable expectation of success requirement, not to motivation to combine; i.e., this argument is irrelevant in this context.

[24] Even if (as Orexo contends) "it is not the mere use of interactive mixture principles, but rather the claimed combination of features, including the structural arrangement of citric acid and buprenorphine in the '330 invention that provides the unexpected

of the relevant prior art, would have been motivated to combine the references and formulate the interactive mixture described by claims 1 and 6 of the '330 patent.[25]

As to claims 8-10, Orexo argues that Actavis "fails to refer to citric acid, a required element." Orexo offers the same criticisms of the prior art (addressed above) and concludes that "there is no teaching that particles of buprenorphine and citric acid should be dry mixed together." (D.I. 200 at 51) For the reasons articulated above, a person of ordinary skill in the art would not have excluded citric acid. Interactive mixtures were known in the art and the '725 application described how to make such a mixture using dry mixing.[26] The court concludes that Actavis has demonstrated, by clear and convincing evidence, a motivation to combine as to claims 1, 3-6, and 8-10.

**c. Secondary considerations**

Orexo argues that the '330 patent is nonobvious in light of unexpectedly increased bioavailability; teaching away arguments;[27] a long-felt need for a therapy less prone to diversion and abuse; additional clinical benefits;[28] and copying.

**i. Unexpected results**

increase in bioavailability through the 'pH timing effect'" (D.I. 200 at 32), the prior art references do not teach away from the claimed combination. The resulting "unexpected increase" is a separate argument analyzed below under secondary considerations.

[25] Orexo does not offer separate reasons for the nonobviousness of claims 3-5.

[26] The court precluded reliance on the '443 application for the dependent claims.

[27] Such arguments were addressed and found to be not persuasive above.

[28] Orexo states that "[c]ontrolled clinical trials show that Zubsolv® is superior to Suboxone® in dissolve time, (and taste, mouthfeel, and ease of administration), which improve patient acceptability and tolerability of treatment." (D.I. 200 at 58) Orexo does not tie such arguments to a particular secondary consideration and closes its argument with the fact that Dr. Santoro and Dr. Sumner "agree that the products are equally efficacious." The court does not consider these arguments as pertinent to the issue of secondary considerations.

"To be particularly probative, evidence of unexpected results must establish that there is a difference between the results obtained and those of the closest prior art, and that the difference would not have been expected by one of ordinary skill in the art at the time of the invention." *Bristol-Myers Squibb Co. v. Teva Pharm. USA, Inc.*, 752 F.3d 967, 977 (Fed. Cir. 2014) (citations omitted). A new compound is not necessarily rendered nonobvious by unexpected properties. "While a 'marked superiority' in an expected property may be enough in some circumstances to render a compound patentable, a 'mere difference in degree' is insufficient." *Id.* (citations omitted). "'[D]ifferences in degree' of a known and expected property are not as persuasive in rebutting obviousness as differences in 'kind'—i.e., a new property dissimilar to the known property." *Id.* (citations omitted).

Orexo points to the patent's disclosure of 66% improved bioavailability for the claimed structure compared to Suboxone, and to Zubsolv having 29% less opioid than Suboxone. ('330 patent, 19:47-52; JTX 153; D.I. 202 at 63:11-17; D.I. 205 at 770:22-771:3) The prior art sought to improve the bioavailability of the opioid. Generally, interactive mixtures were known to improve bioavailability. Although the court rejected Orexo's arguments that the use of citric acid was expected to decrease bioavailability,[29] the increase in bioavailability (albeit a "difference in degree," not a difference in "kind") provides some support to Orexo's argument for nonobviousness.

**ii. Long-felt need**

---

[29] Each party also points to its interpretation and conclusions regarding the prior art. The court will not address these arguments again.

Orexo identifies a long-felt need for an abuse-resistant formulation of Suboxone, based on diversion[30] and abuse. The parties' experts agree that buprenorphine is subject to diversion. (D.I. 205 771:23-772:6; D.I. 206 at 923-924, 927-928, 944-946; PTX 104, PTX 106) Orexo sought approval for Zubsolv pursuant to § 505(b)(2) of the Federal Food, Drug, and Cosmetic Act, relying on the safety and efficacy data for Suboxone tablets. 21 U.S.C. § 355(b)(2). (D.I. 202 at 71:21-73:3) Orexo argued to the FDA that the total buprenorphine dose that could be diverted and misused in Zubsolv was decreased. The FDA disagreed.[31] (DTX 287 at 9; DTX 225 at 15; DTX 204 at 17; D.I. 206 at 903-905) Orexo's vice president of regulatory affairs testified that there were no "claims made in the label that Suboxone and Zubsolv are different from an abuse deterrent perspective." (D.I. 205 at 814:1-4) The label warns that buprenorphine "has the potential for being abused" and "can be abused in a similar manner to other opioids." (DTX 333 at 4, 8; D.I. 206 at 951:1-15)

Orexo's global chief medical officer, Dr. Michael Sumner ("Dr. Sumner"), opined that Zubsolv is less susceptible to diversion based on "Study 006;" a decrease in utilization of buprenorphine when Zubsolv is the preferred product for an insurance plan; and his interactions with healthcare professionals. Study 006 revealed that certain patients with a preference for Zubsolv still selected the Suboxone film when offered a choice of drug. Moreover, certain patients requested higher doses of Suboxone film. (JTX 156; DTX 232; PTX 558) Dr. Sumner testified that, in certain circumstances,

---

[30] A drug is diverted when a patient either sells or gives a prescription drug to someone else. (D.I. 205 at 771:23-772:2; D.I. 206 at 892:9-15)

[31] Such material is redacted.

reduced prescriptions were observed. Moreover, Dr. Sumner also testified regarding interactions with physicians.[32] (D.I. 205 at 772:7-780:4) On cross-examination, Dr. Sumner agreed that the primary objective of Study 006 was not to determine the diversion of Zubsolv as compared to Suboxone film. (D.I. 205 at 785:5-14) Moreover, Orexo has not conducted a clinical trial to fulfill FDA regulations with respect to the decreased abuse argument. (D.I. 205 at 801:4-11)

Dr. William Santoro ("Dr. Santoro"), Actavis' expert, testified that he has treated between 4,000 and 5,000 patients for opioid dependence since 1988. He explained that he prescribes Suboxone tablets, Suboxone film, and Zubsolv tablets to his patients. A physician treating opioid dependence is limited to 100 patients (the "patient cap"). Dr. Santoro described an instance of finding out that one of his patients was diverting her medication to her father ("therapy sharing"), who later became a patient. He cited the **Smith article**,[33] which states that the level of abuse of Subutex and Suboxone is low compared to the number of prescriptions dispensed. Dr. Santoro opined that the majority of the products are being diverted due to lack of access to care, because of the patient cap. He testified that Orexo agreed with this opinion and requested his support in sending a form letter addressing this issue to the Department of Health and Human Services to request an increase in the patient cap. (DTX 343-44) Dr. Santoro explained that the abuse profile of Zubsolv is identical to that of Suboxone, and that he has not seen data to support that Zubsolv is abused less frequently than other products or that it reduces the diversion of buprenorphine. He concluded that Zubsolv (or other

---

[32] Details are redacted.

[33] Meredith Smith et al., *Abuse of Buprenorphine in the United States*, Journal of Addictive Diseases, 26:3, 107-111 (2007). (DTX 297)

medications) could not solve the issue of therapy sharing, so long as the patient cap remains at 100. (D.I. 206 at 886:1-900:17; 907:1-908:12)

On cross-examination, Dr. Santoro testified that he has treated approximately 40 patients with Zubsolv and only a few patients with both Zubsolv and Suboxone. He has not participated in clinical trials regarding opioid dependence. He spent four to five hours reviewing the documentation provided to him (approximately 5,000 pages). (D.I. 206 at 910:7-913:16) Dr. Santoro stated that the Suboxone film is beneficial in that it cannot be crushed and snorted, as opposed to Suboxone (and Zubsolv) tablets. (D.I. 206 at 923:17-924:12) He agreed that the **Monte article**[34] and the **Cicero article**[35] described the risks of therapy sharing and other abuse, but he maintained that lack of access to care was the most common reason for therapy sharing. (D.I. 206 at 936:25-938:16; 944-946) Dr. Santoro testified that Zubsolv and Suboxone have the identical abuse potential because they have the identical formulations of 4/1 naloxone and buprenorphine. Subutex has more abuse potential due to the lack of naloxone. Dr. Santoro agreed that the warning in the label was the same for all three products. (D.I. 206 at 946-954)

Orexo argues that facts learned after FDA approval show that Zubsolv reduces diversion and abuse. Orexo's "real world evidence" set forth above is not compelling or unrebutted. Dr. Santoro attributed the majority of diversion to the need for more access to care (raising the patient cap). Dr. Sumner's testimony regarding insurance plans is

---

[34] Andrew Monte, MD et al., *Diversion of Buprenorphine/Naloxone Coformulated Tablets in a Region with High Prescribing Prevalence*, Journal of Addictive Diseases, 28:226-231 (2009). (JTX 145)

[35] Theodore J. Cicero et al., *Factors contributing to the rise of buprenorphine misuse: 2008-2013*, Drug and Alcohol Dependence (2014). (DTX 324)

speculative, as there was no focused effort to determine why the prescription volume decreased. Dr. Sumner's testimony regarding physician feedback is not an unbiased opinion. Orexo's criticisms of Dr. Santoro do not lead the court to attribute little or no weight to his testimony as requested. The only objective evidence for this factor is that which was presented to, and rejected by, the FDA.

**iii. Copying**

Orexo's contention that Actavis copied the ratios and proportion of key ingredients[36] from a preferred patent example does not compel a finding of nonobviousness. The Federal Circuit has held that it "do[es] not find compelling ... evidence of copying in the ANDA context where a showing of bioequivalency is required for FDA approval." *Purdue Pharma Products LP v. Par Pharm., Inc.*, 377 Fed. Appx. 978, 983 (Fed. Cir. 2010); *see also Bayer Healthcare Pharm., Inc. v. Watson Pharm., Inc.*, 713 F.3d 1369, 1377 (Fed. Cir. 2013) ("[C]opying in the ANDA context is not probative of nonobviousness because a showing of bioequivalence is required for FDA approval."). Accordingly, the court finds that, even if the process of reverse-engineering Zubsolv amounted to copying of the '330 patent, such conduct is not persuasive evidence of nonobviousness.

**iv. Hindsight**

Orexo alleges Dr. Dyar used improper hindsight, by mixing and matching between the Suboxone reference, the Suboxone tablet, and the '443 application. Orexo argues that Dr. Dyar saw citric acid and then searched the art for references to citric

---

[36] The court rejected many of Orexo's interpretations of the prior art, on which it relies for this proposition.

acid included in buprenorphine formulations. (D.I. 204 at 507:4-508:25) In light of the secondary considerations analyzed above, the court concludes that Actavis' obviousness combination should not be discounted because of hindsight.

**d. Conclusion**

The court determined that Actavis demonstrated, by clear and convincing evidence, a motivation to combine and a reasonable expectation of success. Having reviewed the secondary considerations, the court concludes that the unexpected result of increased bioavailability provides some support for nonobviousness, while Orexo's long-felt need and copying arguments are not persuasive evidence of such. The court finds that Actavis has met its burden to prove, by clear and convincing evidence, that claims 1, 3-6, and 8-10 are obvious.

**C. Infringement**

**1. Standard**

A patent is infringed when a person "without authority makes, uses or sells any patented invention, within the United States . . . during the term of the patent." 35 U.S.C. § 271(a). To prove direct infringement, the patentee must establish that one or more claims of the patent read on the accused device literally or under the doctrine of equivalents. *See Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 261 F.3d 1329, 1336 (Fed. Cir. 2001). A two-step analysis is employed in making an infringement determination. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996). First, the court must construe the asserted claims to ascertain their meaning and scope, a question of law. *See id.* at 976-77; *see also Teva Pharms. USA, Inc. v. Sandoz, Inc.*, _ U.S. _, 135 S. Ct. 831, 837

(2015). The trier of fact must then compare the properly construed claims with the accused infringing product. *See Markman*, 52 F.3d at 976. This second step is a question of fact. *Spectrum Pharm., Inc. v. Sandoz Inc.*, 802 F.3d 1326, 1337 (Fed. Cir. 2015) (citing *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998)). "Direct infringement requires a party to perform each and every step or element of a claimed method or product." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1320 (Fed. Cir. 2009) (quoting *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1378 (Fed. Cir. 2007)). "If any claim limitation is absent . . ., there is no literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). If an accused product does not infringe an independent claim, it also does not infringe any claim depending thereon. *Ferring B.V. v. Watson Labs., Inc.-Florida*, 764 F.3d 1401, 1411 (Fed. Cir. 2014) (citing *Wahpeton Canvas Co., Inc. v. Frontier, Inc.*, 870 F.2d 1546, 1552 (Fed. Cir. 1989) ("One who does not infringe an independent claim cannot infringe a claim dependent on (and thus containing all the limitations of) that claim.")). However, "[o]ne may infringe an independent claim and not infringe a claim dependent on that claim." *Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1359 (Fed. Cir. 2007) (quoting *Wahpeton Canvas*, 870 F.2d at 1552) (internal quotations omitted). The patent owner has the burden of proving literal infringement by a preponderance of the evidence. *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, _ U.S. _, 134 S. Ct. 1749, 1758 (2014).

**2. Analysis**

The parties dispute whether Actavis' products are interactive mixtures, i.e., whether the products meet the "presented at,"[37] "adhered to,"[38] and "presented upon"[39] limitations of the asserted claims. To show infringement of these limitations, Orexo provided evidence about the preparation and testing of sample precompression blends, Actavis' documents, and testing of Actavis' tablets.

**a. Sample precompression blends**

Orexo's expert, Dr. Martyn Davies ("Dr. Davies"), testified that his laboratory scientist, Dr. Shen Luk ("Dr. Luk"), drafted instructions to manufacture the precompression blend pursuant to Dr. Davies' instructions based on Actavis' ANDA. A laboratory technician made the precompression blends ("the 1.4 mg blend" and "the 5.7 mg blend"). (D.I. 202 at 190-196; PTX 316) Dr. Davies was not present for the manufacturing. Actavis criticizes the manufacturing process and the documentation for the blends.[40] Actavis alleges that the mixture for the 5.7 mg blend was mixed for longer than it should have been. (D.I. 202 at 218) Dr. Davies testified that this was a notation error and the technician inadvertently noted the stopwatch number instead of the minutes, as blend time would have been noted as minutes and seconds not as "XX."

---

[37] Claim 1 of the '996 patent.

[38] Claim 2 of the '996 patent.

[39] Claim 1 of the '330 patent. Actavis does not separately contend that its products do not meet the "in contact with" limitation.

[40] Orexo points out that of the 166 paragraphs in Dr. Dyar's report, 6 focused on the manufacture. At trial, Dr. Dyar's entire opinion on infringement focused on the manufacture. (D.I. 204 at 452:10-23)

Dr. Davies also spoke with the technician to confirm the blend time used.[41] (PTX 154-56; JTX 31; D.I. 202 at 158-160; D.I. 194-196)

Actavis next argues that it is unclear whether the proper procedure was followed as to "the retains." (D.I. 203 at 370-372) Certain materials are passed through a 40 mesh stainless steel screen and collected in an appropriate vessel ("the screened ingredients"). Dr. Davies testified that screening is a common practice in the pharmaceutical industry and retains are usually added back into the screened ingredients.[42] (D.I. 202 at 161:18-162:11, 212-218) Lastly, Actavis pointed out that the steps in the batch record were misnumbered, resulting in a mismatch of steps requiring the addition of ingredients.[43] (D.I. 202 at 208-214; D.I. 203 at 373-374; PTX 155) Dr. Davies testified that the misnumbering occurred as a result of copying the Actavis form, which had additional steps not applicable to lab-scale processing. (D.I. 202 at 201:2-8; D.I. 203 at 259:23-261:5) Moreover, Dr. Davies testified that he reviewed these errors with the technician and Dr. Luk to verify that the process was done correctly. (D.I. 202 at 212-213)

There can be no real question that the documentation was not up to usual laboratory or commercial standards. Dr. Davies agreed that looking at just the documentation leads to the conclusion that the ANDA procedure was not followed, and

---

[41] Dr. Davies also testified that even if it occurred, the increased blend time at this juncture before the mannitol is added is immaterial. (D.I. 202 at 160:21-161:13)

[42] Dr. Dyar testified that operators in the pharmaceutical industry would know from having previously performed a process what to do if retains were or were not present if no instruction was provided. (D.I. 204 at 468-470)

[43] For example, step 2 requires holding the screened ingredients for step 8, but step 8 requires adding different ingredients (not the screened ingredients) to the blend of step 7.

Dr. Dyar testified that if such errors were detected in the manufacturing documentation, the product would need to be remade. Dr. Dyar, however, also testified that if an investigation revealed that the proper process was followed after errors like these were detected, he would accept the manufactured product.[44] (D.I. 202 at 212:7-15; D.I. 203 at 382:12-20; D.I. 204 at 466:14-467:1) At bar, Dr. Davies testified that he conducted an investigation and determined that the correct process was followed. Testing showed that the final product contained all the ingredients. (D.I. 202 at 212-213)

Actavis also criticizes Dr. Davies' use of a lab-scale bin blender as opposed to the commercial scale V-blender used by Actavis, and points out that Dr. Davies did not conduct a validation test of the two blenders to assess any differences. The **Lemieux article**[45] states that "[i]ndustrial experience has shown that changing from a V-blender to a bin-blender cannot generally be done in a straightforward manner since such a change may have a significant impact on the powder blend uniformity. Indeed, the geometrical characteristics of tumbling blenders may lead to different granular mixing behaviors . . . ." (JTX 133 at 1783) The parties' experts interpreted this statement to refer to changing from one blender type at lab-scale to another type at industrial-scale. (D.I. 203 at 242:3-8, 378:9-24) The Lemieux article compared two lab-scale versions of industrial V- and conical bin-blenders, in part by analyzing the relative standard deviation ("RSD"), a well-known mixing criterion in the pharmaceutical industry. RSD curves for a particular sample "can be compared with the so-called RSD for a

---

[44] This statement was made in response to questioning regarding multiple errors found in Actavis' manufacturing documentation.

[45] M. Lemieux, et al., *Comparative study of the mixing of free-flowing particles in a V-blender and a bin-blender*, 62 Chemical Engineering Science 1783 (2007).

completely random binary mixture in order to determine mixing time and blend uniformity." (JTX 133 at 1784, 1792-93, fig. 9(e)) The Lemieux article concluded that the mixing properties and performance of the lab-scale V-blender and bin-blender using industrial operating parameters were comparable. (*Id.* at abstract, 1800-01)

The **Malmqvist article**[46] sought to "evaluate the effect of scaling up on the time needed to deagglomerate a fine powder and form ordered mixtures with coarse carrier particles." (JTX 143 at 22) The Malmqvist article used dry mixes of smaller particles of riboflavin with larger sodium chloride and lactose carrier particles. A deagglomeration or sieve classification test was used to determine whether the mixing endpoint (the formation of an interactive mixture) had been reached. After the mixing endpoint was reached, tablets were produced, and a homogeneity test thereon was used to confirm "that the deagglomeration test had detected the endpoint in the mixing operations." The Malmqvist article concluded that the results of the homogeneity test of the tablets "indicate that mechanically stable mixtures have been formed." Moreover, "[t]he time needed to produce ordered mixtures is reduced as the batch size is increased." (JTX 143 at 28-29)

The Lemieux article provides support for Dr. Davies' conclusion that the use of a lab-scale bin-blender instead of a lab-scale V-blender does not render the precompression blend unrepresentative of Actavis' precompression blend. The issue at bar is one of scale, i.e., the substitution of a lab-scale blender for the industrial scale V-blender used by Actavis. Dr. Davies relied on the Malmqvist article to opine that

[46] K. Malmqvist and C. Nystrom, *Studies on direct compression of tablets*, 21 Acta Pharm. Suec., 21 (1984).

because scaling up increases interactive forces, the lab-scale mixing process would have underestimated the interactive forces. (D.I. 202 at 151-156) Actavis' insistence that Orexo should have performed industrial size testing by either making the precompression blends in an industrial blender or validating the use of the lab-scale blender is unreasonable. Such experiments would entail considerable expense and logistical challenges.

Dr. Davies used scanning electron microscopy ("SEM") to demonstrate that the precompression blends were interactive mixtures.[47] (D.I. 143:8-11, 164-171; JTX 127; PTX 247-261, PTX 265-289, PTX 290-314) Dr. Davies also relied on his testing of the blend uniformity and Raman imaging.[48] (PTX 157-58, PTX 164-67, PTX 169-70, PTX 563, PTX 581) He concluded that the blend uniformity of the 5.7 mg blend is representative of Actavis' blends. The Raman imaging shows that the 1.4 and 5.7 mg blends are the same and that the 5.7 and 1.4 mg tablets are identical to the Actavis' tablets. (D.I. 202 at 160-162) Although the documentation for Dr. Davies' manufacture of the precompression blends contained numerous errors, his explanations were not wholly unreasonable. While not a perfect reproduction of Actavis' product, particularly given the scaling issue, the precompression blends are at least circumstantial evidence of infringement.

**b. Actavis' documents**

Dr. Sinko analyzed Actavis' documents and concluded that Actavis' blend uniformity tests over time show the existence of interactive forces. He opined that the

[47] As Actavis does not dispute this conclusion, the court will not elaborate thereon.

[48] Actavis' criticisms of these methods to show the presence of an interactive mixture are addressed below.

different particle sizes and free flowing blend would need interactive forces to remain uniform over time, otherwise segregation of the particles would occur. (D.I. 203 at 287-88; JTX 28, JTX 106; D.I. 212 at 26-28) On cross-examination, Dr. Sinko conceded that mixtures with "large particles like carrier particles and smaller particles" do not "necessarily" exhibit interactive forces. (D.I. 203 at 322:14-17) Dr. Davies explained that mixing particles of very different particle sizes (like those present in Actavis' blend) can cause problems with content uniformity. He concluded that the content uniformity of Actavis' mixtures is due to the presence of an interactive mixture. (D.I. 203 at 258-59) On cross-examination, Dr. Davies maintained his position regarding mixtures with different sized particles, but agreed that "for particles which are . . . the same particle size," it was "possible to have a random mixture, not an interactive mixture, but still have good content uniformity." (D.I. 203 at 246-247) Dr. Davies also maintained that the Malmqvist article used blend uniformity to indicate the presence of ordered mixing. (D.I. 203 at 249:2-251:16) Dr. Dyar opined briefly that blend uniformity "measur[ed] the uniformity of the blend prior to it being compressed" and "tells you if you have a well-mixed material." He stated that "[w]hether it's interactive mixture or a random mixture, you cannot determine from content uniformity or blend uniformity alone." (D.I. 203 at 379:25-380:15)

Actavis argues that the above testimony[49] demonstrates that blend uniformity does not show that Actavis' ANDA products contain an interactive mixture. The court

[49] The court does not find particularly helpful the snippet of testimony from Dr. Bret Berner (and Dr. Sinko's interpretation thereof):

> In order to function as a carrier particle, it has to hang on to the carrier particle. If it's falling apart, it's no longer functioning as a carrier particle. . .

disagrees. In context, the Malmqvist article suggests that blend uniformity may indicate the presence of an interactive mixture. Orexo's experts have adequately supported their opinion that blend uniformity (not in isolation) may provide information as to whether an interactive mixture exists.

### c. Testing of Actavis' tablets

Dr. Davies performed Raman imaging on Actavis' tablets and concluded that the consistent special positioning of the particles was due to interactive forces.[50] Dr. Sinko agreed with this opinion. (D.I. 202 at 143-145; 185; D.I. 203 at 285:14-17; PTX 149-150, PTX 564) Actavis avers that such testing is not indicative of the existence of an interactive mixture. Actavis points to Dr. Dyar's testimony that "[t]he blend is the best place to look at. The compressed tablets . . . will have content uniformity if you have a good blend, and it's extremely difficult to be able to tell if you had an interactive mixture just based upon looking at the tablet." Dr. Dyar also stated that "[t]he only real way that you can tell if there's an interactive mixture formed is by looking at the blend itself and seeing if the particles are attached to the carrier particles." (D.I. 203 at 383:8-18; 369:11-16)

Actavis represents that it "argued [during discovery] that the only samples it should have to produce are samples of the final product" because it "did not have any of the precompressed blend to produce." However, Actavis represented to the court that it did not have intermediates to produce and the intermediates (which would include the

---

> . To make that tablet, the mix has to stay together and remain uniform. And if it falls apart, you get segregation and not uniformity.

(D.I. 203 at 265:21-266:3; D.I. 203 at 287:2-6)

[50] Details are redacted.

precompression blend) were "irrelevant" as "it is Actavis' ANDA product that is accused of infringement in this case, not its 'intermediates.'" (D.I. 119 at 3) The court did not compel the production of the intermediates as they were not available. (D.I. 126; D.I. 148) Such non-production shaped Orexo's case, making it incongruous for Actavis to now argue that analysis of the final tablets cannot provide **any** evidence of the presence of an interactive mixture.

**d. Characteristics of ingredients and manufacturing**

Dr. Sinko offered a brief opinion that the characteristics of Actavis' manufacturing process would result in an interactive mixture. He compared Actavis' process, key ingredients, particle sizes, and resulting products to the examples of the '330 patent. (D.I. 203 at 292-295) On cross-examination, Dr. Sinko conceded that "large particles like carrier particles and smaller particles" do not "necessarily" exhibit interactive forces. (D.I. 203 at 322:14-17) Dr. Sinko acknowledged that the mixing times in the examples of the '330 patent were much longer (7 hours and 40 hours). (D.I. 203 at 318-319)

Actavis argues that this testimony has no value and points to a statement by Dr. Dyar made while discussing blend uniformity.[51] (D.I. 203 at 380:16-22) Actavis concludes that there "is simply no comparison" and the processes "are different." (D.I. 212 at 31-32) Although Dr. Sinko's testimony is brief, Actavis cannot (other than through attorney argument) refute his opinion, therefore, such opinion should be afforded some weight.

**3. Conclusion**

---

[51] Which statement is redacted.

Dr. Davies manufactured a representative precompression blend on a lab-scale following Actavis' ANDA protocol, which was determined to be an interactive mixture. Orexo's experts attributed the blend uniformity of Actavis' precompression blend documented in its records and the consistent special positioning of particles in Actavis' tablets to interactive forces. Dr. Sinko testified that Actavis' manufacturing process would yield an interactive mixture. Despite Actavis' criticisms of such opinions, for the reasons articulated above, the court finds that Orexo has proven, by a preponderance of the evidence, that Actavis' tablets infringe the asserted claims.

## III. CONCLUSION

For the foregoing reasons, the court finds that the asserted claims of the '996 patent are not invalid as obvious; the asserted claims of the '330 patent are invalid as obvious; and Actavis infringes the asserted claims of the '996 patent. An appropriate order shall issue.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OREXO AB and OREXO US, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. No. 14-829-SLR |
| | ) | |
| ACTAVIS ELIZABETH LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

At Wilmington this 15th day of November 2016, consistent with the opinion issued this same date;

IT IS ORDERED that:

1. The asserted claims of the '996 patent are valid.

2. The asserted claims of the '330 patent are invalid.

3. Defendant infringes the asserted claims of the '996 patent.

4. The clerk of court is directed to enter judgment in favor of plaintiff and against defendant as to the '996 patent, and in favor of defendant and against plaintiff as to the '330 patent.

United States District Judge

US008940330B2

(12) **United States Patent**
**Fischer**

(10) **Patent No.: US 8,940,330 B2**
(45) **Date of Patent: Jan. 27, 2015**

(54) **ABUSE-RESISTANT PHARMACEUTICAL COMPOSITION FOR THE TREATMENT OF OPIOID DEPENDENCE**

(71) Applicant: **Orexo AB**, Uppsala (SE)

(72) Inventor: **Andreas Fischer**, Uppsala (SE)

(73) Assignee: **Orexo AB**, Uppsala (SE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/127,470**

(22) PCT Filed: **Sep. 18, 2012**

(86) PCT No.: **PCT/GB2012/052303**

§ 371 (c)(1),
(2) Date: **Dec. 18, 2013**

(87) PCT Pub. No.: **WO2013/041851**

PCT Pub. Date: **Mar. 28, 2013**

(65) **Prior Publication Data**

US 2014/0212496 A1 Jul. 31, 2014

**Related U.S. Application Data**

(60) Provisional application No. 61/536,180, filed on Sep. 19, 2011.

(51) **Int. Cl.**
***A61K 9/20*** (2006.01)
***A61K 31/485*** (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ................. ***A61K 9/2077*** (2013.01); ***A61K 9/14*** (2013.01); ***A61K 31/485*** (2013.01); ***A61K 9/20*** (2013.01); ***A61K 9/0056*** (2013.01);
(Continued)

(58) **Field of Classification Search**
USPC .................................. 424/464, 489; 514/282
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,059,686 A 11/1977 Tanaka et al.
4,175,119 A 11/1979 Porter
(Continued)

FOREIGN PATENT DOCUMENTS

EP 0144243 A1 12/1984
EP 0324725 A1 7/1989
(Continued)

OTHER PUBLICATIONS

Office Action for copending U.S. Appl. No. 13/622,151 mailed on Sep. 9, 2014.*
(Continued)

*Primary Examiner* — Richard Schnizer
*Assistant Examiner* — Katherine Peebles
(74) *Attorney, Agent, or Firm* — LeClairRyan, a Professional Corporation

(57) **ABSTRACT**

There is provided pharmaceutical compositions for the treatment of e.g. opioid dependency comprising microparticles of a pharmacologically-effective amount of buprenorphine, or a pharmaceutically-acceptable salt thereof, in associative admixture with particles comprising a weak acid, or particles comprising weakly-acidic buffer forming materials. The composition may further comprise a disintegrant and/or particles of a pharmacologically-effective amount of naloxone, or a pharmaceutically-acceptable salt thereof. The compositions are useful in the treatment of opioid dependency/addiction and/or pain.

**11 Claims, 9 Drawing Sheets**




JTX-001
Orexo AB et al v. Actavis Elizabeth, LLC C.A. No. 14-829-SLR-SRF

(51) **Int. Cl.**
*A61K 9/14* (2006.01)
*A61K 9/00* (2006.01)

(52) **U.S. Cl.**
CPC ............ ***A61K 9/2018*** (2013.01); *A61K 9/2054* (2013.01); ***A61K 9/2095*** (2013.01)
USPC ............................ **424/464**; 424/489; 514/282

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,457,933 | A | 7/1984 | Gordon et al. |
| 4,459,278 | A | 7/1984 | Porter |
| 4,529,583 | A | 7/1985 | Porter |
| 4,661,492 | A | 4/1987 | Lewis et al. |
| 4,755,328 | A | 7/1988 | Mouton et al. |
| 4,755,386 | A | 7/1988 | Hsiao et al. |
| 4,769,372 | A | 9/1988 | Kreek |
| 4,885,173 | A | 12/1989 | Stanley et al. |
| 4,935,428 | A | 6/1990 | Lewis |
| 4,981,468 | A | 1/1991 | Benfiel et al. |
| 5,547,878 | A | 8/1996 | Kell |
| 5,795,909 | A | 8/1998 | Shashoua et al. |
| 5,900,423 | A | 5/1999 | Ward et al. |
| 6,004,582 | A | 12/1999 | Faour et al. |
| 6,133,289 | A | 10/2000 | Ward et al. |
| 6,228,863 | B1 | 5/2001 | Palermo et al. |
| 6,255,502 | B1 | 7/2001 | Penkler et al. |
| 6,337,422 | B1 | 1/2002 | Malthe-Sorenssen et al. |
| 6,375,957 | B1 | 4/2002 | Kaiko et al. |
| 6,440,459 | B1 | 8/2002 | Stampa Diez Del Corral et al. |
| 6,472,563 | B1 | 10/2002 | Tanoury et al. |
| 6,696,088 | B2 | 2/2004 | Oshlack et al. |
| 6,716,449 | B2 | 4/2004 | Oshlack et al. |
| 6,759,059 | B1 | 7/2004 | Pettersson et al. |
| 7,524,515 | B2 | 4/2009 | Roberts |
| 8,147,866 | B2 | 4/2012 | Finn et al. |
| 8,454,996 | B2 | 6/2013 | Pettersson et al. |
| 8,470,361 | B2 | 6/2013 | Pettersson |
| 8,658,198 | B2 | 2/2014 | Pettersson |
| 2002/0010127 | A1 | 1/2002 | Oshlack et al. |
| 2003/0004177 | A1 | 1/2003 | Kao et al. |
| 2003/0035839 | A1 | 2/2003 | Hirsh et al. |
| 2003/0064099 | A1 | 4/2003 | Oshlack et al. |
| 2003/0068371 | A1 | 4/2003 | Oshlack et al. |
| 2003/0068375 | A1 | 4/2003 | Wright et al. |
| 2003/0069263 | A1 | 4/2003 | Breder et al. |
| 2003/0124061 | A1 | 7/2003 | Roberts |
| 2003/0124185 | A1 | 7/2003 | Oshlack et al. |
| 2003/0125347 | A1 | 7/2003 | Anderson et al. |
| 2003/0157168 | A1 | 8/2003 | Breder et al. |
| 2003/0191147 | A1 | 10/2003 | Sherman et al. |
| 2003/0220291 | A1 | 11/2003 | Renshaw |
| 2004/0006091 | A1 | 1/2004 | Kyle et al. |
| 2004/0180916 | A1 | 9/2004 | Levine |
| 2004/0229038 | A1 | 11/2004 | Cooper et al. |
| 2005/0042281 | A1 | 2/2005 | Singh et al. |
| 2005/0063909 | A1 | 3/2005 | Wright, IV et al. |
| 2006/0051413 | A1 | 3/2006 | Chow et al. |
| 2007/0207207 | A1 | 9/2007 | Tzannis et al. |
| 2008/0226717 | A1 * | 9/2008 | Oury et al. .................... 424/474 |
| 2009/0263476 | A1 | 10/2009 | Jobdevairakkam et al. |
| 2010/0168147 | A1 | 7/2010 | Chapleo et al. |
| 2010/0233257 | A1 | 9/2010 | Herry et al. |
| 2011/0033542 | A1 * | 2/2011 | Myers et al. .................. 424/484 |
| 2013/0071477 | A1 | 3/2013 | Fischer |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 1201233 | A1 | 10/2001 |
| GB | 1428361 | | 2/1972 |
| GB | 2162061 | A | 5/1984 |
| WO | 0016750 | A1 | 3/2000 |
| WO | 0016751 | A1 | 3/2000 |
| WO | 0023079 | A1 | 4/2000 |
| WO | 0130288 | A1 | 5/2001 |
| WO | 02067903 | A2 | 9/2002 |
| WO | 03005944 | A1 | 1/2003 |
| WO | 2004067004 | A1 | 8/2004 |
| WO | 2005117838 | A1 | 12/2005 |
| WO | 2006097361 | A1 | 9/2006 |
| WO | 2006103418 | A1 | 10/2006 |
| WO | 2007141328 | A1 | 12/2007 |
| WO | 2008025791 | A1 | 3/2008 |
| WO | 2008068471 | A1 | 6/2008 |
| WO | WO 2008/068471 | * | 6/2008 |
| WO | 2008104737 | A1 | 9/2008 |
| WO | 2008104738 | A1 | 9/2008 |
| WO | WO 2008/152347 | * | 12/2008 |
| WO | 2010132605 | A1 | 11/2010 |
| WO | 2011017483 | A2 | 2/2011 |
| WO | 2011017484 | A2 | 2/2011 |

OTHER PUBLICATIONS

International Search Report and Written Opinion for PCT/GB2012/052303 mailed Dec. 7, 2012 (14 pages).

International Preliminary Report on Patentability for PCT/GB2012/052303 mailed Oct. 15, 2013 (17 pages).

Alho, Hannu, et al., "Abuse liability of buprenorphine-naloxone tablets in untreated IV drug users", Drug and Alcohol Dependence 88, (2007), 75-78.

Ansel, H.C., et al., "Pharmaceutical Dosage Forms and Drug Delivery Systems", 7.sup.th Ed., Chapters 6-7, (1999), 164-228.

Comer, Sandra D, et al., "Abuse liability of intravenous buprenorphine/naloxone and buprenorphine alone in buprenorphine-maintained intravenous heroin abusers", Addiction 105, (2010), 709-718.

Compton, Peggy, et al., "Pharmacokinetics, Bioavailability and opioid effects of liquid versus tablet buprenorphine", Drug and Alcohol Dependence 82, (2006), 25-31.

Fudala, Paul J, et al., "Development of opioid formulations with limited diversion and abuse potential", Drug and Alcohol Dependence 83S, (2006), S40-S47.

Gennaro, A.R., "Remington: The Science and Practice of Pharmacy", 20.sup.th Ed., Chapters 45 and 46, (2000).

Harris, Debra S, et al., "Pharmacokinetics and Subjective Effects of Sublingual Buprenorphine, Alone or in Combination with Naloxone", Clin. Pharmacokinet. 45(3), (2004), 329-340.

Megarbane, Bruno, et al., "Buprenorphine is protective against the depressive effects of norbuprenorphine on ventilation", Toxicology and Applied Pharmacology 212, (2006), 256-267.

Mendelson, John, et al., "Clinical and pharmacological evaluation of buprenorphine and naloxone combinations: why the 4:1 ratio for treatment?", Drug and Alcohol Dependence 70, (2003), S29-S37.

Mohanachandran, P S, et al., "Superdisintegrants: An Overview", International Journal of Pharmaceutical Sciences Review and Research 6(1), (Feb. 2011), 105-109.

Monte, Andrew, et al., "Diversion of Buprenorphine/Naloxone Conformulated Tablets in a Region with High Prescribing Prevalence", Journal of Addictive Diseases 28, (2009), 226-231.

Potter, Jennifer Sharpe, et al., "Pain and continued opioid use in individuals receiving buprenorphine-naloxone for opioid detoxification: Secondary analyses from the Clinical Trials Network", Journal of Substance abuse Treatment 38 (Suppl 1), (2010), S80-S86.

Schuh, Kory J, et al., "Pharmacokinetic comparison of the buprenorphine sublingual liquid and tablet", Drug and Alcohol Dependence 56, (1999), 55-60.

Sigmon, Stacey C, et al., "An injection depot formulation of buprenorphine: extended biodelivery and effects", Addiction 101, (2006), 420-432.

Smith, Meredith Y, et al., "Abuse of Buprenorphine in the United States: 2003-2005", Journal of Addictive Diseases 26, (2007), 107-111.

Staniforth, J N, "Ordered Mixing or Spontaneous Granulation?", Powder Technology 45, (1985), 73-77.

Stimmel, Barry, "Buprenorphine Misuse, Abuse, and Diversions: When Will We Ever Learn?", Journal of Addictive Diseases 26(3), (2007), 1-3.

(56) **References Cited**

OTHER PUBLICATIONS

Strain, Eric C, et al., "Relative bioavailability of different buprenorphine formulations under chronic dosing conditions", Drug and Alcohol Dependence 74, (2004), 37-43.

"Physicians' Desk Reference (PDR)", 56.sup.th Ed,, (2002).

Suboxone(R) Tablets 8mg/2mg—Summary of Product Characteristics (URL http://www.medicines.org.uk/eme/medicine/26225/spc. p. 1, section 2, p. 10, section 6.2), Last updated: May 7, 2013.

Suboxone(R) product data sheet (2006).

Office Action for corresponding U.S. Appl. No. 13/802,292, mailed Jan. 31, 2014.

Suboxone Rote, List (2009) (with partial translation).

Physician's Desk Reference, Product Description: Suboxone, pp. 2866-2869 (2004).

Handbook of Pharmaceutical Excipients, 2d., American Pharmaceutical Association, pp. 71-73, 252-621, 506-507 (1994).

Kuhlman et al., "Human Pharmacokinetics of Intravenous, Sublingual, and Buccal Buprenorphine," J. Analytical Toxicol. 20:369-378 (1996).

Declaration Under 37 C.F.R. Section 1.132 of Thomas Lundqvist, signed Jun. 5, 2007 (as filed in U.S. Appl. No. 10/851,215).

Office Action for corresponding U.S. Appl. No. 13/622,151, mailed Apr. 22, 2014.

Rowe et al., Handbook of Pharmaceutical Excipients, pp. 208-210 (Crospovidone entry), pp. 581-585 (Povidone entry), 6th Edition, Pharmaceutical Press (2009).

* cited by examiner




FIG. 1




FIG. 2




FIG. 3




FIG. 4




FIG. 5




FIG. 6




FIG. 7




FIG. 8


Buprenorphine dissolved (% of target strength)
100
90
80
70
60
50
40
30
20
10
0
Time (min)
0
0.5
1
1.5
2
2.5
3
3.5
4
4.5
5

FIG. 9

# ABUSE-RESISTANT PHARMACEUTICAL COMPOSITION FOR THE TREATMENT OF OPIOID DEPENDENCE

This application is a national stage application under 35 U.S.C. §371 of PCT Application No. PCT/GB 2012/052303, filed 18Sep. 2012, which claims the priority benefit of U.S. Provisional Application Ser. No. 61/536,180, filed 19 Sep. 2011.

This invention relates to new pharmaceutical compositions comprising opioids that are useful in the treatment of opioid/opiate dependency and/or pain, which compositions may be abuse-resistant, and may be administered transmucosally and, in particular, sublingually.

Opioids are widely used in medicine as analgesics. Indeed, it is presently accepted that, in the palliation of more severe pain, no more effective therapeutic agents exist.

Opioid agonist analgesics are used to treat moderate to severe, chronic cancer pain, often in combination with non-steroidal anti-inflammatory drugs (NSAIDs), as well as acute pain (e.g. during recovery from surgery and breakthrough pain). Further, their use is increasing in the management of chronic, non-malignant pain.

A perennial problem with potent opioid agonists however is one of abuse by drug addicts. Drug addiction is a worldwide problem of which opioid dependence, notably of heroin, is a major component. The World Health Organisation (WHO) estimates that there are approximately 4.3 million opioid addicts globally, with approximately 0.7 million in Europe and 0.3 million in the US and Canada.

Opioid dependence is a major health problem and long-term heroin use is connected to a substantially increased risk of premature death from drug overdoses, violence and suicide. Furthermore, sharing of needles among addicts contribute to the spreading of potentially fatal blood infections such as HIV, and hepatitis C. In addition, opioid dependence often leads to difficulties with social relations, inability to manage a normal job and increased criminality to finance addiction, with severe implications for the opioid dependent person and his/her family.

Opioid addicts not only feed their addition by direct purchase of opioids "on the street", typically in the form of opioid-based powders (such as heroin), but may also get hold of pharmaceutical formulations intended for the treatment of e.g. pain. Such individuals then often apply innovative techniques in their abuse of such formulations, for example by extracting a large quantity of active ingredient from that formulation into solution, which is then injected intravenously. With most commercially-available pharmaceutical formulations, this can be done relatively easily, which renders them unsafe or "abusable". Thus, there is a general need for non-abusable pharmaceutical formulations comprising opioid agonists.

Opioid addicts are often treated by way of "substitution" therapy, in which mainly "street" opioids of unknown strength and purity are replaced by pharmaceutical-grade opioids with a longer duration of action, such as buprenorphine.

Further, a new cohort of opioid-dependent individuals has begun to emerge in the last decade, particularly in the US, namely so-called "white collar" addicts, who have become dependent upon prescription opioids, typically initiated for the treatment of pain. Substitution therapy is also required for this growing group of patients.

Opioid antagonists are used to reverse the pharmacological effects of opioids. Selective opioid antagonists, such as naloxone, may therefore be used to treat narcotic drug over-



dose or to diagnose suspected opioid addiction. Naloxone in particular has a poor bioavailability when administered transmucosally but is rendered fully bioavailable when administered by injection.

A simple mixture combination tablet comprising the opioid partial agonist buprenorphine and naloxone in a 4:1 ratio for sublingual administration is available under the trademark Suboxone®. (This and other abuse-resistant opioid-containing formulations are reviewed by Fudula and Johnson in *Drug and Alcohol Dependence,* 83S, S40 (2006). See also US patent applications US 2003/0124061 and US 2003/0191147.)

Because of naloxone's poor transmucosal bioavailability, if Suboxone is taken sublingually, as directed, the small amount of naloxone that is absorbed should not interfere with the desired effects of buprenorphine.

On the other hand, if Suboxone is dissolved and injected by an addict with a view to achieving a "high", the increased availability of naloxone via the parenteral route should serve to antagonize the effects of buprenorphine, at the same time as precipitating unpleasant opioid withdrawal symptoms in an individual physically dependent on opioids.

Nonetheless, when administered parenterally, naloxone's functional blockade of buprenorphine's action is also only partial and is short-lived in its nature. In view of this, diversion and illicit use of Suboxone has frequently been reported, especially in hidden populations such as incarcerated and active drug abusers (see, for example, Alho et al, *Drug and Alcohol Dependence,* 88, 75 (2007), Monte et al, *Journal of Addictive Diseases,* 28, 226 (2009), Stimmel, *ibid.,* 26, 1 (2007) and Smith et al, *ibid.,* 26, 107, 2007). Indeed, a recent study of untreated intravenous abusers in Finland revealed that 68% reported abuse of Suboxone. Moreover, 66% of those that had abused the drug once admitted that they had abused it at least once subsequently, or even regularly thereafter (see Ahlo et al, supra).

Further, Suboxone has also been reported to have several other significant limitations. For example, the tablets are large and disintegrate slowly. The bioavailability of buprenorphine is also significantly lower than for a sublingual solution (see Compton et al, *Drug and Alcohol Dependence,* 82, 25 (2006)). Moreover, the taste is not well tolerated by all patients and the tablet has an unpleasant gritty mouthfeel. A film-based product has recently been developed to counteract these problems, but the film formulation also does not dissolve particularly quickly. Furthermore, a maximum of only two films (with doses of 2 mg and 8 mg of buprenorphine) may be administered simultaneously. Sequential administration is thus required for (commonly administered) doses in excess of 10 mg or 16 mg of buprenorphine, respectively.

There is thus a presently unmet clinical need for an abuse-resistant product for use in opioid addiction substitution therapy, but which does not possess the afore-mentioned limitations. In particular, if it were possible to devise a formulation that was capable of significantly increasing the bioavailability of buprenorphine, it might be possible to reduce the amount of this active pharmaceutical ingredient, giving rise to less opioid in the formulation and so reducing the amount available for injection if diverted by way of intravenous abuse.

International patent applications WO 00/16751, WO 2004/067004, WO 2006/103418 and WO 2008/068471 all disclose drug delivery systems for the treatment of e.g. acute pain by sublingual administration, applying an interactive mixture principle, in which the active ingredient in microparticulate form is adhered to the surfaces of larger carrier particles in the presence of a bioadhesive and/or mucoadhesive promoting

agent. WO 2008/068471 in particular discloses a formulation comprising particles of opioid agonist drug upon the surfaces of carrier particles comprising an opioid antagonist, such as naloxone.

Prior art documents, including international patent applications WO 03/005944, WO 02/067903, WO 2007/141328, WO 2010/132605, WO 01/30288 and US patent application US 2009/0263476 A1 employ pH modifying agents to promote dissolution and/or absorption of active ingredients.

We have now found that, by applying a specific formulation principle to a combination of specific active ingredients, buprenorphine and naloxone, we have provided a product with unexpected, significantly improved pharmaceutical and clinical properties.

According to a first aspect of the invention there is provided a pharmaceutical composition comprising microparticles of a pharmacologically-effective amount of buprenorphine, or a pharmaceutically-acceptable salt thereof, in associative admixture with particles comprising a weak acid, or particles comprising weakly-acidic buffer forming materials. Such compositions are referred to hereinafter as "the compositions of the invention".

It is preferred that the pharmaceutical compositions comprising buprenorphine, or a pharmaceutically-acceptable salt thereof, are presented in admixture (e.g. in simple mixture) together with a disintegrant.

In this respect, there is further provided a pharmaceutical composition comprising:

(i) a composition of the invention as hereinbefore defined ("Component (i)"); and

(ii) a disintegrant (hereinafter "Component (ii)").

Compositions comprising Components (i) and (ii) are also referred to together hereinafter as compositions of the invention.

It is further preferred that the pharmaceutical compositions comprising buprenorphine, or a pharmaceutically-acceptable salt thereof, are presented in admixture (e.g. in simple mixture) together with a disintegrant and naloxone.

In this respect, there is further provided a pharmaceutical composition comprising:

(a) a composition of the invention comprising Components (i) and/or (ii) as hereinbefore defined; and

(b) particles of a pharmacologically-effective amount of naloxone, or a pharmaceutically-acceptable salt thereof (hereinafter "Component (iii)").

Compositions comprising Component (iii) formulated together with Components, (i) and/or (ii) are also referred to together hereinafter as compositions of the invention.

Buprenorphine and pharmaceutically-acceptable salts thereof are presented in the compositions of the invention in the form of microparticles. Naloxone and pharmaceutically-acceptable salts thereof may also (e.g. preferably) be presented in compositions of the invention in the form of microparticles. Microparticles preferably possess a weight based mean diameter, number based mean diameter and/or a volume based mean diameter of between about 0.5 μm and about 15 μm, such as about 1 μm and about 10 μm. As used herein, the term "weight based mean diameter" will be understood by the skilled person to include that the average particle size is characterised and defined from a particle size distribution by weight, i.e. a distribution where the existing fraction (relative amount) in each size class is defined as the weight fraction, as obtained by e.g. sieving (e.g. wet sieving). As used herein, the term "number based mean diameter" will be understood by the skilled person to include that the average particle size is characterised and defined from a particle size distribution by number, i.e. a distribution where the existing fraction (relative amount) in each size class is defined as the number fraction, as measured by e.g. microscopy. As used herein, the term "volume based mean diameter" will be understood by the skilled person to include that the average particle size is characterised and defined from a particle size distribution by volume, i.e. a distribution where the existing fraction (relative amount) in each size class is defined as the volume fraction, as measured by e.g. laser diffraction.

Microparticles of active ingredients may be prepared by standard micronisation techniques, such as grinding, jet milling, dry milling, wet milling, precipitation, etc. An air elutriation process may be utilised subsequently to prepare specific size fractions, if required.

Preferred salts of buprenorphine and naloxone include hydrochloride salts.

Buprenorphine and pharmaceutically-acceptable salts thereof are formulated together in associative admixture with particles of a weak acid, or with particles of weakly-acidic buffer forming materials, to provide compositions of the invention (or Component (i) of compositions of the invention).

Weakly acidic materials that may be mentioned include those that, when provided in a composition of the invention, enable the provision when the composition is dissolved in water and/or saliva (e.g. at the site of administration of compositions of the invention) of a pH of between about 4.0 and about 6.5 (e.g. about 6.25), and are present in a sufficient amount to enable the maintenance of pH within this range for an appropriate length of time (e.g. about 30 seconds, such as about 1 minute) to about 3 minutes (e.g. about 2 minutes, such as about 1.5 minutes) to facilitate dissolution of, particularly, the buprenorphine microparticles, and/or absorption of buprenorphine across the sublingual mucosa thereafter. For the purpose of this invention, the term includes substances that are safe for use in mammals, and includes weak acids, weak acid derivatives and other chemicals that convert to weak acids in vivo (e.g. precursors that convert to acids in vivo, by for example being sequentially activated in accordance with properties of the local environment). Typical pKas of weak acids are in the range of between about −1.5 (e.g. about −1.74) and about 16 (e.g. about 15.74) (e.g. see Vollhardt, *Organic Chemistry* (1987). A preferred range is between about 1 and about 10. More preferably, the weakly acidic material comprises a weak acid that is safe for human consumption, for example a food acid, such as malic acid, fumaric acid, adipic acid, succinic acid, lactic acid, acetic acid, oxalic acid, maleic acid, ammonium chloride, preferably tartaric acid, and more preferably citric acid, or a combination of such acids. The skilled person will appreciate that, when weak acids are employed which are not solids (and therefore not particulate) at or around room temperature and atmospheric pressure, they may be adsorbed into a particulate carrier material (such as colloidal silica) in order to provide particles comprising the weakly acidic material.

Weakly-acidic buffer forming materials include materials that, when provided in a composition of the invention, provide a weakly acidic buffer system when the composition is dissolved in water and/or saliva (e.g. at the site of administration of compositions of the invention), enabling the provision of a pH of between about 4.0 and about 6.5 (e.g. about 6.25), and are present in a sufficient amount to enable the maintenance of pH within this range for an appropriate length of time (e.g. about 30 seconds, such as about 1 minute) to about 3 minutes (e.g. about 2 minutes, such as about 1.5 minutes) to facilitate dissolution of, particularly, the buprenorphine microparticles, and/or absorption of buprenorphine across the sublingual mucosa thereafter.

Buffer forming materials thus include combinations of weak acid and salt of weak acid, such as combinations of the aforementioned acids with alkaline salts of those acids, including sodium citrate, potassium citrate, sodium tartrate, potassium tartrate and the like. Preferred buffer forming materials are citric acid and sodium citrate. The skilled person will appreciate that, when materials are employed which are not solids (and therefore not particulate) at or around room temperature and atmospheric pressure, they may be adsorbed into a particulate carrier material (such as colloidal silica) in order to provide particles comprising the weakly-acidic buffer forming materials.

Suitable particles sizes of weakly acidic, or weakly-acidic buffer forming, materials are in the range about 1 μm and about 1000 μm (e.g. about 800 μm, such as about 750 μm), and preferably between about 40 (such as about 50 μm) and about 600 μm. Suitable amounts of weakly acidic materials that enable the maintenance of pH within the aforementioned ranges after oral administration as hereinbefore described are in the range of at least about 1% to about 10% by weight of the total formulation. Suitable total amounts of weakly-acidic buffer forming materials that enable the maintenance of pH within the aforementioned ranges after oral administration as hereinbefore described are in the range of at least about 1% to about 15% by weight of the total formulation.

The disintegrant or "disintegrating agent" that may be employed as, or as part of, Component (ii) in compositions of the invention may be defined as any material that is capable of accelerating to a measurable degree the disintegration/dispersion of a composition of the invention. The disintegrant may thus provide for an in vitro disintegration time of about 30 seconds or less, as measured according to e.g. the standard United States Pharmacopeia (USP) disintegration test method (see *FDA Guidance for Industry: Orally Disintegrating Tablets*; December 2008). This may be achieved, for example, by the material being capable of swelling, wicking and/or deformation when placed in contact with water and/or mucous (e.g. saliva), thus causing tablet formulations to disintegrate when so wetted.

Suitable disintegrants (as defined in, for example, Rowe et al, *Handbook of Pharmaceutical Excipients,* 6th ed. (2009)) include cellulose derivatives such as hydroxypropyl cellulose (HPC), low substituted HPC, methyl cellulose, ethyl hydroxyethyl cellulose, carboxymethyl cellulose calcium, carboxymethyl cellulose sodium, microcrystalline cellulose, modified cellulose gum; starch derivatives such as moderately cross-linked starch, modified starch, hydroxylpropyl starch and pregelatinized starch; and other disintegrants such as calcium alginate, sodium alginate, alginic acid, chitosan, colloidal silicon dioxide, docusate sodium, guar gum, magnesium aluminium silicate, polacrilin potassium and polyvinylpyrrolidone. Combinations of two or more disintegrants may be used.

Preferred disintegrants include so-called "superdisintergrants" (as defined in, for example, Mohanachandran et al, *International Journal of Pharmaceutical Sciences Review and Research,* 6, 105 (2011)), such as cross-linked polyvinylpyrrolidone, sodium starch glycolate and croscarmellose sodium. Combinations of two or more superdisintegrants may be used.

Disintegrants may also be combined with superdisintegrants in compositions of the invention.

Disintegrants and/or superdisintegrants are preferably employed in an (e.g. total) amount of between 0.5 and 15% by weight based upon the total weight of a composition. A preferred range is from 1 to 8%, such as from about 2 to about 7% (e.g. about 5%, such as about 4%) by weight.



Compositions of the invention may be formulated together (along with any other materials that may be present) by standard simple mixing techniques or by way of granulation.

Granules may be prepared by a process of dry granulation, wet granulation, melt granulation, thermoplastic pelletising, spray granulation or extrusion/spheronisation.

Wet granulation techniques are well known to those skilled in the art and include any technique involving the massing of a mix of dry primary powder particles using a granulating fluid, which fluid comprises a volatile, inert solvent, such as water, ethanol or isopropanol, either alone or in combination, and optionally in the presence of a binder or binding agent. The technique may involve forcing a wet mass through a sieve to produce wet granules which are then dried, preferably to a loss on drying of less than about 3% by weight.

Dry granulation techniques are also well known to those skilled in the art and include any technique in which primary powder particles are aggregated under high pressure, including slugging and roller compaction, for example as described hereinafter.

Melt granulation will be known by those skilled in the art to include any technique in which granules are obtained through the addition of a molten binder, or a solid binder which melts during the process. After granulation, the binder solidifies at room temperature. Thermoplastic pelletising will be known to be similar to melt granulation, but in which plastic properties of the binder are employed. In both processes, the agglomerates (granules) obtained comprise a matrix structure.

Spray granulation will be known by those skilled in the art to include any technique involving the drying of liquids (solutions, suspensions, melts) while simultaneously building up granulates in a fluid bed. The term thus includes processes in which foreign seeds (germs) are provided upon which granules are built up, as well as those in which inherent seeds (germs) form in the fluid bed due to abrasion and/or fracture, in addition to any spray coating granulation technique generally. The sprayed liquid coats the germs and assists further agglomeration of particles. It is then dried to form granules in the form of a matrix.

Extrusion/spheronisation will be well known to those skilled in the art to include any process involving the dry mixing of ingredients, wet massing along with a binder, extruding, spheronising the extrudate into spheroids of uniform size, and drying.

In particular, microparticles of buprenorphine or salt thereof and particles of weakly acidic, weakly-acidic buffer forming, materials are presented in associative admixture with each other in compositions of the invention. By "associative admixture" we mean that whether or not Component (i) is subsequently formulated along with Components (ii) and (iii) as hereinbefore defined, some form of mixing step (simple mixing, granulation as described hereinbefore, or otherwise) takes place as between the buprenorphine/salt microparticles and particles of weakly acidic, weakly-acidic buffer forming, materials, rendering them in intimate contact with each other.

For the avoidance of doubt, by "intimate contact", we include that microparticles of buprenorphine or salt thereof, and particles of weakly acidic, weakly-acidic buffer forming, materials, are presented in compositions of the invention in any form in which they are, at least in part, in intimate contact with each other. This includes the possibility of the inclusion of quickly dissolving coatings on one or other, or both, sets of particles.

In this respect, Component (i) is preferably presented as, or as part of, a composition of the invention in the form of a

interactive mixture comprising at least one population of carrier particles upon the surfaces of which are presented (e.g. adhered) microparticles of buprenorphine or a pharmaceutically acceptable salt thereof.

The term "interactive" mixture will be understood by those skilled in the art to include the term "ordered" mixture, and to denote a mixture in which particles do not appear as single units, as in random mixtures, but rather where smaller particles (e.g. microparticles of, for example, buprenorphine) are attached to (i.e. adhered to or associated with) the surfaces of larger carrier particles. Such mixtures are characterised by interactive forces (for example van der Waals forces, electrostatic or Coulomb forces, and/or hydrogen bonding) between carrier and surface-associated particles (see, for example, Staniforth, *Powder Technol.*, 45, 75 (1985)). In final mixtures, and compositions comprising such mixtures, the interactive forces need to be strong enough to keep the adherent particles at the carrier surface.

When interactive mixtures are employed as the formulation principle by which the particulate Component (i) is presented in a composition of the invention, these are made, preferably, with carrier particles that are of a size (weight and/or volume based average or mean diameter, vide supra) that is between about 30 μm and about 1000 μm (e.g. about 800 μm, such as about 750 μm), and preferably between about 40 (such as about 50 μm) and about 600 μm.

Carrier particles may comprise pharmaceutically-acceptable substances that are soluble in water, such as carbohydrates, e.g. sugars, such as lactose, and sugar alcohols, such as mannitol, sorbitol and xylitol; pharmaceutically-acceptable inorganic salts, such as sodium chloride. Water soluble carrier particles may also comprise the weakly acidic, and/or weakly acidic buffer forming materials, mentioned hereinbefore (such as citric acid and/or sodium citrate). Alternatively, carrier particles may comprise pharmaceutically-acceptable substances that are insoluble or sparingly soluble in water, such as dicalcium phosphate anhydrate, dicalcium phosphate dihydrate, tricalcium phosphate, calcium carbonate, and barium sulphate; starch and pre-gelatinised starch; bioadhesive and mucoadhesive materials, such as crosslinked polyvinylpyrrolidone and croscarmellose sodium; and other polymers, such as microcrystalline cellulose, cellulose and; or mixtures thereof.

By "soluble in water" we include that the material has a solubility in water that is greater than 33.3 mg/mL at atmospheric pressure (e.g. 1 bar) and room temperature (e.g. 21° C.). On the other hand, the term "sparingly soluble or insoluble in water" includes materials that have a solubility in water that is less than 33.3 mg/mL under the same conditions. Preferred soluble carrier particle materials include sugar alcohols, such as sorbitol, xylitol and particularly mannitol. Preferred sparingly water-soluble or water-insoluble carrier particle materials include cellulose and starches, such as microcrystalline cellulose.

It is preferred that buprenorphine or pharmaceutically acceptable salt thereof is presented on the surfaces of water-soluble carrier particles.

In this respect, as stated above, weakly acidic materials, and/or weakly-acidic buffer forming materials, may also function as water-soluble carrier particle materials. Therefore, the associated admixture of such materials with buprenorphine/salt thereof may mean the former comprise carrier particles upon which microparticles of the latter are presented. In such cases, such materials may be presented at least as further water-soluble carrier particles, in addition to the presence of other water-soluble carrier particles, upon the surfaces of both of which are presented burprenorphine microparticles.



When carrier particles comprise such weakly acidic/buffer forming materials, composites of such materials with other water-soluble carrier particle materials (such as those described hereinbefore) may be provided. Such materials may be prepared by direct compression or granulation, for example. Alternatively, carrier particles may consist essentially of a weakly acidic material and/or one or more materials that, when dissolved in saliva, give rise to a weakly acidic buffer system. By "consisting essentially" of such materials, we mean that, excluding the possible presence of water (vide infra), the carrier particles comprise at least about 95%, such as at least about 98%, more preferably greater than about 99%, and particularly at least about 99.5% by weight (based on the total weight of the carrier particle) of such materials. These percentages exclude the presence of trace amounts of water (e.g. crystal water or water bound to external surfaces of materials), and/or any impurities that may be present in such materials, which impurities may arise following the production of such materials, either by a commercial or non-commercial third party supplier, or by a skilled person making a composition of the invention.

Alternatively (and/or in addition), in Component (i), particles of weakly acidic material, and/or of weakly-acidic buffer forming materials, may be presented, at least in part, upon the surfaces of, and/or between, carrier particles. In such cases, suitable particle sizes of such materials are as presented herein for active ingredients and/or disintegrants.

When employed in compositions of the invention, Components (ii) and (iii) are preferably formulated together, for example to form particles comprising naloxone or salt thereof and the disintegrant, prior to mixing with Component (i). Alternatively, particles of weakly acidic material, and/or of weakly-acidic buffer forming materials, may be formulated along with Components (ii) and/or (iii) prior to mixing with buprenorphine microparticles, which latter microparticles may be presented in the form of interactive mixtures with carrier particles as hereinbefore described. Weakly acidic, and/or weakly-acidic buffer forming, materials may thus be formulated in associative admixture with buprenorphine microparticles (as hereinbefore defined) in this way.

Furthermore, in Component (iii), particles of naloxone, or pharmaceutically-acceptable salts thereof, may also be presented upon the surfaces of, and/or between, carrier particles in compositions of the invention, but this is not essential. Such carrier particles may be water-soluble (as hereinbefore defined), or may (preferably) be water-insoluble/sparingly soluble carrier particles.

Disintegrant and/or superdisintegrant materials, may also be presented, at least in part, as particles upon the surfaces of, and/or between, carrier particles, which may or may not also carry naloxone or salt thereof. If employed in particulate form, particles of disintegrants and/or superdisintegrants may be presented with a particle size (weight and/or volume based average or mean diameter, vide supra) of between about 0.1 and about 100 μm (e.g. about 1 and about 50 μm).

Alternatively, disintegrants and/or superdisintegrants may also be present as a constituent in composite excipients. Composite excipients may be defined as co-processed excipient mixtures. Examples of composite excipients comprising superdisintegrants are Parteck® ODT, Ludipress® and Prosolv® EASYtab.

Bio/mucoadhesive materials may also be presented in compositions of the invention. Such materials may be presented upon (e.g. adhered to) the surfaces of carrier particles

when components of compositions of the invention are presented in the form of interactive mixtures.

Compositions of the invention may be employed in the treatment of opioid dependency and/or addiction as described hereinbefore, for example in substitution therapy programs. Opioid dependency and/or addiction may be defined in numerous ways (see, for example, www.who.int/substance_abuse/terminology/definition1), but may be characterized for example by physiological, behavioural, and cognitive phenomena wherein the use of a substance or a class of substances takes on a much higher priority for a given individual than other behaviours that once had greater value, and/or characterised by a desire (often strong, and sometimes overpowering) to take opioids and/or opiates (which may or may not have been medically prescribed). It is particularly preferred that compositions of the invention comprising naloxone are used in the treatment of opioid dependency and/or addiction.

Buprenorphine is a partial agonist at the μ-opioid receptor and an antagonist at the κ-opioid receptor. It has high binding affinity at both receptors and competes with other agonists, such as methadone, heroin (diamorphine) and morphine, at the μ-opioid receptor. Opioid agonist effects of buprenorphine are less than the maximal effects of other, "full" opioid agonists, such as morphine, and are limited by a "ceiling" effect. The drug thus produces a lower degree of physical dependence than other opioid agonists, such as heroin, morphine or methadone and is therefore particularly useful in substitution therapy.

The term "pharmacologically effective amount" refers to an amount of an active ingredient, which is capable of conferring a desired therapeutic effect on a treated patient, whether administered alone or in combination with another active ingredient. Such an effect may be objective (i.e. measurable by some test or marker) or subjective (i.e. the subject gives an indication of, or feels, an effect).

Thus, appropriate pharmacologically effective amounts of buprenorphine (or salt thereof) include those that are capable of producing, and/or contributing to the production of, the desired therapeutic effect, namely decreased opioid and/or opiate craving and/or decreased illicit drug use, when administered transmucosally, whereas appropriate pharmacologically effective amounts of naloxone (or salt thereof) when employed must be sufficient so as not to compete with the above-mentioned pharmacological effect of the buprenorphine present in the composition of the invention upon transmucosal administration, but to antagonize the effect of the buprenorphine and precipitate withdrawal symptoms if an attempt is made by an opioid-addicted individual to inject a composition of the invention.

The amounts of active ingredients that may be employed in compositions of the invention may thus be determined by the skilled person, in relation to what will be most suitable for an individual patient. This is likely to vary with the route of administration, the type and severity of the condition that is to be treated, as well as the age, weight, sex, renal function, hepatic function and response of the particular patient to be treated.

The total amount of buprenorphine/salt thereof that may be employed in a composition of the invention may be in the range of about 0.1%, such as about 1%, to about 20%, such as about 10%, by weight based upon the total weight of the composition. The amount of this active ingredient may also be expressed as the amount in a unit dosage form (e.g. a tablet). In such a case, the amount of buprenorphine/salt that may be present may be sufficient to provide a dose of buprenorphine (calculated as the free base) per unit dosage



form that is in the range of between about 0.1 mg, such as about 1 mg and about 50, for example about 30, such as about 20 mg (e.g. about 15 mg, e.g. about 12 mg, such as about 10 mg). Preferred ranges for the treatment of pain are about 0.1 mg to about 4 mg. Preferred ranges for substitution therapy are about 0.5 mg to about 50 mg, such as about 0.75 mg, (e.g. about 1 mg) to about 12 mg, such as about 10 mg (e.g. about 7 mg). Individual buprenorphine doses per tablet that may be mentioned include about 11.4 mg, about 8.6 mg, about 5.7 mg, about 2.9 mg and about 1.4 mg.

When employed, the total amount of naloxone/salt thereof that may be employed in a composition of the invention may be in the range about 0.125%, such as about 0.25% to about 5%, such as about 2.5%, by weight based upon the total weight of the composition. The amount of this active ingredient may also be expressed as the amount in a unit dosage form (e.g. a tablet). In such a case, the amount of naloxone/salt that may be present may be sufficient to provide a dose of naloxone (calculated as the free base) per unit dosage form that is in the range of between about 0.125 mg and about 12.5 mg, such as about 0.19 mg (e.g. about 0.25 mg) to about 3 mg, such as about 2.5 mg (e.g. about 1.75 mg). Individual naloxone doses per tablet that may be mentioned include about 2.9 mg, about 2.2 mg, about 1.4 mg, about 0.7 mg and about 0.4 mg.

Although, for compositions of the invention containing naloxone, it is preferred that the dose ratio of buprenorphine: naloxone is maintained at about 4:1, the above-mentioned dosages are exemplary of the average case; there can, of course, be individual instances where higher or lower dosage ranges are merited, and such are within the scope of this invention.

Compositions of the invention, once prepared, are preferably directly compressed/compacted into unit dosage forms (e.g. tablets) for administration to mammalian (e.g. human) patients, for example as described hereinafter.

Compositions of the invention may be in the form of powders or, more preferably, tablets for e.g. sublingual administration. Tablets may also comprise a binder. A binder may be defined as a material that is capable of acting as a bond formation enhancer, facilitating the compression of the powder mass into coherent compacts. Suitable binders include cellulose gum and microcrystalline cellulose. If present, binder is preferably employed in an amount of between 0.5 and 20% by weight based upon the total weight of the tablet formulation. A preferred range is from 1 to 15%, such as from about 2.0 to about 12% (e.g. about 10%) by weight.

Suitable further additives and/or excipients that may be employed in compositions of the invention, in particular those in the form of tablets for e.g. sublingual administration may comprise:

(a) lubricants (such as magnesium stearate or, preferably, sodium stearyl fumarate);
(b) flavourings (e.g. lemon, peppermint powder or, preferably, menthol), sweeteners (e.g. neohesperidin, acesulfame K or, preferably, sucralose) and dyestuffs;
(c) antioxidants, which may be naturally occurring or otherwise (e.g. butylated hydroxytoluene (BHT), vitamin C, vitamin E, β-carotene, uric acid, uniquion, superoxide dismutase (SOD), glutathione peroxidase or peroxidase catalase); and/or
(d) other ingredients, such as carrier agents, preservatives and gliding agents (e.g. colloidal silica).

Compositions of the invention may be prepared by standard techniques, and using standard equipment, known to the skilled person.

When presented in the form of interactive mixtures, particles of e.g. buprenorphine/salt may be dry mixed with relevant carrier particles over a period of time that is sufficiently long to enable appropriate amounts of respective active ingredients to adhere to the surface of the carrier particles. This may also apply to other active ingredients and/or excipients defined hereinbefore.

The skilled person will appreciate that, in order to obtain a dry powder formulation in the form of an interactive mixture, larger carrier particles must be able to exert enough force to break up agglomerates of smaller particles. This ability will primarily be determined by particle density, surface roughness, shape, flowability and, particularly, relative particle sizes.

Standard mixing equipment may be used in this regard. The mixing time period is likely to vary according to the equipment used, and the skilled person will have no difficulty in determining by routine experimentation a suitable mixing time for a given combination of active ingredient and carrier particle material(s).

Interactive mixtures may also be provided using techniques other than dry mixing, which techniques will be well known to those skilled in the art.

Other ingredients may alternatively be incorporated by standard mixing or other formulation principles.

The compositions of the invention may be administered transmucosally, such as buccally, rectally, nasally or preferably sublingually by way of appropriate dosing means known to the skilled person. A sublingual tablet may be placed under the tongue, and the active ingredients absorbed through the surrounding mucous membranes.

In this respect, the compositions of the invention may be incorporated into various kinds of pharmaceutical preparations intended for transmucosal (e.g. sublingual) administration using standard techniques (see, for example, Lachman et al, "*The Theory and Practice of Industrial Pharmacy*", Lea & Febiger, 3rd edition (1986) and "*Remington: The Science and Practice of Pharmacy*", Gennaro (ed.), Philadelphia College of Pharmacy & Sciences, 19th edition (1995)).

Pharmaceutical preparations for sublingual administration may be obtained by combining compositions of the invention with conventional pharmaceutical additives and/or excipients used in the art for such preparations, and thereafter preferably directly compressed/compacted into unit dosage forms (e.g. tablets). (See, for example, *Pharmaceutical Dosage Forms: Tablets. Volume* 1, 2nd Edition, Lieberman et al (eds.), Marcel Dekker, New York and Basel (1989) p. 354-356 and the documents cited therein.) Suitable compacting equipment includes standard tabletting machines, such as the Kilian SP300, the Korsch EK0, the Korsch XP1, the Korsch XL100 or the Korsch PharmaPress 800.

Suitable final sublingual tablet weights are in the range of about 30 to about 400 mg, such as about 40 (e.g. about 50) to about 300 mg (e.g. about 250 mg, such as about 200 mg), for example about 50 (e.g. about 60) to 180 mg, more preferably between about 60 (e.g. about 70) and about 160 mg. Suitable final tablet diameters are in the range of about 3 to about 12 mm, for example about 4 to about 10 mm, and more preferably about 5 to about 9 mm. Suitable final tablet thicknesses are in the range of about 0.5 mm to about 4 mm, such as about 1.5 mm to about 3 mm. Various tablet shapes are possible (e.g. circular, triangular, square, diamond, polygon or oval). Suitable tablet hardnesses include crushing strengths in the range of about 10N to about 100N, for example about 15N to about 50N (depending on the size and/or weight of the tablet), according to US Pharmacopoeia method <1217>.

Irrespective of the foregoing, compositions of the invention comprising disintegrants (or other excipients that function by swelling) should be essentially free (e.g. less than about 20% by weight based on the total weight of the formulation) of water. It will be evident to the skilled person that "premature" hydration will dramatically decrease the performance of a tablet formulation in use and may result in premature dissolution of active ingredients.

Wherever the word "about" is employed herein in the context of dimensions (e.g. tablet sizes and weights, particle sizes etc.), surface coverage (e.g. of carrier particles by particles of active ingredients), amounts (e.g. relative amounts of individual constituents in a composition or a component of a composition and absolute doses (including ratios) of active ingredients), temperatures, pressures, times, pH values, concentrations, it will be appreciated that such variables are approximate and as such may vary by ±10%, for example ±5% and preferably ±2% (e.g. ±1%) from the numbers specified herein. Wherever the word "about" is employed herein in the context of pharmacokinetic properties ($C_{max}$, $t_{max}$, AUCs), etc., it will be appreciated that such variables are approximate and as such may vary by ±15%, such as ±10%.

Compositions of the invention may be administered by way of appropriate dosing means known to the skilled person. For example, a sublingual tablet may be placed under the tongue, and the active ingredients absorbed through the surrounding mucous membrane.

We have found that compositions of the invention surprisingly give rise to significantly improved bioavailability for buprenorphine when compared to prior art, commercially-available formulations. This means that formulations with lower single doses of buprenorphine may be administered by way of compositions of the invention, so reducing the "street value" of a single tablet when it comprises a composition of the invention, with more than one such tablet being required to give the same effect when illicitly administered parenterally (i.e. in "street" terms, the same "fix"). This means that compositions of the invention are less likely to be abused than prior art, commercially-available formulations (see Comer et al, *Addiction,* 105, 709-718 (2010)).

Additionally, we have found that compositions of the invention comprising naloxone also surprisingly give rise to significantly (and simultaneously with buprenorphone) improved bioavailability for naloxone when compared to prior art, commercially-available formulations.

Compositions of the invention comprising naloxone thus surprisingly give rise to similar, almost parallel, degrees of improved bioavailability for both buprenorphine and naloxone, which means that the "optimal" ratio of buprenorphine to naloxone, which has been arrived at to reduce abuse potential (see, for example, Mendelson and Jones, *Drug and Alcohol Dependence,* 70, 829 (2003)), may be maintained, and doses of both active ingredients therefore lowered by an equivalent degree to preserve the same ratio.

According to a further aspect of the invention, there is provided a method of treating opioid dependency and/or addiction in a human,

which method comprises sublingual administration to a human patient suffering from opioid dependency and/or addiction of

at least one unit dose of a pharmaceutical composition (e.g. a tablet) comprising buprenorphine or a pharmaceutically acceptable salt thereof, in combination with naloxone or a pharmaceutically acceptable salt thereof, in about a 4:1 buprenorphine:naloxone dose ratio (calculated as free bases),

wherein said unit dose composition comprises a dose of buprenorphine, which is about 75% of that of a random mixture compressed (RMC) tablet comprising buprenorphine, and

which method achieves, after an initial dose in any given treatment program, a plasma-concentration time profile for buprenorphine (and/or naloxone) that is essentially equivalent to that/those exhibited by such RMC tablets.

"RMC tablets" include, but are not limited to, the commercially-available tablet product Suboxone® (NDA No. 20-733, approval date Oct. 8, 2002; buprenorphine strength 2 mg (Product No. 001; actual weight about 100 mg) and 8 mg (Product No. 002; actual weight about 400 mg)). The 8 mg tablets (at least) have a mean crushing strength (US Pharmacopeia method <1217>) of about 127 N. RMC tablet strengths are thus in the range of about 80 to about 180 N. RMC tablets are formed by compression of a random mixture, prepared by wet granulation of a standard mixture comprising buprenorphine hydrochloride, naloxone hydrochloride dihydrate, lactose monohydrate, mannitol, maize starch, povidone K30, citric acid (anhydrous granular), sodium citrate, natural lemon and lime flavour, acesulfame potassium and magnesium stearate.

By "a plasma-concentration time profile for buprenorphine and/or naloxone that is essentially equivalent to that/those exhibited by such RMC tablets", we include that, after an initial dose in any given treatment program, one or more of:

(i) the maximum plasma concentration ($C_{max}$); and/or

(ii) the time to maximum plasma concentration ($t_{max}$); and/or

(iii) the total area under the plasma concentration-time curve from time zero to the time of the last measured plasma concentration ($AUC_t$); and/or

(iv) the area under the plasma concentration-time curve from time zero to the last concentration extrapolated to infinity based on the elimination rate constant ($AUC_{inf}$),

as measured by standard pharmacokinetic monitoring means, e.g. as described in Example 2 hereinafter, for naloxone and/or, more preferably, for buprenorphine, is between about 80% and about 125% of the corresponding values obtained for the aforementioned RMC tablets.

Thus, after an initial dose in any given treatment program, for tablets comprising a dose of buprenorphine that is about 75% of a RMC tablet comprising 8 mg of buprenorphine may present:

(i) a $C_{max}$ of between about 3.0 ng/mL and about 5.6 (such as about 4.5) ng/mL; and/or

(ii) a $t_{max}$ that is less than about 3 hours, preferably less than about 2 hours; and/or

(iii) an $AUC_{inf}$ that is about 25 ng·h/mL to about 40 ng·h/mL, such as about 28 ng·h/mL to about 36 ng·h/mL,

for buprenorphine; and/or

(a) a $C_{max}$ of between about 150 pg/mL and about 300 (such as about 250) pg/mL; and/or

(b) a $t_{max}$ that is less than about 1 hour, for naloxone.

According to a further aspect of the invention, there is provided a method of treating opioid dependency and/or addiction in a human,

which method comprises sublingual administration to a human patient suffering from opioid dependency and/or addiction of

at least one unit dose of a pharmaceutical composition (e.g. a tablet) comprising buprenorphine or a pharmaceutically acceptable salt thereof, in combination with naloxone or a pharmaceutically acceptable salt thereof, in about a 4:1 buprenorphine:naloxone dose ratio (calculated as free bases),

wherein said unit dose composition comprises a dose of buprenorphine, which is about 75% of that of a RMC tablet as hereinbefore defined, and

which method achieves after an initial dose in any given treatment program a mean relative bioavailability compared to such RMC tablets that is:

(A) about 1.2 to about 1.6 for buprenorphine; and/or

(B) about 1.2 to about 2.0 for naloxone.

According to a further aspect of the invention, there is provided a method of treating opioid dependency and/or addiction in a human, which method comprises sublingual administration to a human patient suffering from opioid dependency and/or addiction of at least one unit dose of a pharmaceutical composition (e.g. a tablet) comprising buprenorphine or a pharmaceutically acceptable salt thereof, in combination with naloxone or a pharmaceutically acceptable salt thereof, wherein said tablet comprises a dose of buprenorphine or salt thereof, which is about 6 mg or about 1.5 mg, and the buprenorphine:naloxone dose ratio is about 4:1 (calculated as the free base).

Compositions of the invention may also give rise to a lower norbuprenorphine:buprenorphine ratio in plasma when compared to prior art, commercially-available formulations. A lower norbuprenorphine to buprenorphine ratio is also seen after sublingual administration of an ethanol solution compared to a tablet formulation (see Harris et al, *Clin. Pharmacokinet.*, 43, 329 (2004)) as dose is increased, suggesting that less buprenorphine is being swallowed. In addition, less norbuprenorphine is found in the plasma after parenteral administration compared to sublingual administration (Sigmon et al, *Addiction*, 101, 420 (2005)), further supporting the notion that norbuprenorphine is formed from swallowed buprenorphine by first pass metabolism through the liver. Thus, the lower norbuprenorphine:buprenorphine ratio reported herein may be reflective of the fact that more buprenorphine is absorbed over the sublingual mucosa (and so less is swallowed) than with prior art, commercially available (e.g. RMC tablet) formulations. There may also be benefits from the reduction of the norbuprenorphine:buprenorphine ratio per se, such as reduced respiratory depression (see Megarbane et al, *Toxicology and Applied Phamacology*, 212, 256 (2006)).

According to a further aspect of the invention, there is further provided a method of treating opioid dependency and/or addiction in a human, which method comprises sublingual administration of a pharmaceutical composition comprising buprenorphine or a pharmaceutically acceptable salt thereof, in combination with naloxone or a pharmaceutically acceptable salt thereof, in about a 4:1 buprenorphine:naloxone dose ratio (calculated as the free base), wherein said composition comprises a dose of buprenorphine which is about 75% of that of a RMC tablet as hereinbefore defined, to a human patient suffering from opioid dependency and/or addiction, wherein said formulation achieves after an initial dose in any given treatment program a ratio of norbuprenorphine/buprenorphine concentrations in plasma of less than about 0.8 based upon $AUC_{24}$.

Such methods may comprise administration of a composition of the invention as defined herein.

By "any given treatment program", we mean any course of treatment of a patient with a composition of the invention.

Without being limited by theory, it is understood that the compositions of the invention give rise to such surprisingly increased bioavailability when compared to prior art, commercially-available formulations, e.g. RMC tablets, such as Suboxone, because of a pH-timing effect, in which pH is lowered as hereinbefore described for a short period of time (e.g. between about 1 and about 3 minutes) after sublingual

administration, resulting in improved and/or more rapid dissolution of microparticles of burprenorphine. Although such dissolution might be expected to be improved by decreasing pH, what is completely unexpected is that the degree of absorption across the sublingual mucosa does not appear to decrease. One would expect that lowering local pH would give rise to the presence of more burprenorphine in the ionized state at the site of absorption, which would in turn be expected to decrease the degree of absorption across the sublingual mucosa. The fact that the bioavailability is better per unit dose of buprenorphine for compositions of the invention than it is for prior art compositions is indeed remarkable.

According to a further aspect of the invention, there is provided a pharmaceutical composition comprising microparticles of buprenorphine or a pharmaceutically acceptable salt thereof, and particles of a weak acid or particles of weakly acidic buffer forming materials, characterized in that the composition exhibits, in an in vitro small-volume funnel dissolution method, for example as described in Example 5 hereinafter:

a) a pH drop of about 0.5 to about 5 pH units;

b) a maximum pH drop within about 1 minute of the start of the method; and

c) a return to the initial pH (±0.5) within about 3 minutes.

According to a still further aspect of the invention, there is provided a pharmaceutical composition comprising microparticles of buprenorphine or a pharmaceutically acceptable salt thereof, and particles of a weak acid or particles of weakly acidic buffer forming materials, characterized in that the composition enables the provision (at the site of administration) of a pH of between about 4.0 and about 6.5 (e.g. less than about 6.25), and the maintenance of pH within this range for an appropriate length of time (e.g. about 30 seconds, such as about 1 minute) to about 3 minutes (e.g. about 2 minutes, such as about 1.5 minutes) to facilitate dissolution of, particularly, the buprenorphine microparticles, and/or absorption of buprenorphine across the sublingual mucosa thereafter.

Compositions of the invention comprising naloxone surprisingly give rise to similar, almost parallel, degrees of improved bioavailability for both buprenorphine and naloxone, which means that the "optimal" ratio of buprenorphine to naloxone, which has been arrived at to reduce abuse potential (see, for example, Mendelson and Jones, *Drug and Alcohol Dependence,* 70, 829 (2003)), may be maintained, and doses of both active ingredients therefore lowered by an equivalent degree to preserve the same ratio.

The compositions of the invention are useful in the treatment of opioid dependency and/or addiction. Compositions of the invention may also be useful in the treatment of pain (including mild, moderate and severe pain).

According to three further aspects of the invention there are provided:

(i) a method of treatment of opioid dependency and/or addiction;

(ii) a method of treatment of pain; and

(iii) a method of treatment of both pain and opioid dependency and/or addiction,

which methods comprise administration of a composition of the invention to a person suffering from, or susceptible to, the relevant conditions.

Compositions of the invention may also be administered in the induction phase (i.e. the start-up) of buprenorphine therapy, wherein buprenorphine is administered once an opioid-addicted individual has abstained from using opioids for about 12-24 hours and is in the early stages of opioid withdrawal.

According to a further aspect of the invention there is provided a method of treatment of opioid dependency and/or addiction, which method comprises administration of a composition of the invention to an individual that has abstained from using opioids for at least about 12 hours and/or is in the early stages of opioid withdrawal.

By "treatment" of pain we include the therapeutic treatment, as well as the symptomatic and palliative treatment of the condition. However, by "treatment" of opioid dependency and/or addiction, we further include the prophylaxis, or the diagnosis of the relevant condition in addition to therapeutic, symptomatic and palliative treatment. This is because, by employing buprenorphine in the treatment of pain, compositions of the invention may prevent the development of opioid dependency and/or addiction.

The compositions of the invention enable the production of unit dosage forms that are easy and inexpensive to manufacture, and which enable the rapid release and/or a rapid uptake of the active ingredients employed through the mucosa, such as the oral mucosa, thus enabling rapid relief of symptoms, such as those described hereinbefore.

The compositions of the invention also have the advantage that, if injected by an opioid addict, they do not produce the euphoric effects that such an addict seeks and indeed induce opioid withdrawal symptoms.

Compositions of the invention may also have the advantage that they may be prepared using established pharmaceutical processing methods and employ materials that are approved for use in foods or pharmaceuticals or of like regulatory status.

Compositions of the invention may also have the advantage that they may be more efficacious than, be less toxic than, be longer acting than, be more potent than, produce fewer side effects than, be more easily absorbed than, possess a better patient acceptability than, have a better pharmacokinetic profile than, and/or have other useful pharmacological, physical, or chemical properties over, pharmaceutical compositions known in the prior art, whether for use in the treatment of opioid addiction or pain or otherwise.

The invention is illustrated by way of the following examples, with reference to the attached figures in which analyte concentration-time plasma profiles are presented in linear scale plots for buprenorphine (FIG. **1**), norbuprenorphine (FIG. **2**) and naloxone (FIG. **3**) following sublingual administration of tablets comprising a composition of the invention (diamonds) and the commercially-available comparator, Suboxone® (squares); FIG. **4** shows an in vivo sublingual pH profile obtained for a placebo composition (analogous to one prepared in accordance with the invention); FIG. **5** shows comparative in vitro pH profiles for composition of the invention versus Suboxone and other comparators in a small-volume funnel dissolution test; FIGS. **6** and **7** show release of buprenorphine and naloxone, respectively, from the compositions referred to in FIG. **5**; FIG. **8** shows comparative in vitro pH profiles for compositions of the invention versus Suboxone and other comparators in a small-volume funnel dissolution test; and FIG. **9** show release of buprenorphine from compositions referred to in FIG. **8**.

## EXAMPLE 1

Buprenorphine/Naloxone Sublingual Tablets I

Naloxone hydrochloride dihydrate (Macfarlan Smith, Edinburgh, UK) and buprenorphine hydrochloride (Macfarlan Smith, Edinburgh, UK) were micronised using an air jet mill (Pilotmill-1/Food and Pharma Systems, Italy). The vol-

ume based mean particle size (diameter) of the buprenorphine was 3.4 μm and of the naloxone was 4.6 μm.

9.15 g of the micronised naloxone hydrochloride dihydrate was mixed together with microcrystalline cellulose (47.50 g; Avicel™ PH102 (mean particle size 100 μm), FMC Biopolymer, Cork, Ireland) and croscarmellose sodium (18.00 g; AcDiSol™, FMC Biopolymer) in a tumble blender (Turbula, WAG, Switzerland) for 40 hours.

32.40 g of the micronised buprenorphine hydrochloride was mixed together with mannitol (314.20 g; Pearlitol™ 200SD, Roquette, Lestrem, France), sieved citric acid (15.00 g; fine granular 16/40 grade, DSM, Switzerland, Basel) and sieved (to avoid agglomeration) sodium citrate (48.75 g) Emprove™ cryst., Merck, Darmstadt, Germany) in a tumble blender for 40 hours.

Menthol (5.00 g; Emprove™ cryst., Merck) was mortared until a fine powder was formed. This and also acesulfame potassium (5.00 g; Sunett Pharma D, Nutrinova, Kelsterbach, Germany) and anhydrous colloidal silica (5.00 g; Aerosil™ 200 Pharma, Evonik Degussa, Hanau-Wolfgang, Germany) were added by sieving into the buprenorphine premix, together with the naloxone premix, and the whole mixed together in a tumble blender for 1 hour.

Sodium stearyl fumarate (10.00 g; Pruv™, JRS Pharma, Polanco, Spain) was then added by sieving into this mixture and mixing continued in the tumble blender for 5 minutes.

The final powder mixture was then compressed into tablets in a tablet machine (Korsch XP1) equipped with 7 mm round, flat faced, radius-edged punches, to a tablet weight of 102 mg and a tablet crushing strength of 35 N.

## EXAMPLE 2

Clinical Trial

The tablets of Example 1 were sublingually administered in an open-label, 2-period crossover study with randomised treatment sequence.

The study comprised a screening visit conducted within 28 days prior to first treatment, two treatment periods each of 4 days length (Day—1 to Day 3) and a washout period of at least 10 days between treatment periods. During the treatment periods, subjects were admitted to the clinical unit on the morning prior to first dosing (Day—1) and remained in the unit until the completion of Day 3 procedures. A follow-up visit was carried out 5 to 10 days after completion of the second Investigational Medicinal Product (IMP) administration.

The IMPs were sublingual tablet prepared in accordance with Example 1 (6 mg buprenorphine/1.5 mg naloxone; hereafter "formulation of the invention") and, as the reference product, Suboxone sublingual tablet (8 mg buprenorphine/2 mg naloxone; Reckitt Benckiser Healthcare Ltd, Hull, UK). Treatment with formulation of the invention, or Suboxone (1 tablet) in alternate periods was open-label and was administered on Day 1 in each treatment period.

Naltrexone tablets (Nalorex®, 50 mg, Bristol-Myers Squibb Pharmaceuticals Ltd; Uxbridge, UK) were administered orally (one 50 mg tablet), at −24 to −16 hours, −1 hour (±5 minutes) and +24 hours (±1 hour) in relation to administration of IMP, as a naltrexone block in the study (in order to alleviate opioid side effects during the study).

Eighteen healthy male volunteers aged between 18 and 50 years were enrolled. These received both treatments and were evaluated. The mean age was 29.8 years and ages ranged from 19 to 49 years. All subjects were male Caucasians. The mean weight was 78.16 kg and ranged from 63.0 to 93.5 kg. The mean body mass index of the subjects was 25.05 $kg/m^2$ and ranged from 20.7 to 28.9 $kg/m^2$.

All subjects (except one) reported current alcohol use ranging from 1 to 20 units per week. No subject was a current smoker. All subjects reported current caffeine use of 1 to 5 cups or cans per day. No subject had been treated with opioids within 1 year prior to screening.

No subject reported any pre-study medication (taken within 2 weeks prior to screening). One subject reported ongoing use of antihistamines for systemic use by oral tablet or capsule to treat seasonal allergic rhinitis.

Trial medication was administered in the clinic under the supervision of clinic personnel.

All subjects who were enrolled in the study and who received at least one dose of trial medication. All randomised subjects who received at least one treatment, had at least one evaluable plasma profile and had no major protocol deviations that could have a substantial effect on the buprenorphine, norbuprenorphine or naloxone plasma concentration profile, such as:

- swallowing of study medication (applies to both formulation of the invention and Suboxone)
- vomiting within 4 hours after administration of either type of tablet
- having a pre-dose quantifiable concentration that is >5% of a subject's $C_{max}$

All randomised subjects who received at least one treatment and had disintegration or acceptability data present for at least one treatment.

Pharmacokinetic (PK) variables were based on plasma concentrations of buprenorphine, norbuprenorphine (a metabolite of buprenorphine) and naloxone and were calculated using standard, non-compartmental methods. The PK non-compartmental analysis was performed using WinNonlin™ Professional version 5.2. Data permitting, the following parameters were determined:

- $t_{lag}$ lag time before the start of absorption
- $C_{max}$ maximum plasma concentration
- $t_{max}$ time to reach maximum plasma concentration
- $AUC_{0-t}$ area under the plasma concentration-time curve from time zero to the time of the last quantifiable plasma concentration
- $AUC_{0-48}$ area under the plasma concentration-time curve from time zero to 48 hours post-dose
- MR metabolic ratio

In addition, the relative bioavailability ($F_{rel}$) of formulation of the invention to Suboxone was derived based on dose-adjusted PK data.

Subjects were classified as evaluable or non-evaluable with respect to the PK evaluation by the pharmacokineticist after examining the subjects PK profiles and taking into account any deviations with respect to those listed above. The PK analyses based on the PK population included only those subjects with evaluable PK data.

Actual blood sampling times for buprenorphine, norbuprenorphine and naloxone were converted to a time from dosing (elapsed time). Elapsed times were listed by subject for each treatment, together with the individual buprenorphine, norbuprenorphine and naloxone concentrations. Elapsed times were used in the PK analysis.

The buprenorphine, norbuprenorphine and naloxone concentrations were summarised by descriptive statistics of number of missing samples, number of samples less than the lower limit of quantification (<LOQ), n, arithmetic mean, SD, CV(%), geometric mean, 95% confidence intervals (CI) for the arithmetic mean, median, minimum and maximum. All buprenorphine, norbuprenorphine and naloxone concentra-

tions <LOQ were set to zero for the purpose of calculating descriptive statistics. If at any time-point ⅓ or more of subjects had values <LOQ, descriptive statistics were not calculated.

The PK parameters $C_{max}$ $AUC_{0-t}$ and $AUC_{0-48}$ of buprenorphine, norbuprenorphine and naloxone were compared between treatments using a mixed effects Analysis of Variance (ANOVA) procedure.

Arithmetic mean (+SEM) analyte concentration-time plasma profiles are presented in linear scale plots for each analyte in FIGS. **1** (buprenorphine), **2** (norbuprenorphine) and **3** (naloxone) with both treatments included on each plot. It can be seen from these figures that, for both buprenorphine and norbuprenorphine after administration of formulation of the invention (diamonds), and Suboxone (squares), plasma concentrations of all three analytes increased to a maximum then declined in a biphasic manner.

In relation to other PK parameters:

(i) on average, the lag time was slightly shorter after treatment with formulation of the invention compared to Suboxone by 15% for buprenorphine, 29% for norbuprenorphine and 34% for naloxone;

(ii) the range of times at which maximal concentrations were attained ($t_{max}$) was similar between treatments for all analytes. Median $t_{max}$ values were less than or equal to 1 h for buprenorphine and naloxone indicating rapid sublingual absorption following administration of both formulation of the invention and Suboxone. For norbuprenorphine, $t_{max}$ was generally similar to buprenorphine after both treatments indicating metabolism of buprenorphine to norbuprenorphine was rapid;

(iii) the mean metabolite ratios exceeded 0.5 indicating extensive metabolic conversion of buprenorphine to norbuprenorphine, with conversion being 31% lower following administration of formulation of the invention compared to Suboxone. This result is significant as it means that more buprenorphine is absorbed sublingually in the case of formulation of the invention;

(iv) the doses of both buprenorphine and naloxone were lower in the formulation of the invention, but mean systemic exposure, in terms of $C_{max}$ and AUC, of buprenorphine and naloxone were higher when compared to Suboxone, and, as stated above, the values were lower for norbuprenorphine; and

(v) the mean relative bioavailabilities of formulation of the invention to

Suboxone were 1.659 and 2.056 for buprenorphine and naloxone respectively, indicating higher dose-normalised systemic exposure following administration of formulation of the invention. For norbuprenorphine the dose-normalised systemic exposure appeared to be similar between treatments with a mean relative bioavailability of 1.084. The buprenorphine result is surprising. The reported relative bioavailability of a sublingually-administered ethanol solution comprising buprenorphine (where conditions are theoretically optimised for rapid absorption over the sublingual mucosa) compared to Suboxone was reported to be 1.5 (see Compton et al, *Drug and Alcohol Dependence,* 82, 25 (2006)). The fact that the relative number reported in this study for a solid sublingual tablet was even higher than that reported for a solution is remarkable.

Disintegration time of the tablets was assessed by either a nurse or a physician by mouth inspections, and was also reported by the subjects, who were given thorough instructions of the dosing procedures prior to dosing on Day 1 in both treatment periods, including the procedures for observer and subject assessments of disintegration. Subjects were to report any premature swallowing.

The sublingual space and the tablet were examined to determine the time to disintegration. The tablet residues were characterised as ‘intact’, ‘fragments’, ‘paste like residue’ or ‘dissolved’. Inspections were carried out every 2 minutes and the findings recorded until the tablet was completely disintegrated. In addition, the subject was instructed to indicate when they thought the IMP was dissolved by raising their hand or to indicate whether they had swallowed the tablet before it was dissolved. The time of dissolution or swallowing was recorded.

Median time to non-intact tablets was 2 minutes for the formulation of the invention and was 8 minutes for Suboxone.

## SUMMARY AND CONCLUSIONS

The above-reported parameter ratios suggest that the formulation of the invention resulted in slightly higher plasma buprenorphine and naloxone concentrations and slightly lower plasma norbuprenorphine concentrations than the comparator. The former result is despite the initial dose being lower which indicates that it may be possible to reduce dose still further. Tablets comprising formulations of the invention also disintegrated faster than the comparator.

## EXAMPLE 3

Buprenorphine/Naloxone Sublingual Tablets II

3.97 g of micronized naloxone hydrochloride dihydrate was mixed together with microcrystalline cellulose (20.00 g; Avicel™ PH102 (mean particle size 100 μm), FMC Biopolymer) and croscarmellose sodium (7.20 g; AcDiSol™, FMC Biopolymer) in a tumble blender (Turbula, WAG, Switzerland) for 40 hours.

14.04 g of micronised buprenorphine hydrochloride was mixed together with mannitol (130.30 g; Pearlitol™ 200SD, Roquette, Lestrem, France), sieved citric acid (6.00 g; fine granular 16/40 grade, DSM, Switzerland, Basel) and sieved (to avoid agglomeration), sodium citrate (19.50 g) Emprove™ cryst., Merck, Darmstadt, Germany) and blended in a tumble blender for 42 hours.

Menthol (2.00 g; Emprove™ cryst., Merck KGaA, Darmstadt, Germany) was mortared until a fine powder was formed and was blended with silicon dioxide, colloidal (0.20 g; Aerosil™ 200 Pharma), (1:1 volume ratio).

Sucralose (6.00 g, Merck KGaA, Darmstadt, Germany) was added to the buprenorphine premix. The naloxone premix and the rest of the silicon dioxide colloidal (2.80 g) were added by co-sieving into the buprenorphine premix. The menthol-silicon dioxide blend was added by sieving to the buprenorphine premix and all ingredients were mixed for 1 hour.

Sodium stearyl fumarate (8.00 g; Pruv™, JRS Pharma, Polanco, Spain) was then added by sieving into this mixture and mixing continued in the tumble blender for 10 minutes.

The final powder mixture was then compressed into tablets in a tablet machine (Korsch EK0) equipped with 7 mm round, flat faced, radius-edged punches, to a tablet weight of 110 mg and a tablet crushing strength of 30-35 N.

EXAMPLE 4

In Vivo Experiment

Placebo tablets prepared according to the procedure described in Example 1 above (excluding buprenorpine, but including naloxone) were first administered sublingually.

Sublingual saliva pH was measured in vivo using a Schott CG 842P pH Meter attached to a Schott Flatrode™-electrode (pH 0-14, 0-60° C.). The Flatrode™ has a super-flat membrane for surface measurements and a robust plastic shaft with a ring diaphragm, which guarantees a quick response via enhanced contact between the sample and reference. The diameter of the flat surface of the electrode is 6.0 mm giving a measuring surface of 0.28 $cm^2$.

The Flatrode was positioned (at an open mouth angle of 45°) gently behind the lower teeth, just beside the tablet in the mouth. A very gentle pressure was applied in order to measure pH in saliva rather than venous blood pH (typically pH 7.4).

pH was measured at time intervals of 0, 30, 60 and 90 seconds (over 5 seconds until a stable value was observed). Care was taken to avoid accidental withdrawal of dissolved powder by the electrode. The mouth was shut between measurements with no active swallowing.

Triplicate runs were carried out to ensure a reliable pH-profile. Between runs, the mouth was washed thoroughly with water and pH measured prior to administration to obtain a new zero-value.

The results indicated that the pH decrease peaked at around 35-40 seconds. It can be seen from FIG. **4** that the body rapidly compensates for the modified pH and also slightly overcompensates, and that the window of opportunity (i.e. the time range with a 0.5 pH unit decrease (at least) compared to resting pH) for increased solubility of buprenorphine is only about 80 seconds, starting after 10 seconds (n=4).

EXAMPLE 5

Comparative In Vitro Small-Volume Funnel Dissolution Experiment I

In addition to the sublingual tablets described in Example 3 above, two other otherwise identical batches of sublingual tablets were prepared using the same methodology, except that, in one case, the buprenorphine hydrochloride was not micronized, and in the other, no citric acid and sodium citrate were included (instead a further 12.75 mg per tablet of mannitol was included.

Tablets form the three above-mentioned tablet batches, as well as Suboxone tablets (buprenorphine 8 mg/naloxone 2 mg; Reckitt Benckiser Healthcare Ltd, Hull, UK) were placed on top of a Porosity 1 20 mm diameter silica filter in a 55 mm (upper inner diameter) glass funnel.

Potassium phosphate buffer with a pH of 6.8 (USP/NF), which mimics saliva, was allowed to drip through a soft PVC plastic tube with an inner diameter of 3 mm onto the tablets at a rate, set by a peristaltic pump (Flocon 1003), of 2 mL per minute. The distance between the end of the plastic tube and the silica filter in the funnel was set at approximately 7.5 cm, in order, along with the dripping rate, to correspond to a force similar to the pressure of the underside of the tongue. The small amounts of water involved endeavour to mimic the low amounts of water available in vivo under the human tongue.

pH was measured over time using a Mettler Toledo InLab Expert Pro electrode (pH 0-14; 0-100° C.) attached to standard Mettler Toledo 340 pH meter positioned at the outlet of the glass funnel.

To measure the release of active pharmaceutical ingredients over time from the tablets, a glass beaker equipped with a magnetic stirrer containing 490 mL of potassium phosphate buffer pH 6.8 (USP/NF) collected the drops from the funnel.



800 μL samples were withdrawn from the beaker using a calibrated micropipette at intervals of 0.5, 1.0, 1.5, 2.0, 2.5, 3.0, 3.5, 4.0, 4.5, 5.0, 10.0, 15.0 and 20.0 minutes. These samples were emptied into 1 mL vials already containing 200 μL of diluted phosphoric acid. No additional buffer was added to the collection beaker to compensate. It started with a volume of 490 mL and ended with a volume of 520 mL (the difference between 40 mL added to the beaker over 20 minutes, and 10.4 mL removed in total (13×0.8 mL) is 29.6 mL (i.e. about 30 mL)). It was decided to start at 490 mL instead of 485 mL to be as close to 500 mL for as long a period as possible. The exact individual volumes were of course calculated for each sample.

Three tablets from each of the four tablet table batches in the trial were analysed as release test samples. Amounts of buprenorphine and naloxone were measured using HPLC (Agilent 1000; Diode array-detector, gradient pump, autosampler, column oven), with a gradient method with UV detection at 210 nm.

pH was plotted over time for the following four tablet batches and the results are shown in FIG. **5** (tablets prepared according to Example 3 (squares); non-micronised buprenorphine equivalents (crosses); equivalents without citric acid/sodium citrate (diamonds); and Suboxone (triangles)). The dashed line in FIG. **5** is the superimposed in vivo profile from FIG. **4**.

The drug release profiles over the first 5 minutes for buprenorphine and naloxone are presented in FIGS. **6**, and **7**, respectively. Although Suboxone has a 23% higher drug loading than all of the other tablets, it produces a buprenorphine release after 20 minutes through the funnel of only 75% of that of the tablets according to the invention. The difference is most noticeable over the first 5 minutes.

EXAMPLE 6

Buprenorphine/Naloxone Sublingual Tablets III

336.0 g of micronized naloxone hydrochloride dihydrate was mixed together with microcrystalline cellulose (2000.0 g; Avicel™ PH102 (mean particle size 100 μm), FMC Biopolymer, Wallington, Little Island, Co. Cork, Ireland) and croscarmellose sodium (720.0 g; AcDiSol™, FMC Biopolymer, Wallington, Little Island, Co. Cork, Ireland) in a 12 L double cone blender (Sewin, Zickert systems, Kungsbacka, Sweden) for 3 hours.

Citric acid (600.0 g; fine granular 16/40 grade, DSM, Switzerland, Basel), sodium citrate (1950.0 g Emprove™ cryst., Merck, Darmstadt, Germany) and silicon dioxide, colloidal (480.0 g Aerosil™ 200 Pharma, Evonik Degussa GmbH, Rheinfelden, Germany) were deagglomerated together with Quadro comil apparatus (Quadro Engineering, Ontario, Canada) and premixed with two thirds of a pre-measured amount of mannitol (8737.3 g; Pearlitol™ 200SD, Roquette, Lestrem, France) in a 60 L double cone blender (Sewin, Zickert systems, Kungsbacka, Sweden) for 5 minutes.

1188.0 g of the micronised buprenorphine hydrochloride was added to the premix and the other third of the mannitol (4368.7 g) was added on top of the buprenorphine hydrochloride and all ingredients were mixed for 3 hours.

Menthol (200.0 g; Emprove™ cryst., Merck KGaA, Darmstadt, Germany) was milled with Quadro comill. Silicon dioxide, colloidal (20.0 g) and milled menthol (1:1 volume ratio) was processed with Quadro comill in order to deagglomerate the silicon dioxide (colloidal).

Sucralose (600.0 g, Merck KGaA, Darmstadt, Germany), the naloxone premix and the menthol-silicon dioxide blend were added to the buprenorphine premix and all ingredients were mixed for 1 hour.

Sodium stearyl fumarate (800.0 g; Pruv™, JRS Pharma, Polanco, Spain) was deagglomerated with Quadro comil and added to double cone blender and mixed for 10 minutes.

The final powder mixture was then compressed into tablets in a tablet machine (Korsch XL100, Korsch AG, Berlin, Germany) equipped with 7 mm round, flat faced, radius-edged punches, to a tablet weight of 110 mg and a tablet crushing strength of 30-35 N.

EXAMPLE 7

Buprenorphine/Naloxone Sublingual Tablets IV

200,000 100 mg buprenorphine/naloxone (4:1 dose ratio) tablets comprising a 1.4 mg dose of buprenorphine (calculated as the free base) were prepared using essentially the same procedure as described in Example 6.

EXAMPLE 8

Buprenorphine/Naloxone Sublingual Tablets V

200,000 110 mg buprenorphine/naloxone (4:1 dose ratio) tablets comprising a 5.7 mg dose of buprenorphine (calculated as the free base) were prepared using essentially the same procedure as described in Example 6.

EXAMPLE 9

Comparative In Vitro Small-Volume Funnel Dissolution Experiment II

Using the in vitro small-volume funnel dissolution procedure described in Example 5, pH profiles (measurement of pH over time) were obtained for

(a) buprenorphine/naloxone sublingual tablets prepared as described in Example 8;

(b) buprenorphine/naloxone sublingual tablets prepared essentially as described in Example 8, except that the citric acid and sodium citrate were included during the mixing step in which the two APIs are mixed together;

(c) buprenorphine/naloxone sublingual tablets prepared essentially as described in Example 8, but without citric acid (i.e. sodium citrate only);

(d) buprenorphine/naloxone sublingual tablets prepared essentially as described in Example 8, but without sodium citrate (i.e. citric acid only);

(e) buprenorphine/naloxone sublingual tablets prepared essentially as described in Example 8, except that tartaric acid (Sigma-Aldrich) was used instead of citric acid and sodium citrate; and

(f) Suboxone® film (8 mg buprenorphine/2 mg naloxone; Reckitt Benckiser Healthcare Ltd, Hull, UK).

In the case of tablets (c), and (d), an equivalent amount of mannitol was employed instead of the citric acid, and the sodium citrate, respectively, that was excluded. In the case of tablets (e), 2 mg (per tablet) of tartaric acid and an extra 10.75 mg (per tablet) of mannitol were employed.

The results are shown in FIG. **8** (tablets (a)—diamonds; tablets (b)—black triangles; tablets (c)—white triangles; tablets (d)—black squares; tablets (e)—white squares; Suboxone films (f)—circles). Also superimposed on FIG. **8** are:

(i) the in vivo profile from FIG. **4** (dashed line); and

(ii) the in vitro pH profile previously obtained for Suboxone® tablets (solid line; originally presented in FIG. **5**).

The drug release/dissolution profiles over the first 5 minutes for buprenorphine are presented in FIG. **9**. It can be clearly seen from FIGS. **8** and **9** taken together that drug dissolution correlates strongly with how much the pH is lowered during first 1 minute to 2 minutes after the start of the experiment (corresponding to sublingual administration in vivo). It can also be seen that the largest pH drop, and the highest dissolution rate, were obtained when citric acid alone was used.

The invention claimed is:

**1**. A tablet composition suitable for sublingual administration comprising:

microparticles of a pharmacologically-effective amount of buprenorphine, or a pharmaceutically-acceptable salt thereof, presented upon the surface of carrier particles, wherein microparticles of buprenorphine or a pharmaceutically acceptable salt thereof are in contact with particles comprising citric acid, wherein the buprenorphine or pharmaceutically acceptable salt thereof and the citric acid are not in the same particle;

a pharmacologically-effective amount of naloxone, or a pharmaceutically-acceptable salt thereof; and

a disintegrant selected from the group consisting of croscarmellose sodium, sodium starch glycolate, crosslinked polyvinylpyrrolidone and mixtures thereof.

**2**. The composition as claimed in claim **1**, wherein the microparticles of buprenorphine have a weight based mean diameter of less than about 15 μm.

**3**. The composition as claimed in claim **1**, wherein the carrier particles are of a size that is between about 100 and 800 μm.

**4**. The composition as claimed in claim **1**, wherein the carrier particles are water-soluble.

**5**. The composition as claimed in claim **1**, wherein the carrier particles comprise mannitol.

**6**. The composition as claimed in claim **1**, wherein the particles of citric acid are presented and act as carrier particles.

**7**. The composition as claimed in claim **1**, wherein the composition comprises particles comprising both naloxone or salt thereof and a disintegrant.

**8**. A process for preparation of a composition as defined in claim **1**, wherein mixing takes place between the microparticles of buprenorphine or salt thereof and the particles comprising citric acid, rendering them in contact with each other.

**9**. The process as claimed in claim **8**, wherein the mixing comprises dry mixing.

**10**. The process as claimed in claim **8**, which further comprises dry mixing the carrier particles with the microparticles of buprenorphine or salt thereof.

**11**. The process as claimed in claim **10** further comprising admixing the product of said dry mixing with particles comprising naloxone or salt thereof and disintegrant.

* * * * *

# United States Court of Appeals for the Federal Circuit

*Orexo AB, Orexo US Inc. v. Actavis Elizabeth LLC*, No. 2017-1333

## CERTIFICATE OF SERVICE

I, Elissa Matias, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by MILBANK, TWEED, HADLEY & MCCLOY, LLP, attorneys for Plaintiffs-Appellants to print this document. I am an employee of Counsel Press.

On **February 7, 2017,** counsel has authorized me to electronically file the foregoing **Corrected Non/Con Brief for Plaintiffs-Appellants**, with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

George C. Lombardi, Esq.
Winston & Strawn LLP
35 West Wacker Drive
Chicago IL 60601
(312) 558-5969
glombardi@winston.com

Paper copies of the Corrected Confidential Brief will also be mailed to the above principal counsel on the date as above.

This was originally filed on February 6, 2017.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court within the time provided in the Court's rules.

February 7, 2017

/s/ Elissa Matias
Counsel Press

# CERTIFICATE OF COMPLIANCE

This brief complies with the type–volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,278 words, on the basis of a count made by the word processing system used to prepare this brief, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because it is prepared in a proportionally spaced typeface using Times New Roman in Microsoft Word.

/s/ Errol B. Taylor
Errol B. Taylor
Fredrick M. Zullow
Anna Brook
Jordan P. Markham
MILBANK, TWEED, HADLEY & MCCLOY LLP
28 Liberty Street
New York, New York 10005
Telephone: 212-530-5000
Facsimile: 212-530-5219

*Attorneys for Plaintiffs-Appellants Orexo AB and Orexo US, Inc.*